# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

WAYMO LLC,

*Plaintiff,*

*v.*

UBER TECHNOLOGIES, INC.,
OTTOMOTTO LLC, and OTTO TRUCKING LLC,

*Defendant.*

Appeal from the United States District Court for the Northern District of California in case no. 3:17-CV-00939, Judge William H. Alsup.

## INTERVENOR-APPELLANT ANTHONY LEVANDOWSKI'S EMERGENCY MOTION TO STAY PENDING RESOLUTION OF APPEAL

ISMAIL RAMSEY
MILES EHRLICH
AMY CRAIG
RAMSEY & EHRLICH LLP
803 Hearst Avenue
Berkeley, CA 94710
Phone: (510) 548-3600

*Counsel for Intervenor-Appellant Anthony Levandowski*

April 12, 2017

# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, counsel of record for Intervenor-Appellant Anthony Levandowski certifies as follows:

1. The full name of every party represented by our firm is: Anthony Levandowski.

2. The names of the real parties in interest represented by our firm are:

Not applicable.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the parties represented by our firm are:

Not applicable.

4. The names of all law firms and the partners or associates that appeared for the parties represented by us in the trial court, or are expected to appear in this Court, and who have not or will not enter an appearance in this case are:

Not applicable.

Dated: April 12, 2017

Respectfully submitted,

*/s/ Amy Craig*

Miles Ehrlich
Ismail Ramsey
Amy Craig
Ramsey & Ehrlich LLP
803 Hearst Avenue
Berkeley, CA 94710
Tel: (510) 548-3600

***Counsel for Intervenor-Appellant Anthony Levandowski***

# TABLE OF CONTENTS


CERTIFICATE OF INTEREST ........ ii

TABLE OF CONTENTS ........ iii

TABLE OF AUTHORITIES ........ v

INDEX OF EXHIBITS ........ vii

INTRODUCTION ........ 1

STATEMENT OF COMPLIANCE WITH FED. R. APP. PRO. 8(a)(1) ........ 4

BACKGROUND ........ 5

A. Thursday, March 16, 2017: The Court Orders Expedited ........ 5

Discovery ........ 5

B. Wednesday, March 29, 2017: Mr. Levandowski Informs The ........ 6

Court He Will Invoke His Fifth Amendment Rights ........ 6

C. Friday, March 31, 2017: The District Court Orders Mr. ........ 7

Levandowski to Submit a Brief By the Following Tuesday At Noon ........ 7

D. Tuesday, April 4, 2017: Mr. Levandowski Files His Motion to Modify the Court's Order Requiring A Detailed Privilege Log ........ 7

E. Thursday, April 6, 2017: The District Court Heard Oral Argument ........ 8

F. Monday, April 10, 2017: The Court Denied Mr. Levandowski's Motion and Issued a 3-Day Stay Absent Intervention by the Court of Appeals ........ 8

JURISDICTION ........ 9

ARGUMENT ........ 10

I. LEGAL STANDARD ........ 10

II. DISCUSSION ........ 10

A. Mr. Levandowski's Appeal is Likely to Succeed ........ 11

1. Mr. Levandowski's Fifth Amendment Rights are Implicated ........ 12

2. Mr. Levandowski Demonstrated that the Information in Question is Privileged ........ 13

3. The Crime-Fraud Exception Does Not Apply ........ 18

4. Privilege Log Requirements Must Give Way To Constitutional Rights ....19
B. Without a Stay, Mr. Levandowski Will Suffer Irreparable Harm..................20
C. A Temporary Stay Will Not Significantly Injure..........................................20
Other Involved Parties ........................................................................................20
D. A Temporary Stay Will Not Harm the Public................................................21
CONCLUSION.......................................................................................................21
STATEMENT OF CONSENT OR OPPOSITION ................................................23
CERTIFICATE OF SERVICE ...............................................................................24

# TABLE OF AUTHORITIES

## Cases

*Church of Scientology v. United States,* 506 U.S. 9 (1992) ....................................9
*Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258 (9th Cir. 2000). ..................11
*First USA Bank, N.A. v. Paypal, Inc.*, 76 Fed. Appx. 935 (Fed. Cir. 2003).............9
*Fisher v. United States*, 425 U.S. 391 (1976) ................................................ passim
*Hewlett-Packard Co. v. Bausch & Lomb, Inc.*,
115 F.R.D. 308 (N.D. Cal. 1987)........................................................................15
*Hilton v. Braunskill*, 481 U.S. 770 (1987)............................................................10
*Holmes v. Collection Bureau of America Ltd.*, No. C 09-02540 WHA, 2010 U.S. Dist. LEXIS 4253, 2010 WL 143484 (N.D. Cal. Jan. 8, 2010)...........................15
*In re Grand Jury Proceedings (Corporation)*, 87 F.3d 377 (9th Cir. 1996)..........18
*In re Grand Jury Subpoena*, 383 F.3d 905 (9th Cir. 2004) ...................................12
*In re Grand Jury Subpoenas*, 902 F.2d 244 (4th Cir. 1990)..................................14
*In re Grand Jury*, 705 F.3d 133 (3rd Cir. 2012).......................................................9
*In re Syncor ERISA Litig*., 229 F.R.D. 636 (C.D. Cal. 2005).................................17
*In re TS Tech USA Corp.*, 551 F.3d 1315 (Fed. Cir. 2008).......................................9
*Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100 (2009)........................................20
*Nidec Corp. v. Victor Co.*, 249 F.R.D. 575 (N.D. Cal. 2007)................................14
*Nken v. Holder*, 556 U.S. 418 (2009) ...................................................................10
*OXY Res. Cal. LLC v. Superior Court*, 115 Cal. App. 4th 874 (2004)..................15
*Perlman v. United States*, 247 U.S. 7 (1918)............................................................9
*UMG Recording, Inc. v. Bertelsmann AG (In re Napster Copyright Litig.)*,
479 F.3d 1078 (9th Cir. 2007) .......................................................................20
*United States SEC v. Chin*, No. 12-cv-01336-PAB-BNB,
2012 U.S. Dist. LEXIS 182252 (D. Colo. Nov. 29, 2012).....................................17
*United States v. Austin*, 416 F.3d 1016 (9th Cir. 2005)..........................................12
*United States v. Bergonzi*, 216 F.R.D. 487 (N.D. Cal. 2003)................................14
*United States v. Doe*, 465 U.S. 605 (1984)................................................................2
*United States v. Gonzalez*, 669 F.3d 974 (9th Cir. 2012).......................... 12, 14, 24
*United States v. Griffin*, 440 F.3d 1138 (9th Cir. 2006)........................................20
*United States v. Henke*, 222 F.3d 633 (9th Cir. 2000)..................................... 12, 14
*United States v. Hubbell*, 530 U.S. 27 (2000) ................................................ passim
*United States v. Krane*, 625 F.3d 568 (9th Cir. 2010)..............................................9
*United States v. Sideman & Bancroft, LLP*, 704 F.3d 1197 (9th Cir. 2013)..........12
*United States v. Thompson*, 562 F.3d 387 (D.C. Cir. 2009).....................................9

*United States v. Zolin*, 491 U.S. 554 (1989) ........................................................... 18
*Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340 (Fed. Cir. 1999) .......................... 9

**Statutes**

18 U.S.C. § 1832 ........................................................................................................ 1
28 U.S.C. § 1295(a)(1) ................................................................................................ 9

# INDEX OF EXHIBITS


| EXHIBIT | DESCRIPTION |
|---|---|
| 1 | Transcript of March 29, 2017, hearing before the Honorable William H. Alsup (Dkt. 131) |
| 2 | Non-Party Anthony Levandowski's Notice of Motion and Motion for Modification of Court's Order Dated March 16, 2017; Declaration of John Gardner (Dkt. 147 and 147-1) |
| 3 | Transcript of April 6, 2017, hearing before the Honorable William H. Alsup (Dkt. 169) |
| 4 | Order Denying Motion to Modify Privilege Log (Dkt. 202) |
| 5 | Anthony Levandowski's Notice of Appeal (Dkt. 213) |

## INTRODUCTION

Appellant-Intervenor Anthony Levandowski is a witness in an ongoing civil dispute between Waymo LLC and Uber Technologies, Inc. (and its subsidiary, Ottomotto LLC). The complaint, which was filed by Waymo in the Northern District of California, alleges that Mr. Levandowski, a former Waymo employee, misappropriated Waymo's trade secrets and took them to Uber. *See generally Waymo v. Uber Technologies, Inc.* et al., No. 17-cv-00393-WHA (N.D. Cal.) Dkt. 23.[1] The allegations raise the specter of potential criminal liability, as they assert facts that, if proved, might make out a case that Mr. Levandowski violated 18 U.S.C. § 1832 or another similar federal or state statute. Although Mr. Levandowski is not a party to the suit, Waymo requested records from Uber, and since Mr. Levandowski is an employee of Uber, the obligation to respond runs in part to him. Accordingly, the discovery process implicates Mr. Levandowski's Fifth Amendment privilege against self-incrimination.

One aspect of Mr. Levandowski's privilege is his right to avoid the implicit

[1] Attached to this motion as exhibits are copies of the district court transcripts, filings and orders that will be central to this appeal. This motion will refer to other less-significant entries in the district court docket using the designation "Dkt." As Mr. Levandowski has not had time to perfect the entire record on appeal, he asks the Court to take judicial notice of the records and filings in the district court docket.

testimony that would accompany the production of certain records. *See United States v. Hubbell*, 530 U.S. 27, 36 (2000); *United States v. Doe*, 465 U.S. 605, 612 (1984); *Fisher v. United States*, 425 U.S. 391, 411-13 (1976). The courts recognize that "[a]lthough the contents of a document may not be privileged, the act of producing the document may be." *Doe*, 465 U.S. at 612. "By producing documents . . . the witness would admit that the papers existed, were in his possession or control, and were authentic." *Hubbell*, 530 U.S. at 36 (quotation marks omitted). Thus, when the government cannot demonstrate the existence of potentially incriminating records, or authenticate such records, without the witness's response to a discovery request, the Fifth Amendment privilege applies and the witness may refuse to respond. *Hubbell*, 530 U.S. at 36-37, 41-42; *Doe*, 465 U.S. at 613-14 & n.13; *Fisher*, 425 U.S. at 411-13.

In the district court, Mr. Levandowski raised a claim of privilege under the *Hubbell* line of cases with respect to information that was responsive to Waymo's discovery requests. Previously, Mr. Levandowski had entered into a joint-defense agreement with Uber. Mr. Levandowski claimed that certain information possessed by Uber pursuant to that agreement may implicate his Fifth Amendment rights. As some of the entries parties must usually include in a privilege log would reveal the very information that is protected under the *Hubbell* family of cases, Mr. Levandowski asked the district court to permit such entries to be redacted from

Uber's privilege log. Specifically, Mr. Levandowski asked that Uber be permitted to redact the identity of a third party that prepared a due diligence report pursuant to the joint defense agreement, as well as descriptions of items that third party reviewed. The district court refused, and on April 10, 2017, ordered Uber to produce a full privilege log by April 13 at 5:00 p.m. Pacific Standard Time "unless the court of appeals extends the deadline." Exhibit 4, Order Denying Motion to Modify Privilege Log, at 12.

To vindicate his Fifth Amendment rights, Mr. Levandowski has appealed the district court's order. Because the appeal cannot reasonably be determined before April 13, Mr. Levandowski seeks a temporary stay of the district court's order pursuant to Federal Rule of Appellate Procedure 8. Unless this Court grants the motion for a temporary stay, the issues under consideration will become moot on April 13 when the information protected by Mr. Levandowski's privilege is revealed.

## STATEMENT OF COMPLIANCE WITH FED. R. APP. PRO. 8(a)(1)

Under Federal Rule of Appellate Procedure 8, an appellant seeking a stay "must ordinarily move first in the district court" for relief. Fed. R. App. Pro. 8(a)(1). Mr. Levandowski has satisfied this rule. At the conclusion of the hearing on Mr. Levandowski's motion, counsel made an oral request that the district court stay its order. Exhibit 3, Transcript of April 6, 2017, Hrg. Tr., at 50. The district court indicated that it would consider the matter. *Id*. at 50-52. The district court's written order addressed the requested stay by ruling that a complete privilege log must be produced by April 13, 2017 at 5:00 p.m. "unless the court of appeals extends the deadline." Exhibit 4, Order Denying Motion to Modify Privilege Log, at 12.

## BACKGROUND

In March 2017, Waymo sued Uber, Ottomotto, and Otto Trucking, alleging among other things that Mr. Levandowski stole trade secrets when he stopped working for Waymo and went to work for Uber in its autonomous-driving car program. Dkt. 23 at ¶ 10. Waymo did not name Mr. Levandowski as a defendant, but it alleged that Mr. Levandowski downloaded more than 14,000 highly confidential and proprietary files in December 2015 before leaving the company in January 2016. *Id*. at ¶ 4. Waymo sought expedited discovery and a preliminary injunction stemming from its claims. Dkt. 24, 26. The Court granted Waymo's request for expedited discovery, Dkt. 61, and, when Mr. Levandowski invoked his Fifth Amendment rights, established an extremely abbreviated briefing schedule to adjudicate his claim, Dkt. 132.

### A. Thursday, March 16, 2017: The Court Orders Expedited Discovery

On Thursday, March 16, 2017, the district court ordered expedited discovery. It specifically ordered Uber to produce "all files and documents downloaded by Anthony Levandowski [a non-party] . . . before leaving plaintiff's payroll and thereafter taken by them." Dkt. 61 at 3, ¶ 4. The district court's standing order required prompt production of a privilege log containing, among other things, the "persons making or receiving the privileged or protected communication." Exhibit 4, Order Denying Motion to Modify Privilege Log, at 2-

3 (quoting the standing order).

**B. Wednesday, March 29, 2017: Mr. Levandowski Informs The Court He Will Invoke His Fifth Amendment Rights**

After learning of the expedited discovery schedule, Mr. Levandowski informed the district court, at a hearing on Wednesday March 29, 2017, that he would invoke his Fifth Amendment rights in response to Waymo's discovery requests and that Uber could not unilaterally waive his privileges over certain information and materials. Counsel explained that Mr. Levandowski and Uber obtained a due diligence report prepared by a third party that may (or may not) have referenced the collection of allegedly downloaded documents. Exhibit 1, March 29, 2017, Hrg. Tr., at 12:22-13:5. Uber explained that because the due diligence report itself was privileged, it would not be producing it, but would list it on a privilege log. *Id.*

Mr. Levandowski asserted that the disclosure on the privilege log of information about the due diligence report, as required by the Court's March 16 Order, would violate his Fifth Amendment rights under the *Hubbell* and *Fisher* line of cases by revealing the existence, location, or possession of evidence. *Id.* at 5:19-6:18; 26:18-27:2. Further, to the extent Uber had received information protected from disclosure by the Fifth Amendment, the company could not disclose that information in a privilege log because Uber gained that information

under the auspices of a common interest agreement among Uber, Mr. Levandwoski, and others. *Id.* at 25:3-12.

### C. Friday, March 31, 2017: The District Court Orders Mr. Levandowski to Submit a Brief By the Following Tuesday At Noon

On Friday, March 31, the Court ordered Mr. Levandowski to file "[a]ny motion under the Fifth Amendment to suspend the production or privilege log requirement" by noon on the following Tuesday, April 4, 2017. Dkt. 132 at 1:21-22.

### D. Tuesday, April 4, 2017: Mr. Levandowski Files His Motion to Modify the Court's Order Requiring A Detailed Privilege Log

Mr. Levandowski filed a formal motion to modify the Court's March 16 discovery order to prevent Uber from disclosing any information provided by Mr. Levandowski in the course of the common interest agreement. Exhibit 2, Levandowski's Motion to Modify Court's Order. The motion specifically sought to prohibit the disclosure of information concerning the due diligence report, including the identity of the third party who conducted any such due diligence review, whether Mr. Levandowski possessed any documents that were reviewed by the third party, and the identity of any of Mr. Levandowski's possessions that may have been reviewed. *Id*.

The district court ordered plaintiff to file its response the next day, April 5, by 4 p.m., and set a hearing on the motion the day after, on April 6, 2017, at 9:30

a.m. Dkt. 148. The district court's schedule did not permit Mr. Levandowski to file a reply brief. *Id*. In advance of the hearing, Mr. Levandowski filed a motion for permissive intervention under Federal Rule of Civil Procedure 24(b). Dkt. 151.

### E. Thursday, April 6, 2017: The District Court Heard Oral Argument

At the hearing on Thursday, April 6, the district court heard oral argument on Mr. Levandowski's motion and granted Mr. Levandoswki's motion to intervene. Dkt. 167. The court took Mr. Levandowski's substantive motion under submission. *Id*.

### F. Monday, April 10, 2017: The Court Denied Mr. Levandowski's Motion and Issued a 3-Day Stay Absent Intervention by the Court of Appeals

The following Monday, April 10, the Court denied Mr. Levandowski's motion to modify the March 16 order. Exhibit 4, Order Denying Motion to Modify Privilege Log, at 12. It further ordered Uber to produce a complete privilege log by April 13, 2017 at 5:00 p.m. "unless the court of appeals extends the deadline." *Id.* at 23-24.

## JURISDICTION

Jurisdiction over this appeal lies in this Court pursuant to 28 U.S.C. § 1295(a)(1) because Waymo's complaint includes claims of patent infringement. *See* Dkt. 23 (Third, Fourth and Fifth Causes of Action); *Zenith Elecs. Corp. v. Exzec, Inc.*, 182 F.3d 1340, 1346 (Fed. Cir. 1999). Because the appeal does not raise issues that are unique to patent law, this Court applies the law of the regional circuit, in this case the Ninth Circuit. *See In re TS Tech USA Corp.*, 551 F.3d 1315, 1319 (Fed. Cir. 2008).

The district court's interlocutory order is appealable under the *Perlman* doctrine, which "allows an outsider with a strong interest in the protection of a subpoenaed party's documents, but who is not subject to the order directing discovery, to intervene in that action and appeal the order." *First USA Bank, N.A. v. Paypal, Inc.*, 76 Fed. Appx. 935, 936 (Fed. Cir. 2003) (unpublished) (citing *Perlman v. United States*, 247 U.S. 7 (1918) and *Church of Scientology v. United States*, 506 U.S. 9 (1992)); *see also, e.g., In re Grand Jury*, 705 F.3d 133, 143-44 (3rd Cir. 2012); *United States v. Krane,* 625 F.3d 568, 573 (9th Cir. 2010); *United States v. Thompson*, 562 F.3d 387, 392 (D.C. Cir. 2009).

## ARGUMENT

A stay of the district court's order is necessary to permit Mr. Levandowski to obtain the relief to which he is entitled in this appeal. Without a stay, on April 13, Uber will be forced to disclose the identity of its joint defense privileged due diligence agent and details about the information that agent collected, thereby providing a link in a chain to evidence that could potentially incriminate Mr. Levandowski. There is no unringing this bell. If the information is disclosed to Waymo, the issues raised by Mr. Levandowski's appeal before this Court will be moot.

### I. LEGAL STANDARD

This Court balances four factors in determining whether to grant a stay of a district court order: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987). The first two factors are the most important. *Nken v. Holder*, 556 U.S. 418, 434 (2009).

### II. DISCUSSION

The four-factor *Hilton* test favors a stay in this matter. *First*, the district court erred in its resolution of Mr. Levandowski's motion, and thus this appeal is

likely to succeed. *Second*, Mr. Levandowski will be irreparably harmed in the absence of a stay, since on April 13 the privileged information that lies at the heart of this appeal will irrevocably be disclosed. *Third*, a temporary stay will work no substantial injury on the parties involved in the underlying litigation. *Fourth*, the public has no strong interest in the disclosure of matters covered by Mr. Levandowski's Fifth Amendment privilege.

### A. Mr. Levandowski's Appeal is Likely to Succeed

The first factor militates strongly in favor of a stay. As Mr. Levandowski will demonstrate, if he has the opportunity to pursue this appeal without it becoming moot on April 13, the district court erred in denying his motion.

The district court recognized several "uncontroversial" propositions of law that governed the motion at bench:

> *First*, the Fifth Amendment privilege against self-incrimination can be asserted in a civil proceeding when "the person invoking the privilege reasonably believes that his disclosures could be used in a criminal prosecution, or could lead to other evidence that could be used in that manner." *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1263 (9th Cir. 2000). *Second*, an individual may invoke the Fifth Amendment to avoid producing documents on the basis that the act of production "may have a compelled testimonial aspect" as to that individual. *United States v. Hubbell*, 530 U.S. 27, 36 (2000); *Fisher v. United States*, 425 U.S. 391, 410 (1976). *Third*, the attorney-client privilege protects "[c]onfidential disclosures by a client to an attorney made in order to obtain legal assistance," so as to "encourage clients to make full disclosure to their attorneys." *Fisher*, 425 U.S. at 403. *Fourth*, the joint-defense privilege or "common interest" privilege can extend the attorney-client privilege such that it "protects not only the confidentiality of communications passing from a party to his or her

> attorney but also 'from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel.'" *United States v. Gonzalez*, 669 F.3d 974, 978 (9th Cir. 2012) (quoting *United States v. Austin*, 416 F.3d 1016, 1021 (9th Cir. 2005), and *United States v. Henke*, 222 F.3d 633, 637 (9th Cir. 2000)).

Exhibit 4, Order Denying Motion to Modify Privilege Log, at 6. Unfortunately, however, the district court concluded that these principles were effectively washed away in this case because the discovery request in question seeks information from Uber rather than Mr. Levandowski himself. *Id*. at 7-12. That conclusion was erroneous.

### 1. Mr. Levandowski's Fifth Amendment Rights are Implicated

The centerpiece issue under the *Hubbell* line of cases is whether revealing the information in question could possibly incriminate Mr. Levandowski. *See, e.g., Hubbell*, 530 U.S. at 36; *Fisher*, 425 U.S. at 410; *United States v. Sideman & Bancroft, LLP*, 704 F.3d 1197, 1201-02 (9th Cir. 2013). Mr. Levandowski made that claim in the district court, *see* Exhibit 2, *passim*, and the court's order made no effort to rebut the claim. As the burden of overcoming a Fifth Amendment claim falls on the party seeking disclosure, *see Sideman & Bancroft,* 704 F.3d at 1202 (citing *In re Grand Jury Subpoena*, Dated Apr. 18, 2003, 383 F.3d 905, 910 (9th Cir. 2004)), this analysis need not proceed further.

### 2. Mr. Levandowski Demonstrated that the Information in Question is Privileged

Instead of grappling with the Fifth Amendment issues, the district court focused its analysis on a secondary point. The court contended that, under *Fisher*, if a party has transferred materials to an attorney, in order to invoke the Fifth Amendment he must demonstrate that a privilege protected the communication of the materials to the attorney. Exhibit 4, Order Denying Motion to Modify Privilege Log, at 7-8. As an initial matter, it is far from clear that the Ninth Circuit takes as strict a view of this requirement as did the district court. *See Sideman & Bancroft*, 704 F.3d at 1201 (holding that the Fifth Amendment protection "extends to prevent an individual's attorney from being compelled to produce documents if that production would violate the individual's Fifth Amendment rights"). In any event, however, even accepting the district court's view of the law, its conclusion was unwarranted.

The district court's analysis primarily appears to consider Mr. Levandowski's relationship with his own attorney. But that is not really the question. The attorneys who must respond to the discovery requests at issue are *Uber*'s attorneys, and Mr. Levandowski has asserted that *they* have possession of the relevant information under a common interest privilege.

Common interest or joint-defense agreements are "an extension of the attorney-client privilege." *Henke*, 222 F.3d at 637. "A joint defense agreement

establishes an implied attorney-client relationship" between individuals and the attorneys of other parties to the agreement — here, between Mr. Levandowski and Uber's attorneys. *Id*.

The common interest privilege "applies where (1) the communication is made by separate parties in the course of a matter of common interest; (2) the communication is designed to further that effort; and (3) the privilege has not been waived." *United States v. Bergonzi*, 216 F.R.D. 487, 495 (N.D. Cal. 2003); *see also Henke*, 222 F.3d at 637. A common interest or joint defense agreement is permissible in many circumstances. It does not need to be in writing; it "may be implied from conduct and situation, such as attorneys exchanging confidential communications from clients who are or potentially may be codefendants or have common interests in litigation." *Gonzalez*, 669 F.3d at 979 (internal citations omitted). Nor does it matter whether the litigation in question is civil or criminal, or even whether the parties would align on the same side of the pleadings. *Id*. (*citing In re Grand Jury Subpoenas*, 902 F.2d 244, 249 (4th Cir. 1990)). Indeed, the joint defense privilege applies even if litigation is not in the offing at the time of the agreement between the parties. *Nidec Corp. v. Victor Co.*, 249 F.R.D. 575, 578 (N.D. Cal. 2007) ("The protection of the privilege under the community of interest rationale [ ] is not limited to joint litigation preparation efforts. It is applicable whenever parties with common interests join forces for the purpose of

obtaining more effective legal assistance.”). In all of these circumstances, it is sufficient that the legal interests of the parties invoking the privilege are aligned. *See Holmes v. Collection Bureau of America Ltd.*, No. C 09-02540 WHA, 2010 U.S. Dist. LEXIS 4253, 2010 WL 143484 (N.D. Cal. Jan. 8, 2010) (finding joint defense privilege where “counsel for both defendants submitted sworn declarations that they agreed to pursue a joint defense strategy . . . and to communicate with each other regarding their shared legal interests”).

Courts have expressly held that information shared between individuals and companies in the context of a potential acquisition can fall within the ambit of a common interest privilege’s protections. *See, e.g., Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 115 F.R.D. 308, 310, 312 (N.D. Cal. 1987) (no waiver of attorney-client privilege when defendant, Bausch & Lomb, disclosed a patent opinion letter to a nonparty during negotiations for the purchase of a division of Bausch & Lomb); *OXY Res. Cal. LLC v. Superior Court*, 115 Cal. App. 4th 874, 898-899 (2004) (the common interest “nonwaiver principle” applies to information disclosed in pre-acquisition communications). The determinative factor is whether the communication was “designed to further a joint legal effort” or “in the course of formulating a common legal strategy.” *See Nidec Corp.*, 249 F.R.D. at 579 (discussing *Hewlett-Packard*); *see also OXY Res. Cal. LLC*, 115 Cal. App. 4th at 898-99.

Mr. Levandowski submitted sufficient evidence — in a very short timeframe — to establish that he communicated information to Uber's attorneys as part of a common interest agreement. Mr. Levandowski produced the sworn declaration of his attorney John Gardner, who presented the court with a written joint-defense agreement between Mr. Levandowski, Uber, and others. *See* Exhibit 2, Levandowski's Motion to Modify Court's Order. Mr. Gardner attested that he represented Mr. Levandowski "in connection with Uber's acquisition" of Mr. Levandowski's company in 2016. *Id.*, Gardner Declaration attached to Levandowski's Motion, at ¶ 2. The joint-defense agreement expressly states, among many other clauses, that it was entered "in contemplation of potential investigations, litigation, and/or other proceedings relating to the proposed transactions between Ottomotto, Otto Trucking and Uber and/or any affiliates of Uber." *Id.* & Ex. A to the Gardner Declaration. And Mr. Gardner swore that "a third party prepared a due diligence report that may (or may not) have referenced documents reviewed pursuant to the common interest privileged created under the joint-defense agreement." *Id.* ¶ 4. Mr. Levandowski also told the district court, in his motion, that

> [t]o the extent that Mr. Levandowski *may have* produced any documents for review by a third party hired by counsel for the common purpose of obtaining legal advice, his doing so would have conveyed the same *implicit testimony* that accompanies every act of production—namely, a tacit assertion that documents exist, that they were within his possession, and that they were responsive to a request

> or question posed as part of the privileged due diligence effort.

*Id.,* Levandowski's Motion, at 12 (emphasis in original). All of this evidence plainly establishes that the information at issue in this litigation was provided to Uber as part of a valid common interest agreement.

The district court faulted Mr. Levandowski for failing to provide even more specific evidence under oath about the particulars of his communications with his own and Uber's attorneys. *See* Exhibit 4, Order Denying Motion to Modify Privilege Log, at 10. But the district court's demanding approach would set up an unreasonable Catch-22: it would require litigants to reveal the very information protected by the privilege in order to establish the predicates of the privilege which, in turn, protects against that information's disclosure. That is not the law. *See United States SEC v. Chin*, No. 12-cv-01336-PAB-BNB, 2012 U.S. Dist. LEXIS 182252 at *26 (D. Colo. Nov. 29, 2012) (finding that the Fifth Amendment and *Hubbell* prohibit requiring a respondent to submit a privilege log that lays out the tacit testimony inherent in production); *In re Syncor ERISA Litig*., 229 F.R.D. 636, 649 (C.D. Cal. 2005) (rejecting a motion to compel a privilege log because "requiring defendant [ ] to produce a privilege log listing responsive documents may incriminate defendant [ ] by forcing him to 'admit that the documents exist, are in his possession or control, and are authentic'").

### 3. The Crime-Fraud Exception Does Not Apply

At some places in its order, the district court suggested that the type of relief Mr. Levandowski sought would permit a litigant to, for example, "obstruct justice." Exhibit 4, Order Denying Motion to Modify Privilege Log, at 5. That concern is misplaced. As an initial matter, the very concept advanced by the court appears to disparage the central tenet of the *Hubbell* family of Supreme Court precedents, which recognize that a person has a *constitutional right* to withhold implicit testimony that could be incriminating. In any event, the heart of the district court's concern is largely alleviated by the crime-fraud exception to the attorney-client privilege, which "assure[s] that the seal of secrecy between lawyer and client does not extend to communications made for the purpose of getting advice for the commission of a fraud or crime." *United States v. Zolin*, 491 U.S. 554, 563 (1989) (citation and quotation marks omitted).

To the extent that the district court intended to suggest that the crime-fraud exception to the attorney-client privilege might apply to these JDA communications, plaintiff Waymo had the burden of proof to establish the application of this exception. *See In re Grand Jury Proceedings (Corporation)*, 87 F.3d 377, 381 (9th Cir. 1996). To meet its burden, Waymo needed to demonstrate that (1) "the client was engaged in or planning a criminal or fraudulent scheme when it sought the advice of counsel to further the scheme," and (2) there was

"reasonable cause to believe that the attorney's services were utilized . . . in furtherance of the ongoing unlawful scheme." *Id.* (internal citations and punctuation omitted). Waymo wholly failed to make this showing.

4. Privilege Log Requirements Must Give Way To Constitutional Rights

The district court failed to recognize that its privilege log requirement would require the disclosure of precisely the information that is subject to Mr. Levandowski's Fifth Amendment privilege — for example, the location and authorship of potentially incriminating records. Courts must be sensitive to this issue, lest the rote application of discovery rules take precedence over the Constitution. Although in the usual course a privilege log is a useful tool for litigating claims of privilege, that tool must be employed in a manner that maintains the privilege in question. *Chin*, 2012 U.S. Dist. LEXIS 182252 at *26 (holding that requiring subpoenaed parties "to provide a detailed privilege log of the documents claimed to be subject to the protections of the Fifth Amendment . . . could be incriminating, and falls within the protection against self-incrimination"); *see also* Rule 26(b)(5)(A)(ii) (recognizing that litigants should not be required to log "information itself privileged or protected"). We respectfully submit that the district court failed to strike the proper balance between rights and procedures.

For all of these reasons, Mr. Levandowski is likely to succeed in this appeal.

### B. Without a Stay, Mr. Levandowski Will Suffer Irreparable Harm

The second factor is perhaps the simplest to adjudicate. "[O]nce privileged materials are ordered disclosed, the practical effect of the order is often 'irreparable by any subsequent appeal.'" *UMG Recording, Inc. v. Bertelsmann AG (In re Napster Copyright Litig.)*, 479 F.3d 1078, 1088 (9th Cir. 2007) (quoting *United States v. Griffin*, 440 F.3d 1138, 1142 (9th Cir. 2006)) *abrogated in part on other grounds by Mohawk Indus., Inc. v. Carpenter*, 558 U.S. 100 (2009). That would certainly be true here; if this Court does not order a stay, then the privileged matters will be disclosed to Waymo on April 13, 2017, and the cat will be out of the proverbial bag.

### C. A Temporary Stay Will Not Significantly Injure Other Involved Parties

A delay in resolving the question at issue in this appeal will not work any substantial injury to the other parties in the litigation. Mr. Levandowski recognizes that the district court has set a swift pace for the preliminary injunction proceedings below. *See, e.g.,* Dkt. 61. But the dispute over Mr. Levandowski's privileges is but a small piece of that larger litigation, and a small delay while this Court considers the issue will not significantly hamper the litigation. And as a practical matter, the parties do not need the information at issue to assess the validity of the asserted privilege claims. Mr. Levandowski's motion has fully set

out the basis of his privilege claims, and thus the purpose of the privilege log has already been served. Further, any concerns about this factor could be mitigated by setting an accelerated schedule for the briefing on appeal — an accommodation to which Mr. Levandowski would not object.

### D. A Temporary Stay Will Not Harm the Public

Finally, Mr. Levandowski can discern no reason why a temporary stay of the district court's order would undermine the public's interests. To the contrary, given the importance of the underlying dispute here — the right to invoke the protections of the Fifth Amendment to avoid the disclosure of incriminating testimonial evidence — the public would be best served if the court allowed sufficient time to allow this issue to be fully briefed and heard.

## CONCLUSION

For all of the above reasons, Mr. Levandowski submits that the Court should temporarily stay parts 2 and 3 of the district court's order, thus relieving Uber of the duty to file a privilege log containing the disputed information. If the Court is so inclined, Mr. Levandowski would not object to an accelerated briefing schedule for the substantive briefs on appeal.

Dated: April 12, 2017

Respectfully submitted,

*/s/ Amy Craig*

Miles Ehrlich
Ismail Ramsey
Amy Craig
Ramsey & Ehrlich LLP
803 Hearst Avenue
Berkeley, CA 94710
Tel: (510) 548-3600

***Counsel for Intervenor-Appellant Anthony Levandowski***

## STATEMENT OF CONSENT OR OPPOSITION

Pursuant to Federal Circuit Rule 27(a)(5), I hereby certify that counsel for Mr. Levandowski conferred with counsel for Uber concerning the relief requested in this motion. Uber does not take a position with respect to the relief requested in this motion, but stated it did not intend to file an opposition brief. Counsel for Mr. Levandowski also conferred with counsel for Waymo. Waymo opposes the relief requested in this motion, and intends to file a brief in opposition.

Dated: April 12, 2017

*/s/ Miles Ehrlich*

Miles Ehrlich
Attorney for Intervenor-Appellant
Anthony Levandowski

# CERTIFICATE OF SERVICE

I hereby certify that I filed the foregoing Brief for Intervenor-Appellant Anthony Levandowski with the Clerk of the United States Court of Appeals for the Federal Circuit via the CM/ECF system and served a copy on counsel of record, this 12th day of April, 2017, by the CM/ECF system and by electronic mail to the parties on service list below.


Charles Kramer Verhoeven
Andrew Michael Holmes
David Andrew Perlson
Felipe Corredor
Grant Nicholas Margeson
James Dubois Judah
Jeffrey William Nardinelli
John William McCauley, IV
John M. Neukom
Jordan Ross Jaffe
Lindsay Cooper
Melissa J. Baily
**Quinn Emanuel Urquhart & Sullivan, LLP**
50 California Street, 22nd Floor
San Francisco, CA 94111
Phone: (415) 875-6600
charlesverhoeven@quinnemanuel.com
drewholmes@quinnemanuel.com
davidperlson@quinnemanuel.com
felipecorredor@quinnemanuel.com
grantmargeson@quinnemanuel.com
jamesjudah@quinnemanuel.com
jeffnardinelli@quinnemanuel.com
johnmccauley@quinnemanuel.com
johnneukom@quinnemanuel.com
jordanjaffe@quinnemanuel.com
lindsaycooper@quinnemanuel.com
melissabaily@quinnemanuel.com

*Attorneys for Waymo LLC*

Arturo J. Gonzalez
Matthew Ian Kreeger
Daniel Pierre Muino
Eric Akira Tate
Esther Kim Chang
Michael A. Jacobs
**Morrison & Foerster LLP**
425 Market Street
San Francisco, CA 94105
Phone: (415) 268−7000
agonzalez@mofo.com
mkreeger@mofo.com
dmuino@mofo.com
etate@mofo.com
echang@mofo.com
mjacobs@mofo.com

*Attorneys for Uber Technologies, Inc., Otto Trucking LLC, and Ottomoto LLC*

Hamish Hume
Jessica E Phillips
Kyle Smith
**Boies Schiller and Flexner LLP**
1401 New York Ave., NW
Washington, DC 20005
Phone: (202) 237−2727
hhume@bsfllp.com
jphillips@bsfllp.com
ksmith@bsfllp.com

*Attorneys for Uber Technologies, Inc., Otto Trucking LLC, and Ottomoto LLC*

Karen Leah Dunn
Martha Lea Goodman
**Boies, Schiller and Flexner LLP**
5301 Wisconsin Avenue, NW
Washington, DC 20015
Phone: (202) 237−2727
kdunn@bsfllp.com
mgoodman@bsfllp.com

*Attorneys for Uber Technologies, Inc., Otto Trucking LLC, and Ottomoto LLC*

Rudolph Kim
**Morrison & Foerster LLP**
755 Page Mill Road
Palo Alto, CA 94304
Phone: (650) 813−5869
rudykim@mofo.com

*Attorneys for Uber Technologies, Inc., Otto Trucking LLC, and Ottomoto LLC*

Meredith Richardson Dearborn
**Boies Schiller Flexner LLP**
435 Tasso Street, Suite 205
Palo Alto, CA 94301
Phone: (650) 445−6400
mdearborn@bsfllp.com

*Attorneys for Uber Technologies, Inc., Otto Trucking LLC, and Ottomoto LLC*

Michelle Ching Youn Yang
**Morrison Foerster LLP**
2000 Pennsylvania Avenue, NW
Washington, DC 20006
Phone: (202) 887−1537
myang@mofo.com

*Attorneys for Uber Technologies, Inc., Otto Trucking LLC, and Ottomoto LLC*

Michael Darron Jay
**Boies Schiller & Flexner LLP**
401 Wilshire Boulevard, Suite 850
Santa Monica, CA 90401
Phone: (310) 752−2400
mjay@bsfllp.com

*Attorneys for Uber Technologies, Inc., Otto Trucking LLC, and Ottomoto LLC*

Wendy Joy Ray
**Morrison & Foerster LLP**
707 Wilshire Boulevard Suite 6000
Los Angeles, CA 90017
Phone: (213) 892-5200
wray@mofo.com

*Attorneys for Uber Technologies, Inc.,*
*Otto Trucking LLC, and Ottomoto LLC*

Dated: April 12, 2017

*/s/ Amy Craig*
AMY CRAIG
RAMSEY & EHRLICH LLP
*Counsel for Intervenor-Appellant*
*Anthony Levandowski*

# EXHIBIT 1

**Pages 1 - 40**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE WILLIAM H. ALSUP, JUDGE

WAYMO LLC,

Plaintiff,

VS.

UBER TECHNOLOGIES, INC.; OTTOMOTTO LLC; OTTO TRUCKING LLC,

Defendants.

**No. C 17-0939 WHA**

San Francisco, California
Wednesday, March 29, 2017

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:
QUINN, EMANUEL, URQUHART & SULLIVAN LLP
50 California Street - 22nd Floor
San Francisco, California 94111
**BY: CHARLES K. VERHOEVEN, ESQUIRE**
**DAVID A. PERLSON, ESQUIRE**

For Defendants Uber Technologies, Inc.; Ottomotto LLC; Otto Trucking LLC:
MORRISON & FOERSTER
425 Market Street
San Francisco, California 94105
**BY: ARTURO J. GONZÁLEZ, ESQUIRE**

For Defendants Uber Technologies, Inc. and Ottomotto LLC:
BOIES SCHILLER FLEXNER LLP
1401 New York Avenue, N.W.
Washington DC 20005
**BY: KAREN L. DUNN, ESQUIRE**

(Appearances continued on next page)

Reported By: Katherine Powell Sullivan, CSR #5812, RPR, CRR
Official Reporter - U.S. District Court

**APPEARANCES (CONTINUED):**

For Anthony Levandowski:

RAMSEY & EHRLICH LLP
803 Hearst Avenue
Berkeley, California 94710

**BY: MILES EHRLICH, ESQUIRE**
**ISMAIL RAMSEY, ESQUIRE**

**Wednesday - March 29, 2017** **2:05 p.m.**

**P R O C E E D I N G S**

---000---

**THE CLERK:** Calling Civil Action 17-0939 WHA, Waymo versus Uber Inc., et al. On for an in-camera hearing.

Counsel, can you please state your appearances.

**MR. VERHOEVEN:** Good afternoon, Your Honor. Charles Verhoeven. With me is David Perlson, from Quinn Emanuel, representing the plaintiff, Waymo. We also have Shana Staton who is in house at Google, back there.

**THE COURT:** Thank you. Welcome to you.

**MR. GONZÁLEZ:** Good afternoon, Your Honor. Arturo González from Morrison & Foerster, on behalf of the Uber entities. And I'd like to introduce Your Honor to our new co-counsel.

**MS. DUNN:** Good afternoon, Your Honor. Karen Dunn, of Boies Schiller Flexner, on behalf of Uber and Ottomotto.

**THE COURT:** Welcome to you.

**MR. EHRLICH:** Good afternoon, Your Honor. Miles Ehrlich and Ismail Ramsey appearing to represent Anthony Levandowski individually to protect interests we think are at stake in upcoming discovery.

**THE COURT:** This is both of you represent him; is that correct?

**MR. EHRLICH:** Both of us, correct, Your Honor.

**THE COURT:** All right. Thank you. Welcome.

So we are here on the record. I cannot promise anyone that this will stay under seal. You have made a request that we exclude the public. I have done that on the come. But I cannot promise you that once I hear all of this that I'm going to agree that anything should stay under seal.

So go ahead. If you wish to make a presentation, I'm all ears.

**MR. GONZÁLEZ:** Thank you, Your Honor. We appreciate that.

Your Honor, we want to talk about two things. One pertains to the document production. You've ordered us to produce documents by this Friday. And that issue is relevant to the second point we want to briefly address, which is our request that you hear the petition to compel arbitration on an expedited basis.

I want to start briefly with our document production, which is due on Friday. We are making good progress. And I am expecting that by Friday we will be able to produce documents that are at Uber that are responsive to the Court's order.

Now --

**THE COURT:** Responsive or all documents?

**MR. GONZÁLEZ:** Well --

**THE COURT:** That's a cleverly worded thing. I didn't just fall off the turnip truck. I know what you're telling me.

That means you're not going to produce everything.

**MR. GONZÁLEZ:** Well, and here's why: We don't have some of these documents that are in the complaint and in the motion for preliminary injunction. We, Uber, do not have those.

**THE COURT:** Who does have them?

**MR. GONZÁLEZ:** Well --

**THE COURT:** How about Mr. Levandowski, does he have them?

**MR. EHRLICH:** Your Honor, maybe I should step up.

We -- given the nature of the allegations in this case, we recognize that there's potential for criminal action. We're brought in to advise him in that regard.

We have notified counsel for Uber that we are broadly asserting, for the time being -- until we can make a final determination, we're broadly asserting Mr. Levandowski's Fifth Amendment rights as to any documents he may possess and control that are of relevance to this action.

We are specifically asserting that under the authority of the *Hubbell* and *Fisher* line of cases from the Supreme Court that protect against compelled disclosure that would identify the existence, location or possession of any responsive documents.

There is no pending subpoena against Mr. Levandowski. We're advising the Court and the parties that to the extent

there is one coming, we would like to brief the *Hubbell* issues, the Fifth Amendment issues before the Court. Consistent with the way it's done in criminal practice, we'd ask for the opportunity to do ex parte briefing to establish that it is a valid assertion of the privilege.

But the separate issue that causes us concerns, that we have advised Uber's counsel about, is to the extent -- *Hubbell* and the Fifth Amendment protect an individual's right not to be forced to disclose the existence, location or identity of documents.

To the extent Uber's counsel or Uber has any information about those issues, the very issues that *Hubbell* protects, that is information that was only acquired through a protected common interest privilege. And in order to do our job to protect the viability of -- of this very important constitutional right, we also need to very broadly protect against inadvertent -- even inadvertent waiver of information that could tend to undermine those Fifth Amendment protections.

**THE COURT:** What are you going to do about this problem?

I don't know about the *Hubbell* thing. I have to study up on that. Maybe you're right. I don't know. I'm not saying you're right.

In about May 3rd -- when May 3rd comes, if your side is taking some kind of Fifth Amendment -- they have a record over

there of theft. That's all they need. They don't need anything from your side.

And if you think for a moment that I'm going to stay my hand, because your guy is taking the Fifth Amendment, and not issue a preliminary injunction to shut down what happened here, you're wrong.

This is a very serious -- now, some of the things in your motion are bogus. You've got things in there like lists of suppliers as trade secrets. Come on. It undermines the whole thing.

But there are some things in that motion that are very serious. They are genuine trade secrets. And if you don't come in with a denial, you're probably looking at a preliminary injunction.

**MR. EHRLICH:** Your Honor, I understand the Court's comments. I just want to make very clear --

**THE COURT:** Go ahead.

**MR. EHRLICH:** -- Mr. Ramsey and I do not represent Uber. We do not represent Ottomotto. We do not represent --

**THE COURT:** You represent somebody who is important in that organization. If his truck driving company gets shut down because of theft of trade secrets on a record that he's not willing to deny, too bad for him. Too bad.

Listen, I'm not sympathetic to it. You represent somebody who's in a mess. Well, they're in a mess too. And there's

some equities here. So you better get your act together on this.

**MR. EHRLICH:** Your Honor --

**THE COURT:** The fact that he's facing criminal liability, too bad. I've got a civil case where they want a preliminary injunction, and they made a record that deserves something. I'm not saying it deserves everything. But if you don't deny it, they're going to get something.

**MR. EHRLICH:** Understood, Your Honor. And -- and Mr. Ramsey and I are in a position very often to represent people who have these sorts of issues. It is a valid constitutional right.

And I want to say there is -- there is an opportunity for the Court to order compulsion, to compel production so long as the Court --

**THE COURT:** I already have.

**MR. EHRLICH:** Well --

**THE COURT:** I sent out an order saying that these documents have got to be produced at least by Uber.

**MR. EHRLICH:** Your Honor, let me address that.

The order would need to be to Anthony Levandowski. And that order would need to carry the protections --

**THE COURT:** No, no.

**MR. EHRLICH:** -- of 6003.

**THE COURT:** You've got it all wrong. You're trying to

put the burden on me and on them. They have made a record. You are not even a party to the case. Uber is the party to the case. And on this record there is a good chance that Uber is going to get hit with a preliminary injunction come May 3rd.

And if you want to deny the facts, go ahead. If you want to stand moot because of the Fifth Amendment, that's your privilege. But you're not going to slow this down -- you're not going to slow this down because of this kind of a situation. I'm sorry. The equity is on their side, not on your side.

**MR. EHRLICH:** And I'm not asking to slow it down, Your Honor. I'm simply trying to explain that, as I understand it, Uber is going to produce, they have represented to the Court, everything in their possession. And that is their obligation to do.

My concern, frankly, is a relatively small issue, at this point, because there is no pending subpoena directed at Mr. Levandowski. My concern is that in disclosing materials that Uber has, and providing a privilege log regarding privileged information that they cannot produce, they would inadvertently be disclosing information that may tend to undermine Mr. Levandowski's Fifth Amendment right. And they are not permitted to do that because they -- they only know about the existence or location or identity of any potential documents that may exist through attorney-client privilege

communications.

**THE COURT:** I don't believe that.

Look, they could go and look on their servers. If they find emails within the Uber company or that subsidiary that contain copies or forwarding or excerpts from the documents that allegedly were stolen, the 14,000, there's no privilege in the world that's going to stop that.

**MR. EHRLICH:** Absolutely. That's correct. We agree.

**THE COURT:** So then what are you talking about then? If Uber has found -- let's just make up a number -- 103 emails that reference this stuff, something in the 14,000, they've got to produce it. They can't -- they can't say, oh, wait, maybe this is going to implicate Mr. Levandowski.

**MR. EHRLICH:** Agreed. Absolutely agreed.

**THE COURT:** What point are you trying to get at then?

**MR. EHRLICH:** I'm trying to protect a valid Fifth Amendment privilege and protection he has. I can disclose under seal the information that I am -- that -- that I'm trying to communicate to the Court.

**THE COURT:** No. This is -- this is a nonstarter. I'm not going to get diverted off into you coming in here with -- with no motion whatsoever, nothing, and trying to get special pleading because you represent somebody big, and get an under-seal hearing so the public can't hear it. That's not going to work.

If you want to make a formal motion, you can make it. I will give it the consideration that it deserves. But it won't slow things down.

**MR. EHRLICH:** Let me confer --

**THE COURT:** It will not slow things down.

**MR. EHRLICH:** Can I confer with Mr. González? He may be able to answer that question.

**THE COURT:** Sure.

(Counsel confer off the record.)

**MR. GONZÁLEZ:** Your Honor, let me try to shed some light on this. And you can see why this is a sensitive issue.

First --

**THE COURT:** The public should be here right now. The public should be here. This is not something that we should have excluded the public on.

**MR. GONZÁLEZ:** So, Your Honor, first of all, we have searched and we are in the process of searching all of our computers for the sorts of information that you referred to. And if we find those documents, we intend to produce those.

In addition, Your Honor, we are searching Uber's computer that was assigned to all three of the people that are mentioned in the complaint. We are searching all of their individual Uber computers.

We're really here to talk about two things that are related. One is, anything that Mr. Levandowski may or may not

have on his own -- let's just assume hypothetically that he's got something at home -- that is not something we have access to. And I just want to be forthright and tell you that.

But the issue here is whether any of the stuff is at Uber. And we are searching for that.

**THE COURT:** Uber has the authority to say to its employees, "If you have anything at home you bring it in here, give it to Mr. González, and he will turn it over to the Court."

You have the authority to do that. And you also have the authority to say, "And if you don't do that, you're fired."

**MR. GONZÁLEZ:** So, Your Honor, this is where maybe it's not quite that easy. I want to make it real clear to you, and I don't mind saying this without waiving the privilege, we have made it clear to him that the Court has ordered this. He understands that. And that's why he has obtained separate counsel.

Second, to add just a tiny bit of clarity on what we are talking about, because one of the things I wanted to discuss is how do we log this on a privilege log without infringing rights.

Here's what you're missing right now because we haven't explained it clearly: Before the acquisition some due diligence was done. A third party prepared a report based on that due diligence. We intend to put that report on a

privilege log.

There's a concern that's been raised about whether or not we should identify the party who prepared the report. The concern is that by identifying the party, we are waiving or infringing upon a Fifth Amendment right.

That's the issue I want to talk to Your Honor about because I don't want Your Honor to think we're being sneaky.

**THE COURT:** You want me to decide something like it without having briefed it?

**MR. GONZÁLEZ:** No.

**THE COURT:** You gave me some kind of secretive, mysterious letter, and you want me to give you advice and counsel right now?

**MR. GONZÁLEZ:** No, Your Honor. I just want to explain the situation to you. We wanted to come in and explain the situation because what we didn't want to happen is the following: We didn't want Friday to come and we produced some documents, but the 14,000 files that they've referenced thus far we haven't found them. That's not a surprise to me. But we're still looking.

In fact -- I wanted you to know this -- we asked them to produce the hash values for these files, which is some computer thing that you can use to try to help you find the files. And we got those last night. And we're even searching the hash values throughout our computers to see if any of that

information is there.

So it's not that we're not trying. We are digging.

**THE COURT:** Let's play a scenario out here. You file on -- you're eventually going to file your opposition.

**MR. GONZÁLEZ:** Correct.

**THE COURT:** And they get to take some depositions.

**MR. GONZÁLEZ:** Yes.

**THE COURT:** I'm sure they're going to take Mr. Levandowski's deposition. Let's say he takes the Fifth Amendment on everything. How is that going to look for Uber?

**MR. GONZÁLEZ:** Your Honor --

**THE COURT:** Don't you think that's going to lead almost inevitably to a preliminary injunction?

**MR. GONZÁLEZ:** Two things in response to that.

**THE COURT:** I can't -- I can't fix -- this is a problem that your side made, not a problem that the Court or the other side made.

If your guy is involved in criminal activity and has to have criminal lawyers of the caliber of these two gentlemen, who are the best, well, okay, they got the best. But it's a problem that I can't solve for you. And if you think I'm going to cut you slack because you're looking at -- your guy is looking at jail time, no.

They are going to get the benefit of their record. And if you don't deny it -- if all you do is come in and say, "We

looked for the documents and can't find them," then the conclusion is they got a record that shows Mr. Levandowski took it, and maybe still has it. And he's -- he's still working for your company. And maybe that means preliminary injunction time. Maybe. I don't know. I'm not there yet.

But I'm telling you, you're looking at a serious problem. And you want me to somehow cut slack --

**MR. GONZÁLEZ:** No, that's not it at all, Your Honor. Let me be clear on this.

**THE COURT:** What is it you want from me today?

**MR. GONZÁLEZ:** So I will tell you, Your Honor. First, this is related, in part, to the petition to compel arbitration for this reason: If the Court grants our petition, then it means that this trade secrets issue goes into arbitration. And if he testifies there, it's -- it's in confidence. It's a big difference.

**THE COURT:** Ridiculous. It's not in confidence. The United States Attorney can go subpoena information all day long.

**MR. GONZÁLEZ:** Well, Your Honor, at least it's not in the public where it's going to be on the front page of *The New York Times* the next day.

It is a factor that they may take into consideration, Your Honor. That's all. It's a factor.

**THE COURT:** That argument gets nowhere. If he

testified, they will -- if they don't let him testify here, they're not going to let him testify there.

**MR. GONZÁLEZ:** So the other issue, Your Honor, that we're concerned about -- and I can see already, just from your reaction, Your Honor -- is the adverse impact it has on our client.

Let me be clear about something. I want you to know, it is important for me that you know this. I would love to put Mr. Levandowski on the stand to explain to you what happened, because I think he has a good story to tell. But I can't force him to do that.

So what am I doing -- no, no, Your Honor, you just asked, What are you going to do? Let me tell you what we are going to do. And I've got to approach this two ways.

If I cannot get a declaration from him, then, Your Honor, I'm going to do the following: We're going to demonstrate to you that we are not using any of these things that they say he may have taken. That's my point. And it's a very important point.

**THE COURT:** That would be a legitimate point.

**MR. GONZÁLEZ:** That's what I want Your Honor to understand.

**THE COURT:** Maybe you can convince me of that. I have -- I have considered that it's possible that you can come in and say, here's the way our light diodes are arranged, and

it's not the same, and all these other things. Like, the list of suppliers don't even qualify as a trade secret.

Okay. That could be done. And it's possible that would fly. I don't know. I'm not going to say that you wouldn't win on that. I'm just saying that is a plausible scenario that I would have to evaluate.

However, what if it turns out that your light diode things are arranged in the same way or very close to it? Are you going to try to convince me that that didn't have some influence on how -- I don't know. I don't know.

**MR. GONZÁLEZ:** So, Your Honor, I appreciate everything you've said. You may not realize it, but this has been very helpful to us for sure. This has been very helpful.

**THE COURT:** How could that be?

**MR. GONZÁLEZ:** Well, because, Your Honor, I now understand how strongly you feel, and it makes a difference as to what position Uber is going to take. Frankly, we obviously have a conflict here. We obviously have a conflict. And I just wanted you to be aware so that -- I didn't want you to think later that we were sandbagging you.

**THE COURT:** Look. I want you to know I respect both sides here. And everyone knows I know Mr. González from the days when he was a young associate and I was a partner, and he was working for me on cases. And he has gone on to be a much better lawyer than I ever was.

But you shouldn't have asked for in camera on this. This could have all been done in the open. I'm sorry that Mr. Levandowski has got his -- got himself in a fix. That's what happens, I guess, when you download 14,000 documents and take them, if he did. But I don't hear anybody denying that.

**MR. GONZÁLEZ:** Your Honor, the reason why we wanted it in chambers is because of the adverse impact that we think it would have on our client. If there's a headline tomorrow saying this guy is asserting the Fifth Amendment --

**THE COURT:** Listen, please don't do this to me again. There's going to be a lot of adverse headlines in this case on both sides. And I can't stop that.

And that's -- the public has a right -- in fact, this whole transcript, I'm going to make it public. There's nothing -- what do you say?

**MR. VERHOEVEN:** Well, Your Honor, with respect, I think we should have had notice of what they were planning to lay out here.

**THE COURT:** You should have had notice.

**MR. VERHOEVEN:** And I don't think it's fair for me to have to address arbitration issues without any notice or the Fifth Amendment issues without any notice. So I'm going to restrain from doing that.

I would have a question, Your Honor, and that is whether Mr. Levandowski is still running their entire program over

there.

**THE COURT:** Well, you can ask them that question at his deposition.

**MR. VERHOEVEN:** Okay.

**THE COURT:** This is not a discovery thing.

And if he doesn't testify to that at the deposition, well, I guess Uber -- you know, Uber is -- if you think this is going to help you, my preliminary view of it is it's not going to help you; and that if there's not a clear-cut path to showing that those 14,000 documents weren't used, then you're looking at a preliminary injunction.

On the other hand, maybe you can convince me that those 14,000 documents somehow none of them were used. Okay. That's a possibility. That has occurred to me that that's true. I just don't know. I don't know. But if Mr. Levandowski is unwilling to say -- hey, listen, I read in the newspaper that he said he did it so that he could do work at home. That's what I read in the newspaper. I don't know. So, look, if he's not willing to come clean, then that looks bad in a civil lawsuit. In a civil lawsuit.

Now, for criminal purposes, okay, maybe he's got the right to take the Fifth Amendment. But for civil purposes, there's a thing called adverse inferences.

**MS. DUNN:** I think one point we want to reinforce -- this actually sounds a lot like what Your Honor is saying -- is

that if Your Honor is in the situation where he must draw an adverse inference against Mr. Levandowski, we would ask you to keep open the possibility in your mind that the adverse inference should not be drawn against Uber, which is a separate party. And it is our responsibility to come in and show to you that we have not used this and that we're differently situated. So in that respect we agree.

**THE COURT:** Okay. I will say this: I'm not going to prejudge the issue without seeing what your record is. And it's conceivable, it's conceivable that that would fly. But it's also conceivable that I would draw the adverse inference against the employer who has the guy, who's taking the Fifth Amendment, who runs the company. To me that is a -- I don't know. I don't know what I would do.

Listen, I'm not going -- I have not made up my mind how to deal with the timing on the issue of the motion for -- to arbitrate. And the equities are not on the side of -- except in one respect. Mr. -- I can never -- I want to say your name correctly.

**MR. VERHOEVEN:** Verhoeven.

**THE COURT:** Verhoeven. I apologize. You're famous. I should know how to say Verhoeven.

You should have told me in your papers that you had already brought an arbitration against Mr. Levandowski. I only learned that reading their papers.

**MR. VERHOEVEN:** Apologize, Your Honor.

**THE COURT:** You should have told me that. But that slightly changes the mix a little bit.

I'll give you a couple of other thoughts. If you all keep insisting on redacting so much information, like -- and you're the guilty one on that, Mr. Verhoeven -- then arbitration looks better and better. Because I'm not going to put up with it. If we're going to be in a public proceeding, 99 percent of what -- 90 percent, anyway, has got to be public.

The stuff -- this employment agreement by Google, it's laughable that you want to keep that under wraps. Just laughable.

**MR. VERHOEVEN:** If I may, Your Honor.

**THE COURT:** Yeah.

**MR. VERHOEVEN:** I didn't personally engage in this, but I've been informed by the individual who did that there was not even a meet and confer to confirm the statements that were made to you in that unilateral filing that said we had insisted that everything was confidential. So we hadn't had an opportunity to address that, Your Honor.

**THE COURT:** All right. Is that true, Mr. González? You keep bombarding me with letters accusing them of things. And then the response I get back is that you failed to meet and confer, and they're hearing about this for the first time.

So who is it -- who exactly was it at Google that told you

that -- or Waymo that told you that everything was confidential?

**MR. GONZÁLEZ:** So, Your Honor, we have many, many written communications where Google is represented by separate counsel. They're represented by John Keker's firm in the arbitrations. And they are emphatic that we are not to disclose the information from those arbitrations. So there is no question, the only reason --

**THE COURT:** No, we're talking about the employment agreements.

**MR. GONZÁLEZ:** The employment agreements, that's right.

**THE COURT:** You're telling me that somebody representing Google told you that those employment agreements could not be publicly -- made public?

**MR. GONZÁLEZ:** That is correct, Your Honor.

**THE COURT:** What was the name of that person?

**MR. GONZÁLEZ:** That's the only reason we sealed them.

**THE COURT:** Who is that person?

**MR. GONZÁLEZ:** Your Honor, I don't know which lawyer. Somebody at John Keker's firm. But we've been communicating about this for a long time. Those arbitrations were filed back in October. This is not a new issue.

**THE COURT:** Yes, but -- all right. I want you to know it is laughable that an employment agreement could be kept

secret from the public. We are a public institution. So the best -- listen, I want you to understand.

**MR. VERHOEVEN:** Yes, Your Honor.

**THE COURT:** The best thing -- if we were -- one of the factors that you ought to be considering is maybe you should -- if you want all this stuff to be so secret, you should be in arbitration. You shouldn't be trying to do this in court and constantly telling them not to, or you putting in -- the public has a right to see what we do.

And I feel that so strongly. I am not -- the U.S. District Court is not a wholly owned subsidiary of Quinn Emanuel or Morrison & Foerster or these two big companies. We belong to the public.

And if this continues, then several things are going to happen. One, we're going to call a halt to the whole -- we're going to stop everything. And we're going to have document-by-document hearings in this room, where I go through every document and you justify to me why we're there. And then after we sort it all out, we will resume. And, of course, I'll make 90 percent of those public. We will then resume. And your motion for preliminary injunction will be delayed day by day until we get this done.

You have a very strong incentive to stop this nonsense with the redactions.

**MR. VERHOEVEN:** I understand, Your Honor.

**THE COURT:** And over there, please don't do this to me again, where you complain about them and then it turns out they say you never met and conferred.

For my purposes, John Keker does -- his firm -- I love the guy to death, but his firm is not in this case. Mr. Verhoeven is the one you should be talking to, not John Keker. All right.

So right now I'm not advancing the date of that motion for the -- you've known about this arbitration thing and the possibility of this lawsuit for months. You should have had that arbitration motion ready to go long ago. So I'm not sympathetic to your desire to advance that.

I do have in mind the possibility that I will give you a little bit of advancing on it. But they made a serious motion for a preliminary injunction. And I'm going to give them -- unless this redaction thing gets in the way, I'm going to give them -- I'm going to try to stick to that May 3rd date.

All right. So, to my mind, we haven't accomplished anything here today. But I want to find out, I want to give you another opportunity. Is there some -- some relief that the Court can give either side that you want me to rule on today?

**MR. EHRLICH:** The only relief, Your Honor, that we are asking, on behalf of Mr. Levandowski, is that the Court not order Uber to disclose the identity of this third party who conducted due diligence review on materials belonging to

Mr. Levandowski. And the reason -- can I just say?

**THE COURT:** Yeah.

**MR. EHRLICH:** The reason I ask this involves an overlap between the Fifth Amendment active production protection and attorney-client privilege.

And counsel who acquires knowledge as part of a common interest agreement stands in the same shoes as counsel for an individual facing potential criminal prosecution. And that means they are supposed to guard and protect, at every peril to themselves, the disclosure of information that could undermine an important constitutional right. We could brief the Court on this issue.

There are serious implications that are not all unfavorable I should point out. If the Court orders disclosure in the context where there's a valid Fifth Amendment privilege, valid Fifth Amendment right, there's a host of *Castigar* issues that will follow. And it is very hard to unring the bell for -- for any party.

We are asking the Court to take this slowly, to let us brief the *Hubbell* active production issue and the attorney-client privilege. We can't unring the bell --

**THE COURT:** Here's the answer: The answer is no, I'm not going to do that.

I have already issued an order two weeks ago, at least, to Uber as to what they've got to produce and not produce. I'm

not changing that in the least.

Now, if you want to bring some motion out of left field and set it on the calendar and give Mr. Verhoeven a fair chance to -- instead of sandbagging him the way you did here today, then I'll consider that in due course. But I'm not going to give any relief. I'm not giving any delays.

I'm not saying that you -- I'm standing a hundred percent by the order that I gave a few -- two weeks ago. I don't remember what it is now. Two weeks ago. The scheduling order that laid out how this was going to come down.

So if you've got some -- if you've got some privilege log that is due, you've got to comply with the normal rules on privilege logs. And I'm not giving -- Uber does. Uber is the party here.

Mr. Verhoeven has made a big point that he's not suing Mr. Levandowski. So he -- Levandowski doesn't have to do any kind of privilege log, but Uber does.

**MR. EHRLICH:** So I need to assert on the record, then, in court, that we are asserting Mr. Levandowski's Fifth Amendment active production rights under *United States vs. Hubbell*. And we are specifically objecting to the disclosure of any confidential information that was acquired as part of a common interest privilege.

We are specifically not waiving either of those rights or privileges. And we would ask the Court, it's simply the

question of identifying the name of a vendor who reviewed materials. This is something that can wait.

**THE COURT:** No, it can't wait. There is no basis for making this wait. At least on the record that I have now.

And you were free for the last two weeks to bring any motion that you wanted, instead of a sandbag motion out of left field and the way you're doing it here today.

So the answer is no. Your objection is made for the record. Good. Okay.

**MR. EHRLICH:** And I just --

**THE COURT:** Uber will take that into account in doing whatever they're going to do. But I have made it pretty clear to you that you're looking at adverse inferences even at the Uber level.

**MR. GONZÁLEZ:** We understand.

**THE COURT:** And if you don't -- if you can't order your guy to do what he's required to do to meet the charges Mr. Verhoeven has leveled against him, and has proof to back it up, that sounds to me -- then, to finish my thought, too bad.

Here's the way I figure what's going on here: Whoever this vendor was, let's call them ABC Inc. who did due diligence. They have a document that shows the $14,000 were download -- 14,000 documents were downloaded. And your side doesn't want that ever to see the light of day because it might lead to jail time. Okay.

**MR. EHRLICH:** That's not accurate, to my understanding.

**THE COURT:** Good. I hope it's not accurate. But that's one way to read this.

And you over there wondering, well, do we -- I'm not -- you've got to do -- I'm not going to rule on this. I'm not relieving Uber one inch from what I have ordered you to do.

Now, when I was practicing law, the idea that you could withhold the author of a document in a privilege log was also laughable. No such thing.

So maybe what you need to do is bring your own lawsuit against Uber. But I'm not giving you that relief right now.

If you brought a formal motion with points and authorities that said I had to do that, of course, I would definitely consider that. But off the top of my head and the way this is being presented out of left field today, I would say you're out of luck on that.

**MR. EHRLICH:** And can I understand the deadline for the privilege log?

**MS. DUNN:** Friday.

**MR. EHRLICH:** Friday close of business?

**MR. GONZÁLEZ:** Well, actually, not necessarily. The Court's order, I think, says -- it's got some language in there about, you know-- I forget the exact words in the standing order, but it basically says you've got to provide it promptly.

Something like that.

**THE COURT:** I don't remember what it is. But I'm not changing a word out of my orders. So whenever the privilege log is normally due, you've got to produce that privilege log.

**MR. GONZÁLEZ:** Your Honor, may I ask one question?

By the way, you may not realize this is, in my view, quite helpful, to us at least.

On the redaction, there is only one thing that I do think we might want to redact with respect to our petition to compel arbitration.

You should know, by the way, we have been conferring. And as I was coming here, we did file the entire petition unredacted. Now we're discussing my declaration and the attachments. The only thing I am a little sensitive about are the two complaints, the two arbitration lawsuits that they filed against Mr. Levandowski and another employee whose name hasn't even come up.

I don't know that we need to make those public, those arbitration matters that they have filed in arbitration, when ordinarily those wouldn't be. Because the point, for your purposes, is just that they exist. And you yourself can see what they allege.

And I've already said in the document, I've already just made a statement what they are, they don't allege trade secrets. They allege other things against them. They were

careful not to allege trade secrets.

**THE COURT:** I don't see why that should be withheld from the public. If you're relying on that document to say that this lawsuit is very close to what's being alleged in that lawsuit, why shouldn't I get to see that and the public get to see that? What's so secret about that?

**MR. GONZÁLEZ:** Your Honor, if you think about it, there's another individual whose name hasn't been mentioned, who is accused of misconduct in one of those complaints.

**THE COURT:** All right. Well, maybe that guy's name can be withheld. But the rest of it could be -- why can't you two agree? It seems to me that, at most, that other guy's name ought to be redacted even now temporarily.

Would you agree with that, Mr. Verhoeven?

**MR. VERHOEVEN:** Can I check with my client real quick?

**MR. PERLSON:** So the -- in terms of the -- our firm is not doing the arbitration. As I understand it, there were terms of an agreement that actually, we thought, required it with Mr. Levandowski, that they required it to be confidential.

All that Google is concerned about is -- not concerned about their employment agreements being public. The only concern is protecting someone's confidential, private information.

**THE COURT:** Confidential what?

**MR. PERLSON:** Private information such as someone's

salary, or something like that, that California law --

**THE COURT:** Salary, social security number, where they live, telephone number, personal identifying information, I will give you that always. That can be redacted.

**MR. VERHOEVEN:** The answer to your question is, yes, we can agree to what you asked me.

**THE COURT:** So I think I've solved that problem for you.

**MR. GONZÁLEZ:** Thank you, Your Honor.

**THE COURT:** All right. Now, what else do you have for today?

**MR. GONZÁLEZ:** I guess, Your Honor, my closing comment is this: We cannot force somebody to testify. I think you appreciate that. We cannot do that.

**THE COURT:** Well, maybe you can't force them to, but you can order them to.

**MR. GONZÁLEZ:** Fair enough.

**THE COURT:** You can say, "You're our employee. You're an important employee. This is an important case to us. You either testify or we may fire you." Of course, you've got the right to do that.

**MR. GONZÁLEZ:** Understood. But I guess my parting thought is this: I want to leave you with the idea that it is possible, it's absolutely possible that an employee might take something from company number one and go to company number two,

and it's possible that that information was never used at company number two.

**THE COURT:** Yeah, I agree with that.

**MR. GONZÁLEZ:** That's all I'm asking, is for you to keep an open mind about that.

**THE COURT:** It's also possible it was used.

**MR. GONZÁLEZ:** Understood.

**THE COURT:** Let me ask this: Are you going to be able to look at their product before the preliminary injunction hearing and see that traces -- your trade secrets trace into their product in some way?

**MR. VERHOEVEN:** If we get access, absolutely, we can make a determination.

**THE COURT:** I think you should get access. You should ask for that.

**MR. VERHOEVEN:** Yes, Your Honor.

**THE COURT:** Or at least you should be asking questions in the deposition.

Are you -- are they going to get access to your product so that they can see if the -- I know Uber has got cars on the road, now, in Arizona.

**MR. GONZÁLEZ:** So, Your Honor, we haven't discussed it. Certainly -- we had anticipated that they would be asking our witnesses questions about the widget, and where did the widget come from, and how did you design the widget. All of

that stuff we understand we're going to have to answer. Probably that part, Your Honor, would be under seal because then we are talking about our trade secrets at that point.

**THE COURT:** I think it would be.

But it seems to me that -- okay. I'm not changing the program at all here. But I can imagine circumstances that it would be important for me to know that Mr. Verhoeven's experts have looked at your actual on-the-ground product to see if some of these key features are there.

And so -- but I'm not ordering that -- I'm not changing that prior order. And I have forgotten how I worded it, so I'm not -- I'm not trying to change a thing.

But I am being sympathetic with the idea that we could come down to -- if it comes down to a debate over whether or not it's being used, and you tell me it's not being used, and they say, "Yeah, but they wouldn't let us look at the product," then I may -- I may -- I don't know what I'll do.

**MS. DUNN:** Well, maybe we can table that for a different day. Because I think if they're -- if it's up to their paid experts to determine what we have done that is different than our experts, and we taking our evidence to the Court to prove our piece and their taking their evidence to the Court to prove their piece.

So I think we should all --

**THE COURT:** For example, let's say you put on an

expert that says, "I've looked at their trade secrets and I've looked at the product, and not a single one of those are being used." They're going to get to take the deposition of the expert. And it could turn out that what the expert is relying on is not very -- it's inconclusive. It may be their side's expert ought to take a look at it too.

**MS. DUNN:** Right. They would have the opportunity, in the ordinary course, to depose our expert certainly.

**THE COURT:** How about looking at the actual product?

**MR. GONZÁLEZ:** Your Honor, that's something we can confer about.

**MR. VERHOEVEN:** We will meet and confer, Your Honor. We intend to ask to look at the product. And we interpret the Court's order to allow us to include that as one of our document requests, is to ask for physical inspection.

**THE COURT:** It may be. And I'm not saying no to that.

**MR. VERHOEVEN:** Okay.

**THE COURT:** I am being careful here because I did not know what this hearing was about. And I don't have a good enough memory of what I said in the order two weeks ago, and I don't want to say something that would add or subtract from that. So there we go.

So I'm not saying no to what you've said. I'm not saying yes to it either.

**MR. VERHOEVEN:** Thank you, Your Honor.

**MS. DUNN:** I think we would just ask Your Honor and acknowledge legally there's an adverse inference that -- that legally will be drawn against Mr. Levandowski if he invokes his rights. But --

**THE COURT:** Well, I cannot say everything -- I'm just -- I'm not ruling on this yet.

**MS. DUNN:** No, no, I'm not asking you to rule.

**THE COURT:** I'm telling you, though, in prior practice every time in a civil case, that I can remember, if somebody invoked the Fifth Amendment, it was proper to draw an adverse inference from that.

**MS. DUNN:** Against the party invoking. And --

**THE COURT:** Yes, for sure. But maybe against you, too, because he's your key guy.

**MS. DUNN:** Right. And so what our position would be on that is that to draw an adverse inference against the company would prejudice, extremely prejudice the company for reasons that I think we've discussed today; and that our responsibility is to show Your Honor, on our evidence that we bring to you, which is our responsibility, that we are going to prepare for the PI opposition, that the company is differently situated than Mr. Levandowski.

And so all we would ask you to do is just keep an open mind about that, because that is our -- that's our responsibility and that is our intent.

**THE COURT:** Could be. But that due diligence document will become pretty important.

**MR. VERHOEVEN:** If I may say, none of this -- we've been given no notice of any of this. And here they are arguing their case and we're being sandbagged on this.

The last I heard, Your Honor, he was a senior executive at Uber in charge of their entire LiDAR system, their entire driverless car system. They won't say otherwise. So all I can say is I disagree. And I would think an inference absolutely could be drawn.

**THE COURT:** Well, I haven't ruled -- look. I feel like it's unfair to the judge for you all to -- and please don't say that I have absolutely made any rulings today. The only one is that I am not, I am not changing what I ordered. I want that to be very clear.

And if the criminal lawyers want to bring some special motion, then I'll hear that in due course. But it's going to have to be on the public record.

All right. Now, are we at an end? Because I want to end with telling you that this -- unless somebody says they want an opportunity to appeal to the Court of Appeals, this transcript is going to be on the public record as soon as this most excellent court reporter can -- can transcribe it.

**MR. GONZÁLEZ:** Understood, Your Honor.

**MR. EHRLICH:** Understood, Your Honor.

**THE COURT:** All right. So when you say "understood," is that --

**MR. VERHOEVEN:** Yes, Your Honor.

**THE COURT:** All right. So that means -- what I take you understand to mean is that you're not asking me in any way to stay my hand on this while you take an appeal.

**MR. EHRLICH:** I'm not aware of strong authority that would allow us to request that.

**MR. GONZÁLEZ:** Your Honor, the only thing I'll throw out is -- I appreciate the desire to have open public hearings and all of that. I understand that. I just think it's very prejudicial to Uber for a transcript like this to go public when they will immediately do what they did with their preliminary injunction, which I found out about it by reading in the paper before it was even filed, a story that was written.

So they clearly intend, I think, to send out a press release, call the reporters and say, "Fifth Amendment. Fifth Amendment."

I think that's very prejudicial to us, to Uber, because we're not asserting the Fifth Amendment. We want him to testify. I want to be real clear about that. We would love for him to testify.

**THE COURT:** Okay. The public will read what you just said.

I'm sorry, but the public's right to know what goes on in the federal courts is more important than the newspapers beating up on you in the press.

**MR. EHRLICH:** Your Honor, may I just be heard on that issue?

**THE COURT:** Yes, sure.

**MR. EHRLICH:** As the Court knows, as all the lawyers in this courtroom I'm sure know, Fifth Amendment protects the innocent as well as the guilty. Unfortunately, in our society there is a tendency to draw conclusions that are adverse to somebody who is simply trying to assert their constitutional rights.

This is a case that is moving very quickly. Mr. Ramsey and I recently got involved. Our obligation is to do what we do for every client, which is make sure we're protecting all constitutional rights that exist. And we have advised Mr. Levandowski that he has these rights and he needs to assert them for now.

It could well change. We are examining the issues. And as the Court knows, depositions, you can take it question by question. You can't make a blanket assertion of the Fifth. So I don't want the record to suggest that he's come to that decision.

And I also, in fairness to Uber, need to make clear that this is not -- the Court made a number of comments to suggest

that this is Uber's decision or somehow we're in cahoots.

This is Mr. Levandowski's rights at stake. We're representing him, not Uber, not any other party in this courtroom.

**THE COURT:** No, I think you're right. You're doing a great job. And the public will read your comments that you've just made. And you articulated it better than I possibly could have. So good for you.

But, again, this transcript will be made public by tomorrow, as soon as the court reporter can finish it, unless someone asks me to stay that pending an appeal to the Court of Appeals, which I would do just out of -- so as not to prejudice the appeal.

But if you're not going to take an appeal or seek a writ of mandate then -- writ of mandate, really, then there is no point in delaying.

**MR. EHRLICH:** May I have one moment?

**THE COURT:** Yes.

**MR. GONZÁLEZ:** Your Honor, because I know how important this issue is to our client, we need to consult with them. They're not here.

I would just ask -- I would request 24 hours to consult with them. And we'll let you know within 24 hours if there's any further relief that we intend to seek.

**THE COURT:** By noon tomorrow, you need to let me know

whether or not you definitely are going to seek a writ of mandate from the Court of Appeals, and the timetable. If it's long and drawn out, I will deny. And this will go public.

If it is going to be very expedited to the Court of Appeals, then I would consider staying my hand, keeping this under wraps. But what you cannot do is say you need more time to think about it or that "We intend to do it." You've got to do it.

And you've got to tell me that you'll get it on file by Friday or by Monday. Very quickly. Because this is not something we ought to just delay, delay, delay, delay so that -- so it's just a delay game.

The chances that the Court of Appeals would say that this ought not to be public, in my view, are pretty small.

**MR. GONZÁLEZ:** Thank you, Your Honor.

**THE COURT:** All right. So noon tomorrow. So I will ask the court reporter not to put this on the public record until further order of the Court.

All right. Are we done.

**MR. EHRLICH:** Thank you.

**MR. GONZÁLEZ:** Yes, Your Honor. Thank you.

**MR. VERHOEVEN:** Thank you.

**THE COURT:** All right.

(At 2:55 p.m. the proceedings were adjourned.)

\- - - -

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Wednesday, March 29, 2017

______________________________________________

Katherine Powell Sullivan, CSR #5812, RMR, CRR
U.S. Court Reporter

# EXHIBIT 2

MILES EHRLICH (Bar No. 237954)
miles@ramsey-ehrlich.com
ISMAIL RAMSEY (Bar No. 189820)
izzy@ramsey-ehrlich.com
AMY CRAIG (Bar No. 269339)
amy@ramsey-ehrlich.com
RAMSEY & EHRLICH LLP
803 Hearst Avenue
Berkeley, CA 94710
(510) 548-3600 (Tel)
(510) 291-3060 (Fax)

Attorneys for Non-Party Anthony Levandowski

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

WAYMO LLC,

Plaintiff,

v.

UBER TECHNOLOGIES, INC., *et al.*,

Defendants.

Case No.: 3:17-cv-00939-WHA

**NON-PARTY ANTHONY LEVANDOWSKI'S NOTICE OF MOTION AND MOTION FOR MODIFICATION OF COURT'S ORDER DATED MARCH 16, 2017 (DKT. #61)**

**Hearing Date:** To be determined by court
**Time:** To be determined by court
**Courtroom:** 8, 19th Floor
**Judge:** The Honorable William H. Alsup

**NOTICE OF MOTION AND MOTION**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that at a date and time selected by this Court, in the courtroom of the Honorable William H. Alsup at the United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, California, non-party Anthony Levandowski will and hereby does move for an order modifying the Court's March 16, 2017 Order (Dkt. #61) and prohibiting Defendant Uber Technologies, Inc. ("Uber") from disclosing any information provided by Mr. Levandowski in the course of the Joint Defense and Common Interest Agreement entered into by Mr. Levandowski and Uber, and specifically prohibiting the disclosure of information concerning the due diligence review conducted by a third party under that agreement, including but not limited to the identity of the third party who conducted any such due diligence review, whether Mr. Levandowski possessed any documents that were reviewed by the third party, and the identity of any of Mr. Levandowski's possessions that may have been reviewed.

This motion is based on this notice of motion and motion, the accompanying memorandum of points and authorities, the supporting declaration of John Gardner, and accompanying exhibit, the pleadings, files and records in this case, as well as other written or oral argument which may be presented at the hearing.

DATED: April 4, 2017

RAMSEY & EHRLICH LLP

By *<u>/s/ Amy Craig</u>*
Miles Ehrlich
Ismail Ramsey
Amy Craig

***Counsel for Non-Party Anthony Levandowski***

## TABLE OF CONTENTS

I. INTRODUCTION ........................................ 1

II. PROCEDURAL BACKGROUND ........................................ 3

A. Court order to Uber to produce documents from Mr. Levandowski ........................................ 3

B. This Court's requirements of a detailed privilege log ........................................ 4

III. ARGUMENT ........................................ 5

A. Under The Fifth Amendment A Person May Not Be Compelled To Testify Against Himself ........................................ 5

1. This Fifth Amendment protections are broadly construed and apply to any testimony that could provide a link in the chain of evidence. ........................................ 6

2. *Fisher* and *Hubbell* make clear that the Fifth Amendment protects implicit testimony inherent in the act of producing documents in response to a court order or a subpoena .......... 7

B. The Attorney-Client Privilege And The Duty Of Confidentiality Preclude An Attorney From Revealing Incriminating Communications That His Client Has Revealed In Confidence. 8

C. A Common-Interest Privilege Extends The Attorney-Client Privilege And Duty Of Confidentiality To Counsel Representing Third Parties ........................................ 9

D. Requiring A Detailed Privilege Log Here Would Violate Mr. Levandowski's Fifth Amendment Privilege ........................................ 11

E. This Court Should Modify Its Order To Suspend The Requirements Of A Privilege Log For Any Documents Protected By The Fifth Amendment. ........................................ 13

IV. CONCLUSION ........................................ 15

# TABLE OF AUTHORITIES

## CASES

*Baird v. Koerner*, 279 F.2d 623, 629-30 (9th Cir. 1960) ........ 1

*Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258 (9th Cir. 2000) ........ 6

*Fisher v. United States*, 425 U.S. 391 (1976) ........ passim

*Grunewald v. United States*, 353 U.S. 391 (1957) ........ 1

*Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 115 F.R.D. 308 (N.D. Cal. 1987) ........ 11

*Hoffman v. United States*, 341 U.S. 479 (1951) ........ 6

*Holmes v. Collection Bureau of America Ltd.*, No. C 09-02540 WHA, 2010 U.S. Dist. LEXIS 4253, 2010 WL 143484 (N.D. Cal. Jan. 8, 2010) ........ 10

*In re Fustolo*, No. 13-12692-JNF, 2015 WL 9595421 (Bankr. D. Mass. Dec. 31, 2015) ........ 12

*In re Grand Jury Subpoenas*, 902 F.2d 244 (4th Cir. 1990) ........ 10

*In re Master Key Litig.*, 507 F.2d 292 (9th Cir. 1974) ........ 1

*In re Syncor ERISA Litig.*, 229 F.R.D. 636 (C.D. Cal. 2005) ........ 3, 12

*J.C. Penney Life Ins. Co. v. Houghton*, Civ. A. No. 86-2637, 1986 WL 14732 (E.D.Pa. Dec. 24, 1986) ........ 7

*Maffie v. United States*, 209 F.2d 225 (1st Cir. 1954) ........ 6

*Malloy v. Hogan*, 378 U.S. 1 (1964) ........ 6

*Nidec Corp. v. Victor Co.*, 249 F.R.D. 575 (N.D. Cal. 2007) ........ 10

*Ohio v. Reiner*, 532 U.S. 17 (2001) ........ 1

*OXY Res. Cal. LLC v. Superior Court*, 115 Cal. App. 4th 874 (2004) ........ 11

*Perrignon v. Bergen Brunswig Corp.*, 77 F.R.D. 455 (N.D. Cal. 1978) ........ 8

*Quinn v. United States*, 349 U.S. 155 (1955) ........ 5

*United States SEC v. Chin*, Civil Action No. 12-cv-01336-PAB-BNB, 2012 U.S. Dist. LEXIS 182252 (D. Colo. Nov. 29, 2012) ........ 3, 12

*United States v. Bergonzi*, 216 F.R.D. 487 (N.D. Cal. 2003) ........ 9

*United States v. Bright*, 596 F.3d 683 (9th Cir. 2010) ........ 13
*United States v. Drollinger*, 80 F.3d 389 (9th Cir. 1996) ........ 14
*United States v. Gonzalez*, 669 F.3d 974 (9th Cir. 2012) ........ passim
*United States v. Henke*, 222 F.3d 633 (9th Cir. 2000) ........ 9
*United States v. Hubbell*, 530 U.S. 27 (2000) ........ passim
*United States v. Judson*, 322 F.2d 460 (9th Cir. 1963) ........ 8
*United States v. Neff*, 615 F.2d 1235 (9th Cir. 1980) ........ 6
*United States v. White*, 322 U.S. 694 (1944) ........ 8

STATUTES

Cal. Bus. & Prof. Code § 6068(e)(1) -------- 9
18 U.S.C. § 6002 --------13

OTHER AUTHORITIES

8 J. Wigmore, Evidence § 2292 (McNaughton rev. 1961) -------- 8
CAL. PRACTICE GUIDE: PROFESSIONAL RESPONSIBILITY, at §§ 7:86, 7:103-106 -------- 9
Cal. State Bar Formal Opn. No. 2003-161-------- 9
CAL. PRACTICE GUIDE: PROFESSIONAL RESPONSIBILITY (The Rutter Group 2016) §7:26-------- 9

RULES

Cal. Rules of Prof'l Conduct R. 3-100(A) -------- 9
FED. R. CIV. PROC. 26(b)(5)-------- 4
Federal Rule of Civil Procedure 26(b)(5)-------- 4
Federal Rule of Civil Procedure 26(b)(5)(ii) --------11
NDCA Civil Local Rule 11-4 -------- 8

**MEMORANDUM OF POINTS AND AUTHORITIES**

## I. INTRODUCTION

Anthony Levandowski is not a party to this action, and we have no basis to believe that he is presently under criminal investigation. But given the explosive nature of the accusations raised against him in this case, and the possibility that an investigation could be initiated at some later date, any prudent person in Mr. Levandowski's circumstances would be wise to ensure that his constitutional rights remain fully protected. As the Supreme Court has emphasized for decades, the core purpose of the Fifth Amendment's guarantee is not to shield the guilty, but "to protect innocent men . . . 'who otherwise might be ensnared by ambiguous circumstances.'" *Ohio v. Reiner*, 532 U.S. 17, 21 (2001) (quoting *Grunewald v. United States*, 353 U.S. 391, 421 (1957)). Further, because the Fifth Amendment's protections turn not "upon the *likelihood*, but upon the *possibility*, of prosecution," *In re Master Key Litig.*, 507 F.2d 292, 293 (9th Cir. 1974), the Fifth Amendment can be implicated even in a civil lawsuit when no criminal investigation has been—or ever will be—initiated.

Mr. Levandowski is requesting a modification of the Court's standing privilege log requirement. If applied in its usual fashion, the Court's requirement would improperly compel Uber to disclose information protected by a common interest privilege and thereby undermine Mr. Levandowski's Fifth Amendment right against compelled production as recognized by the Supreme Court in *United States v. Hubbell*, 530 U.S. 27 (2000), and *Fisher v. United States*, 425 U.S. 391 (1976). In making this request, Mr. Levandowski relies upon the following well-settled principles of law:

- A client's confidential communications with his attorney are protected by the attorney-client privilege. *Baird v. Koerner*, 279 F.2d 623, 629-30 (9th Cir. 1960).
- A client's potentially incriminatory communications to his attorney, whether explicit or implicit, are further protected against compelled disclosure by the Fifth Amendment. *Fisher*, 425 U.S. at 405.

- The Fifth Amendment prohibits a court from compelling a person to produce records or information if that act of production would tacitly communicate a "link in a chain" to evidence a prosecutor might use to build a case. *Hoffman v. United States*, 341 U.S. 479, 486 (1951); *Doe v. United States*, 487 U.S. 201, 208 n. 6 (1988); *Hubbell*, 530 U.S. at 38.
- When an attorney shares his client's potentially incriminatory communications in the context of a joint defense agreement creating a common interest privilege, all counsel who are parties to that agreement must maintain the confidentiality of those communications. *United States v. Gonzalez*, 669 F.3d 974, 978 (9th Cir. 2012).

The immediate issue before the Court is precisely how detailed Uber's counsel must be in listing on its privilege log the "due diligence report prepared by a third party that *may (or may not)* have referenced the collection of allegedly downloaded documents." Dkt. #132 at 1:16-18 (emphasis added). In reliance on his rights under *Hubbell* and *Fisher*, Mr. Levandowski asks that Uber's counsel—because of its common interest confidentiality obligations to Mr. Levandowski—be relieved of any obligation to provide detail concerning (1) the identity of the third-party who conducted any such due diligence review, (2) whether Mr. Levandowski possessed any documents that were reviewed by the third party, or (3) the identity of any of Mr. Levandowski's possessions that may have been reviewed.

This is necessary for two reasons. First, ordering public disclosure of these facts on the privilege log would impair Mr. Levandowski's attorney-client privilege because it would compel disclosure of confidences shared by Mr. Levandowski with his own counsel that were later communicated with other counsel as part of an enforceable joint defense and common interest privilege agreement. Second, requiring disclosure of these facts would separately violate Mr. Levandowski's Fifth Amendment right not to be compelled to reveal the existence, location, possession, or identity of any documents that might furnish a link in a chain of possible incrimination.

In similar circumstances, courts have recognized that it is improper to compel a degree of detail in a privilege log where, as here, such detail would tacitly disclose testimony protected by

the privilege against self-incrimination. *See United States SEC v. Chin,* Civil Action No. 12-cv-01336-PAB-BNB, 2012 U.S. Dist. LEXIS 182252, at *16-17 (D. Colo. Nov. 29, 2012) (finding that the Fifth Amendment and *Hubbell* prohibit requiring a respondent to submit a privilege log that lays out the tacit testimony inherent in production); *In re Syncor ERISA Litig*., 229 F.R.D. 636, 649 (C.D. Cal. 2005) (rejecting a motion to compel a privilege log because "requiring defendant [] to produce a privilege log listing responsive documents may incriminate defendant [] by forcing him to 'admit that the documents exist, are in his possession or control, and are authentic.'").

On behalf of Mr. Levandowski, we respectfully ask for the same accommodation here.

## II. PROCEDURAL BACKGROUND

### A. Court order to Uber to produce documents from Mr. Levandowski

In April 2016, Anthony Levandowski, Ottomotto LLC, Otto Trucking LLC, Lior Ron, Uber Technologies, Inc., and their respective attorneys entered into a "Joint Defense, Common Interest and Confidentiality Agreement" in connection with Uber's proposed acquisition (at that time) of Ottomotto and Otto Trucking. Declaration of John Gardner at ¶ 3 & Ex. A. Under the agreement—which establishes a common interest privilege that Mr. Levandowski now asserts—a due diligence report was produced by a third party. *Id.* at ¶ 4; *see also Gonzalez*, 669 F.3d at 978 (9th Cir. 2012).

In March 2017, Waymo sued Uber, Ottomotto, and Otto Trucking, alleging among other things that Mr. Levandowski stole trade secrets when he stopped working for Waymo and went to work for Uber in its autonomous-driving car program. Dkt. #23 at ¶10. Waymo sought expedited discovery and a preliminary injunction. Dkt. #24. The Court ordered expedited discovery, and specifically ordered Uber to produce, among other things, "all files and documents downloaded by Anthony Levandowski . . . before leaving plaintiff's payroll and thereafter taken by them." Dkt. #61 at 3, ¶ 4.

**B. This Court's requirements of a detailed privilege log**

To the extent that Uber intends to assert any privilege over documents, Federal Rule of Civil Procedure 26(b)(5) and this Court's standing orders requires prompt production of a privilege log containing the following information:

> Privilege logs shall be promptly provided and must be sufficiently detailed and informative to justify the privilege. *See* FRCP 26(b)(5). No generalized claims of privilege or work-product protection shall be permitted. With respect to each communication for which a claim of privilege or work product is made, the asserting party must at the time of assertion identify:
>
> (a) all persons making or receiving the privileged or protected communication;
>
> (b) the steps taken to ensure the confidentiality of the communication, including affirmation that no unauthorized persons have received the communication;
>
> (c) the date of the communication; and
>
> (d) the subject matter of the communication.
>
> Failure to furnish this information at the time of the assertion will be deemed a waiver of the privilege or protection. The log should also indicate, as stated above, the location where the document was found.

Supp. Order to Setting Initial Case Management Conference in Civil Cases Before Judge William Alsup at ¶ 16; *see also* Fed. R. Civ. Proc. 26(b)(5).

On March 29, 2017, the undersigned advised the Court that a privilege log in this form would violate Mr. Levandowski's Fifth Amendment right against self-incrimination, as interpreted by the *Hubbell* and *Fisher* line of cases. 3/29/17 Trans. at 5-6, 9-10. Specifically, the undersigned noted that a privilege log in this form would reveal the existence, location, or

possession of evidence that Mr. Levandowski may possess and control that is of relevance to this action. *Id.*

The undersigned further noted that, to the extent Uber received information protected from disclosure by the Fifth Amendment, the company cannot disclose it because "counsel who acquires knowledge as part of a common interest agreement stands in the same shoes as counsel for an individual." *Id.* at 25:6-12. Arturo Gonzalez, counsel for Uber, echoed this concern, stating he wanted to discuss how to provide a privilege log "without infringing upon a Fifth Amendment right." *Id.* at 12-13. Mr. Gonzalez noted that Uber intended to identify a due diligence report on the privilege log, but was unsure whether to name the third party who prepared it. *Id.*

The undersigned asked to brief the question. *Id.* at 25:19-21. He also asserted Mr. Levandowski's "Fifth Amendment [act of] production rights under *United States v. Hubbell*," and made clear that Mr. Levandowski objected "to the disclosure of any confidential information that was acquired as part of a common interest privilege." *Id.* at 26:18-23.

This Court's March 31, 2017 order followed; it allows Mr. Levandowski to move under the Fifth Amendment to "suspend the production or the privilege log requirement.[1]" Dkt. #132.

## III. ARGUMENT:

### THE FIFTH AMENDMENT PROTECTS MR. LEVANDOWSKI FROM HAVING HIS LAWYERS—WHETHER DIRECT OR JOINT DEFENSE—REVEAL CONFIDENCES THAT MIGHT INCRIMINATE HIM.

#### A. Under The Fifth Amendment A Person May Not Be Compelled To Testify Against Himself.

The Fifth Amendment privilege not to be a witness against oneself is a central tenet of our democracy. *Quinn v. United States*, 349 U.S. 155, 161 (1955). "[A]ny compulsory

[1] In response to this Court's Order of March 31, 2017, counsel for Mr. Levandowski has briefed the application of the Fifth Amendment (which, here, arises from a common interest privilege) to the production of the third party report and any required privilege log notations for this report. This motion does not brief any other privileges that may apply to the production of all or any portion of the third party report, all of which are expressly reserved.

discovery by extorting the party's oath . . . to convict him of crime . . . is contrary to the principles of a free government . . . . It may suit the purposes of despotic power, but it cannot abide the pure atmosphere of political liberty and personal freedom." *Malloy v. Hogan*, 378 U.S. 1, 9 n.7 (1964).

**1. This Fifth Amendment protections are broadly construed and apply to any testimony that could provide a link in the chain of evidence.**

Given its importance to our criminal justice system, "[t]his provision of the [Fifth] Amendment must be accorded liberal construction in favor of the right it was intended to secure." *Hoffman v. United States*, 341 U.S. 479, 486 (1951). A person can invoke the Fifth Amendment's protections in any proceeding—be it "civil, criminal, administrative, judicial, investigative or adjudicatory." *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1263 (9th Cir. 2000). In the civil context, "the invocation of the privilege is limited to those circumstances in which the person invoking the privilege reasonably believes that his disclosures could be used in a criminal prosecution, or could lead to other evidence that could be used in that manner." *Id.* The "privilege against self-incrimination does not depend upon the *likelihood*, but upon the *possibility*, of prosecution and also covers those circumstances where the disclosures would not be directly incriminating, but could provide an indirect link to incriminating evidence." *Id.* (emphasis in original).

Courts have found that the privilege applies when an answer could:

- "[P]rovide an indirect link to incriminating evidence[.]" *Doe ex rel. Rudy-Glanzer*, 232 F.3d at 1263.
- "[P]rovide a lead or clue to evidence having a tendency to incriminate." *United States v. Neff*, 615 F.2d 1235, 1239 (9th Cir. 1980).
- Disclose "a fact that could serve as a link in a chain of circumstantial evidence from which guilt might be inferred" or a "fact" that "might furnish a lead to a bit of evidence useful to the prosecution." *Maffie v. United States*, 209 F.2d 225, 228 (1st Cir. 1954).

- "[G]ive a prosecutor a starting point from which he might proceed step by step to link the witness with criminal offenses." *J.C. Penney Life Ins. Co. v. Houghton*, Civ. A. No. 86-2637, 1986 WL 14732, at *3 (E.D.Pa. Dec. 24, 1986).

In short, the link-in-the-chain test is "broadly protective," *United States v. Chandler*, 380 F.2d 993, 1000 (2d Cir. 1967), and must be "liberally construed" by the courts. *Id.* at 997.

**2. *Fisher* and *Hubbell* make clear that the Fifth Amendment protects implicit testimony inherent in the act of producing documents in response to a court order or a subpoena**

In *Fisher v. United States*, the Supreme Court ruled that an individual can invoke the Fifth Amendment privilege in responding to a request for the production of documents. The Court held that, even when the content of a document itself is not privileged, the act of producing the document may be, because the act of producing evidence in response to a subpoena "has communicative aspects of its own, wholly aside from the contents of the papers produced." 425 U.S. 391, 410 (1976). In other words, when producing documents, a person tacitly testifies about (1) the actual existence of the papers demanded, (2) their possession or control by the witness, as well as the location of the documents, and (3) the witness's belief that the papers are those described in the subpoena. *Id.* The Supreme Court reaffirmed this holding and the act-of-production privilege in *United States v. Hubbell*, 530 U.S. 27, 32-36 (2000) (holding that, in response to a subpoena for documents, the subpoenaed party may refuse to produce because "the act of production itself may implicitly communicate statements of fact," such as an admission that "the papers existed, were in the [witness's] possession or control, and were authentic").

The Fifth Amendment's protection regarding an act of production applies with equal force even if the witness himself no longer possesses the documents sought, but rather has turned the documents over to his attorneys and their agents in order to get legal advice. *Fisher*, 425 U.S. at 405 (holding that "the papers, if unobtainable by summons from the client, are unobtainable by summons directed to the attorney by reason of the attorney-client privilege."). "The thrust of the Fifth Amendment is that 'prosecutors are forced to search for independent evidence instead of relying upon proof extracted from individuals by force of law.'" *United States v. Judson*, 322

F.2d 460, 466 (9th Cir. 1963) (*quoting United States v. White*, 322 U.S. 694, 698 (1944)). "'It follows, then, that when the client himself would be privileged from production of the document, either as a party at common law . . . or as exempt from self-incrimination, the attorney having possession of the document is not bound to produce.'" *Fisher*, 425 U.S. at 404. The fact that an individual furnished documents to his lawyer to obtain effective representation does not create an independent source from which to obtain those documents; rather, the lawyer stands in the shoes of his client when it comes to invoking the Fifth Amendment privilege. Absent a grant of immunity, a court cannot compel an individual, or his attorney, to make a production that could be used to build a case against him. *Hubbell*, 530 U.S. at 45 ("Given our conclusion that respondent's act of production had a testimonial aspect, at least with respect to the existence and location of the documents sought by the Government's subpoena, respondent could not be compelled to produce those documents without first receiving a grant of immunity under § 6003.")

**B. The Attorney-Client Privilege And The Duty Of Confidentiality Preclude An Attorney From Revealing Incriminating Communications That His Client Has Revealed In Confidence.**

Confidential communications between an attorney and his client are privileged. *Fisher*, 425 U.S. at 403 (citing 8 J. Wigmore, Evidence § 2292 (McNaughton rev. 1961)). An attorney must keep these communications secret unless a client waives the privilege. *Perrignon v. Bergen Brunswig Corp.*, 77 F.R.D. 455, 459-60 (N.D. Cal. 1978).

This Court also requires that all lawyers practicing before it adhere to the California Rules of Professional Conduct, *see* NDCA Civil Local Rule 11-4 (requiring that any attorney practicing in the court be "familiar and comply with the standards of professional conduct required of members of the State Bar of California"), which even more broadly obligate attorneys to resist disclosing any "confidences" or "secrets" of their clients. Both California statutory law and the California Rules of Professional Conduct mandate that lawyers "maintain inviolate the confidence, and at every peril to himself or herself . . . preserve the secrets, of his

or her client." Cal. Bus. & Prof. Code § 6068(e)(1) (emphasis added); accord Cal. Rules of Prof'l Conduct R. 3-100(A) ("A member shall not reveal information protected from disclosure by Business & Professions Code § 6068(e)(1) without the informed consent of the client.").

The duty not to disclose client "confidences" and "secrets" is virtually absolute and much broader in scope than privilege. *See* Vapnek *et. al*., CAL. PRACTICE GUIDE: PROFESSIONAL RESPONSIBILITY (The Rutter Group 2016) §7:26; *see also* Cal. State Bar Formal Opn. No. 2003-161 (a California attorney's ethical duty of confidentiality under §6068(e) protects "all information gained in the professional relationship that the client has requested be kept secret or the disclosure of which would likely be harmful or embarrassing to the client.") In short, if a client does not permit disclosure, then disclosure must be avoided unless an appropriate court order is obtained by the requesting party. CAL. PRACTICE GUIDE: PROFESSIONAL RESPONSIBILITY, at §§ 7:86, 7:103-106. To avoid violating the duty of confidentiality, a lawyer must not disclose any client confidences unless and until the court has determined that an exception to §6068(e)(1) applies. *Id*. at § 7:88.

### C. A Common-Interest Privilege Extends The Attorney-Client Privilege And Duty Of Confidentiality To Counsel Representing Third Parties

In general, the disclosure to a third party of attorney-client communications destroys any privilege that might otherwise attach to such communications. But that rule does not hold when the privilege holder and the third party share a common legal interest with respect to the subject matter of the communication and enter into their own agreement of confidentiality. *See, e.g, Gonzalez*, 669 F.3d at 978. This extension of the attorney-client privilege, known as a "common interest privilege," "applies where (1) the communication is made by separate parties in the course of a matter of common interest; (2) the communication is designed to further that effort; and (3) the privilege has not been waived." *United States v. Bergonzi*, 216 F.R.D. 487, 495 (N.D. Cal. 2003); *see also United States v. Henke*, 222 F.3d 633, 637 (9th Cir. 2000) (existence of a joint defense agreement extends the attorney-client privilege to create an implied attorney-client relationship between the codefendants and their counsel).

One party to a joint defense agreement "cannot unilaterally waive the privilege for other holders." *Gonzalez*, 669 F.3d at 982; *In re Grand Jury Subpoenas*, 902 F.2d 244, 250 (4th Cir. 1990) (holding that all documents related to common claim "are subject to a joint defense privilege that [one party] may not waive unilaterally"). Courts recognize that allowing unilateral waiver of confidential communications by one party without the consent of the others "would likely severely undermine the rationale for the joint defense privilege in the first place." *Gonzalez*, 669 F.3d at 983.

A common interest or joint defense agreement is permissible in many circumstances. It does not need to be in writing; it "may be implied from conduct and situation, such as attorneys exchanging confidential communications from clients who are or potentially may be codefendants or have common interests in litigation." *Gonzalez*, 669 F.3d at 979 (internal citations omitted). Nor does it matter whether the litigation in question is civil or criminal, or even whether the parties would align on the same side of the pleadings. *Id.* (*citing In re Grand Jury Subpoenas*, 902 F.2d 244, 249 (4th Cir. 1990)). Indeed, the joint defense privilege applies even if litigation is not in the offing at the time of the agreement between the parties. *Nidec Corp. v. Victor Co.*, 249 F.R.D. 575, 578 (N.D. Cal. 2007) ("The protection of the privilege under the community of interest rationale [] is not limited to joint litigation preparation efforts. It is applicable whenever parties with common interests join forces for the purpose of obtaining more effective legal assistance."). In all of these circumstances, it is sufficient that the legal interests of the parties invoking the privilege are aligned. *See Holmes v. Collection Bureau of America Ltd.*, No. C 09-02540 WHA, 2010 U.S. Dist. LEXIS 4253, 2010 WL 143484 (N.D. Cal. Jan. 8, 2010) (finding joint defense privilege where "counsel for both defendants submitted sworn declarations that they agreed to pursue a joint defense strategy . . . and to communicate with each other regarding their shared legal interests").

Courts have expressly held that information shared between individuals and companies in the context of a potential acquisition can fall within the ambit of a common interest privilege's protections. *See, e.g., Hewlett-Packard Co. v. Bausch & Lomb, Inc.*, 115 F.R.D. 308, 310, 312

(N.D. Cal. 1987) (no waiver of attorney-client privilege when defendant, Bausch & Lomb, disclosed a patent opinion letter to a nonparty during negotiations for the purchase of a division of Bausch & Lomb); *OXY Res. Cal. LLC v. Superior Court*, 115 Cal. App. 4th 874, 898-899 (2004) (the common interest "nonwaiver principle" applies to information disclosed in pre-acquisition communications). The determinative factor is whether the communication was "designed to further a joint legal effort" or "in the course of formulating a common legal strategy." *See Nidec Corp*., 249 F.R.D. at 579 (discussing *Hewlett-Packard Co. v. Bausch & Lomb, Inc*.); *see also OXY Res. Cal. LLC*, 115 Cal. App. 4th at 898-99.

Here, there is no question that a valid joint defense agreement exists between Mr. Levandowski and Uber. It was memorialized in writing and is attached as Exhibit A to the Declaration of Mr. Levandowski's attorney, John Gardner. That agreement was entered into for the express purpose of protecting communications made in the course of an ongoing joint effort to defend against "potential investigations, litigation, and/or other proceedings relating to the proposed transaction between Ottomotto, Otto Trucking and Uber and/or any affiliates of Uber." Ex. A to Gardner Declaration at 1. In keeping with that purpose, the agreement contains an unconditional promise that the signatories would keep any documents shared under the agreement secret. *Id.* ¶¶ 2-5.

### D. Requiring A Detailed Privilege Log Here Would Violate Mr. Levandowski's Fifth Amendment Privilege

The basic purpose of a privilege log is to provide information sufficient for other parties and the court to assess whether an asserted privilege applies, but without actually disclosing the information protected by the privilege itself. Thus, Federal Rule of Civil Procedure 26(b)(5)(ii) provides that privilege logs must "describe the nature of the documents, communications, or tangible things not produced or disclosed . . . *without revealing information itself privileged* or protected . . . ." (emphasis added).

In the ordinary case, where no Fifth Amendment act-of-production right has been invoked, the detailed information required by this Court's standing order can be provided

without revealing the privileged or protected content of the information for which protection is sought. But the situation presented here is different—because public disclosure of even such commonplace details as whether a document exists, who may have possessed it, or where it is located would divulge information that the Fifth Amendment protects. *See Fisher*, 425 U.S. at 410.

Accordingly, courts hold that the requirement of a detailed privileged log must yield to the constitutional right to be free from forced self-incrimination. *See Chin*, 2012 U.S. Dist. LEXIS 182252, at *26; *In re Syncor ERISA Litig*., 229 F.R.D. at 649; *see also In re Fustolo*, No. 13-12692-JNF, 2015 WL 9595421, at *1, 5 (Bankr. D. Mass. Dec. 31, 2015) (implicitly accepting argument that a privilege log would undermine right against self-incrimination by modifying the privilege log requirement).

As the Court noted in its March 31, 2017 order, Uber's counsel has already indicated in open court that, "prior to the acquisition of Otto Trucking LLC and Ottomoto LLC, Uber Technologies, Inc. obtained a due diligence report prepared by a third party that *may (or may not)* have referenced the collection of allegedly downloaded documents." Dkt. #132 at 1:16-18 (emphasis added). Adding further detail to this disclosure is precisely what threatens Mr. Levandowski's *Hubbell* and *Fisher* rights. To the extent that Mr. Levandowski *may have* produced any documents for review by a third party hired by counsel for the common purpose of obtaining legal advice, his doing so would have conveyed the same *implicit testimony* that accompanies every act of production—namely, a tacit assertion that documents exist, that they were within his possession, and that they were responsive to a request or question posed as part of the privileged due diligence effort.

What the *Hubbell* and *Fisher* line of cases teach, at bottom, is that there is no meaningful constitutional difference between "saying something" with words and "saying something" with the act of production. Hence, any testimonial communications that Mr. Levandowski made through his act of production to his own counsel, and then to any other counsel bound by a common interest privilege, are twice-protected against court-ordered disclosure. These

communications are protected by the attorney-client privilege, as extended through the common interest privilege here, and they are protected further under the Fifth Amendment. The Court cannot, consistent with the Fifth Amendment, order Mr. Levandowski—or *any counsel owing obligations of attorney-client confidentiality to him*—to disclose information that could furnish a "link in the chain" to the existence, possession, location, or identity of evidence that may be used in any possible criminal prosecution of Mr. Levandowski.

Plaintiffs are certainly free to use any legitimate tools of civil discovery to locate evidence they deem relevant to their civil lawsuit. But they are not free to use the power and authority of this Court to order disclosures that are protected under Mr. Levandowski's Fifth Amendment rights. Thus, absent an order granting Mr. Levandowski immunity coextensive with 18 U.S.C. § 6002 or a showing by the government that it already knew of the existence, location, possession, and identity of such documents with a degree of particularity rendering each question a "foregone conclusion," any order compelling Uber's counsel to disclose these confidential testimonial communications on a privilege log would run afoul of the Fifth Amendment. *See United States v. Bright*, 596 F.3d 683, 692 (9th Cir. 2010) (It is only "[w]here the existence and location of the documents are a foregone conclusion and the individual adds little or nothing to the sum total of the Government's information by conceding that he in fact has the documents . . . that enforcement of the summons' does not touch upon constitutional rights.").

**E. This Court Should Modify Its Order To Suspend The Requirements Of A Privilege Log For Any Documents Protected By The Fifth Amendment.**

The Court's order to Uber—which by its terms would require the company to produce any documents (to the extent it received any) that Mr. Levandowski produced under a common-interest privilege—would violate Mr. Levandowski's Fifth Amendment rights. With respect to any such documents, this Court should modify its order to require only disclosure of information sufficient to establish (a) the existence of a common-interest agreement between Mr. Levandowski and Uber, and (b) that Mr. Levandowski provided information to the third-party conducting due diligence under the agreement. Uber should not be required to disclose

information regarding the location of any protected document, including the name of the third-party vendor, or the subject matter beyond noting “due diligence report.” Requiring Uber to provide this information would violate the Fifth Amendment as those details could serve as a link in the chain for the government to obtain the report and use it in any criminal investigation of Mr. Levandowski. *Hubbell*, 530 at 45 (information regarding “the existence and location of the documents sought” is protected by the Fifth Amendment).

To the extent the Court requires additional information from Mr. Levandowski relating to Fifth Amendment privilege issues, Mr. Levandowski is prepared to submit the information *in camera* and *ex parte*, a procedure that is approved by the Ninth Circuit. *See, e.g.*, *United States v. Drollinger*, 80 F.3d 389, 393 (9th Cir. 1996).

///

///

///

///

///

///

///

///

///

///

///

///

## IV. CONCLUSION

To properly protect Mr. Levandowski's Fifth Amendment rights, this Court must modify the normal requirements of a privilege log with respect to the third-party due diligence report. Without this requested accommodation, this Court will be compelling Mr. Levandowski to disclose information that he shared in confidence with his lawyers under an attorney-client and common-interest privilege, in violation of *Hubbell* and *Gonzalez*. If Mr. Levandowski is forced to do so, his implicit testimony will surely be used against him later, should a criminal investigation develop.

Date: April 4, 2017

Respectfully submitted,

/s/ ______________________________

Miles Ehrlich
Ismail Ramsey
Amy Craig
Ramsey & Ehrlich LLP
803 Hearst Avenue
Berkeley, CA 94710
Tel: (510) 548-3600
Fax: (510) 291-3060

miles@ramsey-ehrlich.com
izzy@ramsey-ehrlich.com
amy@ramsey-ehrlich.com

***Counsel for Non-Party Anthony Levandowski***

I, John Gardner, declare and affirm as follows:

1. I am a partner at the law firm of Donahue Fitzgerald LLP and am licensed to practice law in the State of California. The facts stated herein are of my own personal knowledge and, if sworn as a witness, I could and would testify competently thereto.

2. I represented Anthony Levandowski in connection with Uber's acquisition of Ottomotto LLC in 2016.

3. In connection with this transaction, Ottomotto LLC, Otto Trucking LLC, Uber Technologies, Inc., Anthony Levandowski and Lior Ron, and their respective attorneys, including me, entered into a Joint Defense, Common Interest and Confidentiality Agreement ("Joint Defense Agreement"), a true and correct copy of which is attached as Exhibit A.

4. Thereafter, a third party prepared a due diligence report that may (or may not) have referenced documents reviewed pursuant to the common interest privilege created by the Joint Defense Agreement.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct and that this declaration is executed on this 3rd day of April, 2017 at Walnut Creek, California.

John Gardner

EXECUTION

**JOINT DEFENSE, COMMON INTEREST AND CONFIDENTIALITY AGREEMENT**

This JOINT DEFENSE, COMMON INTEREST AND CONFIDENTIALITY AGREEMENT (this "Agreement") is hereby entered into by and among Ottomotto LLC ("Ottomotto"), Otto Trucking LLC ("Otto Trucking"), Anthony Levandowski ("Levandowski"), Lior Ron ("Ron") and Uber Technologies, Inc. ("Uber"), and their respective attorneys (hereinafter referred to individually as a "Party" and collectively as the "Parties"), in contemplation of potential investigations, litigation, and/or other proceedings relating to the proposed transactions between Ottomotto, Otto Trucking and Uber and/or any affiliates of Uber (hereinafter termed as the "Transaction").

WHEREAS, the Parties and their respective legal counsel have recognized and have discussed that certain third parties may be notified of the Transaction and such parties may conduct investigations and proceedings (collectively, "Potential Proceedings") that may require submission of additional information. The purpose of this Agreement is to confirm terms and conditions for the Parties' common interest in opposing, and, if necessary, engaging in a joint defense against Potential Proceedings; and

WHEREAS, the Parties have undertaken and may undertake factual, legal and economic research, investigation and analysis (including any such analysis performed by third parties), and the Parties are of the opinion that it is in the best interests of the Parties to exchange certain information, pool individual work product, and cooperate in connection with any filings, submissions, or Potential Proceedings; and

WHEREAS, cooperation in such a joint defense and/or common interest effort necessarily involves the exchange of confidential business, financial, technical and other information, as well as information that is otherwise a privileged attorney/client communication and/or attorney work product; and

WHEREAS, the Parties have confidential and proprietary documents containing financial, operating and planning data, which they have shared with each other and may wish to disclose to retained lawyers, economists and/or consultants for the Parties; and

WHEREAS, the Parties recognize that they share a common interest in resolving any issues concerning the Transaction under all applicable laws and that a joint defense effort will promote evaluation and preparation of their respective defenses; and

WHEREAS, the Parties by their joint defense and common interest efforts (i) do not intend to diminish in any way the confidentiality of any materials exchanged between the Parties and (ii) intend to rely on the joint defense and common interest exceptions to the waiver of the attorney/client and attorney work product privileges; and

WHEREAS the Parties wish to pursue their common interests and to avoid any suggestion of waiver of the confidentiality or immunity of communications and documents protected by the attorney-client privilege, the attorney work product doctrine, or any other

applicable privileges or immunities under applicable statutes, rules, regulations and common law.

NOW, THEREFORE, in consideration of the mutual terms and covenants herein, the Parties memorialize their pre-existing understanding and oral agreement and further agree as follows:

1. All non-public information, documents, data, opinions, strategies or other materials in any form, including oral, written or electronic communications, exchanged or communicated in the past or future by whatever means between or among the Parties in connection with the joint defense efforts pursuant to and in connection with any Potential Proceedings, the defense of the Transaction and any actions related to or arising out of the Transaction (hereinafter referred to collectively as "Joint Defense Information"), shall be deemed subject to the terms of this Agreement. Wherever possible, the party providing the Joint Defense Information (the "Producing Party") shall label the materials "Joint Defense Information - Privileged and Confidential," although materials may be Joint Defense Information subject to the terms of this Agreement even if not labeled.

2. Each Party affirms that Joint Defense Information includes information that has been communicated to counsel in confidence, by one or both of the Parties, for the purpose of securing legal advice and representation and attorney-work product and that all such Joint Defense Information is therefore subject to the attorney/client and/or work product privilege belonging to the client or an attorney, which privilege may not be waived by any Party without the prior written consent of the client or attorney entitled to assert such privilege. Any disclosure, whether inadvertent or purposeful, by any Party of information exchanged pursuant to this Agreement shall not constitute a waiver of any privilege or protection of any other Party. No Party has or will have authority to waive any applicable privilege or doctrine on behalf of another Party.

3. The Parties hereby agree that to the extent that Joint Defense Information is disclosed to them (the "Receiving Party"), it will be kept confidential and disclosed by the Receiving Party only to the following persons who will maintain its confidentiality: (i) the signatories to this Agreement and the partners, associates, staff and other employees of their respective law firms who are working on the joint defense effort and/or any Potential Proceeding in connection with the Transaction; (ii) experts retained by any Party to assist in the joint defense effort and any related Potential Proceeding in connection with the Transaction; (iii) any outside copying service or other outside vendor retained by any Party that is necessary to assist in the joint defense effort and any related Potential Proceeding in connection with the Transaction, so long as such outside copying service or other outside vendor is subject to a written obligation to not use or disclose Joint Defense Information other than for the purpose of assisting the Parties in a Potential Proceeding in connection with the Transaction; (iv) except as provided in Paragraph 4, each other Party; and (v) subject to Paragraph 7, as required by law. It is expressly understood that, except as expressly provided for herein, Joint Defense Information shall not be further disclosed to any other person, unless authorized in writing by the Producing Party.

4. Nothing in this Agreement shall preclude any Producing Party from designating material "Outside-Counsel Only" or "Attorneys Eyes Only." The term "Outside Counsel" shall refer to any law firm that is or may become a signatory to this Agreement. Joint Defense Information provided on an "Outside-Counsel Only" basis may be exchanged among outside counsel, attorneys within the outside counsel's law firm, and employees or agents of such firm, and may be provided to any experts or vendors (and including any employees or agents of their firms) retained in connection with the Transaction, but shall not be divulged to any other person. All Joint Defense Information that a Producing Party intends to be provided on an "Outside-Counsel Only" basis shall be clearly marked or otherwise designated "Outside-Counsel Only." The term "Attorneys Eyes Only" shall include (i) Outside Counsel, including employees or agents of such firm; (ii) in-house lawyers for the Parties; and (iii) any experts and vendors (and including any employees or agents of their firms) retained in connection with the Transaction so long as such experts and vendors are subject to a written obligation to not use or disclose Joint Defense Information other than for the purpose of assisting the Parties in a Potential Proceeding in connection with the Transaction.

5. Except as otherwise provided for herein, Joint Defense Information will be used by the Receiving Party only for purposes of the joint defense effort and any Potential Proceeding in connection with the Transaction, as identified above, and shall not be used for any other purpose without the prior written consent of the Producing Party. Notwithstanding the foregoing, in any proceeding between the Parties, the fact that a Party provided the other Party with information or a document as Joint Defense Information under this Agreement will not (i) preclude or limit in any way the Producing Party's ability to reference or use such information or documents; or (ii) affect the discoverability or use of such information or documents by the Receiving Party, provided that (a) such information or documents would otherwise have been subsequently discoverable or obtainable from the Producing Party without asserting that there has been a waiver of attorney client privilege or attorney work product protection for such documents or information as a result of being provided to the Receiving Party as Joint Defense Information; or (b) is otherwise obtained by the Receiving Party from other sources outside of this Agreement without violating this Agreement.

6. Joint Defense Information shall not include documents and information that: (a) were generally publicly available prior to the date hereof; (b) become publicly available subsequent to the date hereof other than through an unlawful act or breach of the Receiving Party under this Agreement; (c) are in the possession of a Party that were lawfully obtained from a source other than the Producing Party; and (d) are obtained from a third party or were received or developed outside of this joint defense effort subsequent to the date hereof without violating this Agreement. Joint Defense Information includes, however, communications between or among the Parties forwarding, discussing, or relating to the information in categories (a)-(d) of this paragraph.

7. If any person or entity requests or demands from a Receiving Party access to Joint Defense Information that the Receiving Party obtained from a Producing Party by subpoena, court order, arbitral order or otherwise, the Party receiving the demand, subpoena or order shall notify the Producing Party in writing within forty-eight (48) hours. Each Party agrees that, except as required by law, the Producing Party shall have the opportunity promptly, and in any event no more than ten (10) days after receiving notice of the subpoena or order, to

assert any rights or privileges against the request to obtain the material, and that the Producing Party and the Party who received the request shall take all steps necessary and appropriate to assist in the assertion of applicable rights and privileges with regard to said Joint Defense Information in the appropriate forum. The Producing Party shall bear the legal costs, including attorneys' fees, in asserting such rights and privileges, subject to Uber's obligation to provide indemnification to Ottomoto, Otto Trucking, Levandowski and Ron pursuant to any written agreement among the Parties. If the return date on the subpoena or order is less than ten (10) days, the Party receiving the subpoena or order shall take all reasonable steps to secure an extension of time for the Producing Party to have a reasonable opportunity to assert any applicable rights or privileges prior to the return date.

8. The existence of this Agreement or of a joint defense or common interest effort in connection with the Transaction shall not be used in any fashion against any of the Parties to this Agreement, except that nothing herein shall prohibit the use of the foregoing to enforce the obligations, rights, and remedies of the Parties under this Agreement. No Party to this Agreement will claim (i) that any counsel is disqualified in such litigation or any other matter by reason of the joint defense or common interest effort or such counsel's access to confidential, privileged, or work product documents or (ii) that this Agreement creates any attorney-client relationship that did not exist prior to the earlier of any prior understanding of the Parties regarding their common interests with respect to the Transaction, or the execution of this Agreement.

9. At any time, any Producing Party may request of any Receiving Party in writing that it return to the Producing Party or destroy any Joint Defense Information provided to the Receiving Party pursuant to this Agreement and the Receiving Party will promptly comply with such request except as prohibited by law, legal duty or legal obligation. Upon request of the Producing Party, a Receiving Party will redact (i.e., permanently delete) from any retained work product all statements and disclosures of Joint Defense Information provided by the Producing Party; provided, however, that each Party's Outside Counsel may retain an original (i.e., non-redacted) copy of any such work product on the condition that it will not provide the original work product to its client without making any necessary redactions unless it has obtained the prior written consent of the Producing Party. The Parties agree that a failure to return, destroy, or redact such materials upon request provides adequate grounds for the Producing Party to seek a court order directing return, destruction, or redaction of the materials. If a Receiving Party is unable to ensure the destruction or redaction of any Joint Defense Information, it will take reasonable measures to make such Joint Defense Information permanently inaccessible to employees of the Receiving Party. Any such destruction or redaction shall, upon the written request of the Producing Party, be certified in writing to the Producing Party by an authorized person supervising the same. Even after the conclusion of the joint defense effort, Joint Defense Information will be treated as confidential. The Parties acknowledge that they and others permitted access to Joint Defense Information pursuant to this Agreement may maintain archived or back-up tapes and other media not accessed in the ordinary course of business but used only to restore inadvertently destroyed or otherwise lost data ("Back-up Systems") that may include such Joint Defense Information. Notwithstanding the foregoing, the Parties acknowledge that it would be burdensome to remove information from such Back-up Systems or to render the information permanently inaccessible. The Parties shall not be required to engage in such steps but agree that they shall take no steps to retrieve such information from

Back-up Systems in the absence of any need to use those Back-up Systems more generally to restore destroyed or lost data. Such Back-up Systems will be erased or destroyed in accordance with the Parties' normal course document preservation and destruction policies. Further, in the event such Back-up Systems are used to restore data destroyed or lost for other reasons, any Joint Defense Information will be removed from such restored systems and destroyed or rendered permanently inaccessible.

10. Nothing in this Agreement shall obligate any Party to provide any information to any other Party or exchange any information with any other Party. The Parties each recognize their respective rights to separately confer, and to elect not to share such communications with the other Party.

11. Nothing in this Agreement shall restrict any Party from using or disclosing in any manner it chooses materials, whether confidential or otherwise, originating with that Party so long as such materials do not contain or disclose Joint Defense Information that was received from another Party.

12. Any Party may withdraw from the Agreement upon written notification (electronic or otherwise) to the other Parties. All Parties agree that in the event any Party withdraws, such Party will promptly return or destroy (pursuant to Paragraph 9) all Joint Defense Information provided by any of the other Parties and any such destruction shall, upon the request of the Producing Party, be certified in writing to the Producing Party by an authorized person supervising the same. The Parties agree that a failure to return or destroy such materials provides adequate grounds for the Producing Party to seek a court order directing return or destruction of the materials. Notwithstanding any withdrawal, each Party remains subject to the provisions of Paragraphs 2-9 and 13-14 of this Agreement.

13. Each Party acknowledges and agrees that money damages would not be a sufficient remedy for any breach of any provision of this Agreement by any Party, and that in addition to such remedies which any non-breaching Party may have, such non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy for such breach.

14. Each Party agrees to assume liability for any breach of this Agreement by it or any third-party it retains in conjunction with its representation related to the Transaction. Each Party hereby agrees that it assumes liability for any breach of this Agreement.

15. Any modifications to this Agreement must be in writing and signed by all Parties.

16. Any and all disputes concerning the validity, construction, interpretation, and effect of this Agreement shall be resolved under the laws of the State of Delaware applicable to agreements made and to be performed entirely with the State of Delaware, without regard to the conflict of law provisions thereof that would result in the application of the law of any other jurisdiction. Each party hereby irrevocably and unconditionally consents to submit to the exclusive jurisdiction of the Delaware Court of Chancery in and for New Castle County, or in the event (but only in the event) that such Delaware Court of Chancery does not have subject matter jurisdiction over such matter, the United States District Court for the District of Delaware (as

applicable, the "Chosen Court"), for any actions, suits or proceedings arising out of or relating to this Agreement and the transactions contemplated hereby (and each party agrees not to commence any action, suit or proceeding relating thereto except in such courts, and further agrees that service of any process, summons, notice or document by registered mail to such party's address in the notice provision of the Transaction Agreement shall be effective service of process for any action, suit or proceeding brought against it in any such court). Each Party hereby irrevocably and unconditionally waives and agrees not to plead or claim in any such court that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

17. The Parties (or any successor entity to such Parties), together with any other signatories thereto, executed a Mutual Non-Disclosure Agreement, dated as of February 1, 2016 (as amended, the "NDA"). This Agreement is intended to supplement, not replace, the NDA and this Agreement should be read consistently with the NDA. To the extent there is any conflict between this Agreement and the NDA, this Agreement shall control.

18. This Agreement may be executed in counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

*[signatures only to follow]*

**JOINT DEFENSE PRIVILEGED**

Ottomotto LLC:

By: ______________________

Date: ______________________

Otto Trucking LLC:

By: ______________________

Date: ______________________

Uber Technologies, Inc.:

By: ______________________
Travis Kalanick, President, Chief Executive Officer and Secretary
Date: April 11, 2016

Counsel for Ottomotto LLC/Otto Trucking LLC:

By: ______________________
Eric Amdursky
O'Melveny & Myers LLP

Date: ______________________

Counsel for Uber Technologies, Inc.:

By: ______________________
Eric Tate
Morrison & Foerster LLP

Date: ______________________

Anthony Levandowski:

By: ______________________

Date: ______________________

Counsel for Levandowski:

By: ______________________
John F. Gardner
Donahue Fitzgerald LLP

Date: ______________________

Lior Ron:

By: ______________________

Date: ______________________

**JOINT DEFENSE PRIVILEGED**

Ottomotto LLC:

By: ______________________________

Date: ______________________________

Uber Technologies, Inc.:

By: ______________________________

Date: ______________________________

Otto Trucking LLC:

By: ______________________________

Date: ______________________________

Counsel for Ottomotto LLC/Otto Trucking LLC:

By: ______________________________
Eric Amdursky
O'Melveny & Myers LLP

Date: ______________________________

Counsel for Uber Technologies, Inc.:

By: Eric Tate by [initials]
Eric Tate
Morrison & Foerster LLP

Date: April 11, 2016

Anthony Levandowski:

By: ______________________________

Date: ______________________________

Counsel for Levandowski:

By: ______________________________
John F. Gardner
Donahue Fitzgerald LLP

Date: ______________________________

Lior Ron:

By: ______________________________

Date: ______________________________

#688754.2

**JOINT DEFENSE PRIVILEGED**

Ottomotto LLC:

By: ______________________________

Date: April 11, 2016

Uber Technologies, Inc.:

By: ______________________________

Date: ______________________________

Otto Trucking LLC:

By: ______________________________

Date: April 11, 2016

Counsel for Ottomotto LLC/Otto Trucking LLC:

By: ______________________________
Eric Amdursky
O'Melveny & Myers LLP

Date: ______________________________

Counsel for Uber Technologies, Inc.:

By: ______________________________
Eric Tate
Morrison & Foerster LLP

Date: ______________________________

Anthony Levandowski:

By: ______________________________

Date: ______________________________

Counsel for Levandowski:

By: ______________________________
John F. Gardner
Donahue Fitzgerald LLP

Date: April 11, 2016

Lior Ron:

By: ______________________________

Date: April 11, 2016

#688754.2

**JOINT DEFENSE PRIVILEGED**

Ottomotto LLC:

By: ______________________________

Date: ______________________________

Uber Technologies, Inc.:

By: ______________________________

Date: ______________________________

Otto Trucking LLC:

By: ______________________________

Date: ______________________________

Counsel for Ottomotto LLC/Otto Trucking LLC:

By: ______________________________
Eric Amdursky
O'Melveny & Myers LLP

Date: April 11, 2016

Counsel for Uber Technologies, Inc.:

By: ______________________________
Eric Tate
Morrison & Foerster LLP

Date: ______________________________

Anthony Levandowski:

By: ______________________________

Date: ______________________________

Counsel for Levandowski:

By: ______________________________
John F. Gardner
Donahue Fitzgerald LLP

Date: ______________________________

Lior Ron:

By: ______________________________

Date: ______________________________

#688754.2

**JOINT DEFENSE PRIVILEGED**

Counsel for Ron:

By: ______________________________
Alisa J. Baker
Levine & Baker LLP

Date: April 11, 2016

# EXHIBIT 3

**Pages 1 - 58**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

| | |
|---|---|
| WAYMO LLC,<br><br>Plaintiff,<br><br>VS.<br><br>UBER TECHNOLOGIES, INC.; OTTO TRUCKING LLC; and OTTOMOTTO LLC,<br><br>Defendants. | **NO. C 17-00939 WHA** |

San Francisco, California
Thursday, April 6, 2017

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiff:

QUINN, EMANUEL, URQUHART, OLIVER & SULLIVAN LLP
50 California Street - 22nd Floor
San Francisco, California 94111
**BY: MELISSA J. BAILY, ATTORNEY AT LAW**
**CHARLES K. VERHOEVEN, ATTORNEY AT LAW**
**JORDAN R. JAFFE, ATTORNEY AT LAW**

For Defendants:

MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105
**BY: ARTURO J. GONZALEZ, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY: Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
Official Reporter

**APPEARANCES**: (CONTINUED)

For Defendants:
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Avenue, N.W.
Washington, D.C. 20015
**BY: KAREN L. DUNN, ATTORNEY AT LAW**

For Intervenor Defendant Anthony Levandowski:
RAMSEY & EHRLICH LLP
803 Hearst Avenue
Berkeley, California 94710
**BY: ISMAIL RAMSEY, ATTORNEY AT LAW**
**MILES EHRLICH, ATTORNEY AT LAW**

**Thursday - April 6, 2017** **9:31 a.m.**

**P R O C E E D I N G S**

**---000---**

**THE CLERK:** Calling Civil 17-939 WHA, Waymo LLC versus Uber Technologies, Inc., et al. It's on for motion hearing.

Counsel, please state your appearances.

**MS. BAILY:** Your Honor, Melissa Baily and my colleagues Charlie Verhoeven and Jordan Jaffe for Waymo.

**THE COURT:** Thank you.

**MR. RAMSEY:** Good morning, Your Honor. Ismail Ramsey and my colleague Miles Ehrlich of Ramsey & Ehrlich on behalf of Anthony Levandowski.

**THE COURT:** Thank you.

**MR. GONZALEZ:** Good morning, Your Honor. Arturo Gonzalez for Morrison & Foerster on behalf of Uber.

**MS. DUNN:** And Karen Dunn from Boies, Schiller & Flexner on behalf of Uber.

**THE COURT:** All right. Thank you. Good morning to all of you.

Motion to intervene, what do you have to say on that motion?

**MR. RAMSEY:** Your Honor, just we'll submit it. We're asking for a permissive motion to intervene just with respect to this motion -- not this motion, I'm sorry -- the motion to modify.

**THE COURT:** All right. Let me ask. Is anyone going to be arguing that granting this motion would somehow improve chances for arbitration?

(Pause in proceedings.)

**THE COURT:** Mr. Gonzalez, I want to know if this is going to be used to say that this improves the argument for arbitration.

**MR. GONZALEZ:** Your Honor, candidly, I hadn't given it any thought at all. That's not our intent.

**THE COURT:** All right. I'll take you at your word it is not your intent, so I'm going to allow the intervention, but solely for purposes of this motion and it has nothing to do with arbitration.

All right. Let's hear your motion.

**MR. RAMSEY:** Your Honor, you want me to begin?

**THE COURT:** I'm sorry?

**MR. RAMSEY:** You'd like me to begin?

**THE COURT:** What?

**MR. RAMSEY:** I just would ask --

**THE COURT:** Yes, please begin.

**MR. RAMSEY:** Okay. Your Honor, Anthony Levandowski has asserted his Fifth Amendment broadly. Waymo wants to get certain information from Anthony. They want to know to whom did he give materials in his possession to review for due diligence. The Fifth Amendment prevents this.

So what they can't get from Mr. Levandowski, Waymo is seeking to pry out from his lawyers. It's the equivalent of serving an interrogatory *To whom did you give the materials to for review?* Answering this question on a privilege log or through production of documents carries the implicit testimony of, one, *What were the files that you gave?* and, two, *Where are they and who may have them now?*

So what they can't get from Anthony, they're trying to get from his lawyers. This information, the tacit testimony that comes with any active production of documents is the heart of what the Supreme Court in *Hubbell* says the Fifth Amendment protects. It's the testimony about the existence of documents, the possession and location, and that these are the documents that are requested.

This is implicit testimony Mr. Levandowski gave to his lawyer, information about these documents, when he produced, to the extent that he did, any documents to his lawyer, and then those lawyers would share under a valid joint defense privilege.

*Gonzalez* teaches us that a common interest privilege is an extension of the attorney-client privilege. So the attorneys within that joint defense privilege stand in the shoes of the client with respect to asserting the Fifth Amendment privilege. The extension of that attorney-client privilege carries with it the duty of confidentiality. Not only is there the extension

of the attorney-client privilege, but the requirements of the Business and Professions Code and the legal ethics to not reveal client confidences.

We've shown here that this information, to the extent that it was, was provided in the context of this joint defense privilege. The privilege is valid.

As we submitted, there was a written joint defense agreement which explicitly set forth the purposes; and as we pointed out, it was prepared and entered into in contemplation -- and I'm quoting, Your Honor -- "in contemplation of potential investigations, litigation, and/or other proceedings relating to the proposed transactions."

**THE COURT:** What were those proceedings?

**MR. RAMSEY:** Well, it's the -- there were no active proceedings at that time, but they were the potential proceedings.

I would actually quote --

**THE COURT:** Well, what were they? What were the potential proceedings?

**MR. RAMSEY:** Well, there's various things. One of those could have been this very litigation. As I would quote the opening paragraph from Waymo's brief opposing our motion, it says (reading):

"That agreement," the joint defense agreement, "expressly contemplated potential litigation regarding the

yet-to-be-consummated acquisition; i.e., Uber, Otto. Mr. Levandowski and their lawyers anticipated that there would be a legal proceeding just like this one."

**THE COURT:** So tell me, have I got this right, that way back before any of this litigation started and at the time this acquisition was being negotiated, your client and Uber were fearful that litigation like this would arise? True?

**MR. RAMSEY:** I would say, yes, fearful general litigation and the potential that litigation like this would arise.

**THE COURT:** But why? If it was a legitimate deal, why would they have anything to fear?

**MR. RAMSEY:** Well, there's a lot of aggressive litigation surrounding patents. There are employment issues, particularly when someone's going from one company to another and there are noncompete agreements. So there's a variety of various issues that arise when an employee moves from one company to another; and some of the issues that, quite frankly, were raised in the arbitration are ones that are potential.

**THE COURT:** But that came later, didn't it?

**MR. RAMSEY:** Not the issue, not the potential issue for it. I think here you've got the issue of an acquisition of an individual moving from one company to another, and the the potential for litigation in various aspects are present, particularly where you have companies or employers who

aggressively assert a patent. Technology has come to fruition in this lawsuit. There's a variety of areas, and I think that that's the legal proceeding.

As the Ninth Circuit pointed out in *Gonzalez*, the proceeding doesn't have to be active or present; it can be anticipation of future proceedings. And that was the legal advice that was being sought. In that sense, the joint defense is valid, and the information that --

**THE COURT:** Where does the joint defense agreement reference privilege logs?

**MR. RAMSEY:** It doesn't.

**THE COURT:** It doesn't.

**MR. RAMSEY:** It doesn't reference privilege logs, but the issue here, Your Honor, is the testimony.

**THE COURT:** It does say that both sides will try to make a claim of privilege in response to a subpoena, that's true, but the way you make a claim of privilege is through a privilege log. So where in your agreement does it say that you won't do a privilege log?

**MR. RAMSEY:** Well, it doesn't say that in the agreement, Your Honor, but this is an unusual situation because that claim of privilege relates to attorney-client privilege and work product privilege, but what we're talking about here are the protections of the Fifth Amendment.

**THE COURT:** Where does your agreement refer to the

Fifth Amendment?

**MR. RAMSEY:** It doesn't, but the --

**THE COURT:** No.

**MR. RAMSEY:** It doesn't specifically but it doesn't change the fact that, as *Gonzalez* has pointed out, that the duty of confidence extends to confidentiality, extends to the other lawyers within that joint defense agreement, and that they stand in the shoes of the client.

And Mr. Levandowski retains his Fifth Amendment privilege, and that's what's at the heart of this issue, Your Honor, and that is that there is implicit testimony that Mr. Levandowski has given to his lawyers. And I don't think there's any question that --

**THE COURT:** What is that testimony?

**MR. RAMSEY:** Well, like I pointed out initially, Your Honor, it's the implicit idea of, one, *What were the files that you gave*? and, two, *Where are they and who may have them now?*

And there's no question that -- and I don't think there's any debate or opposition to the notion that Waymo could not serve interrogatories on Mr. Levandowski at this time and ask those questions and he not have the ability to assert his Fifth Amendment privilege. So --

**THE COURT:** Possibly that's true, but no one's trying to get that information right now. We're trying to just get a

privilege log.

**MR. RAMSEY:** But I think what *Hubbell* teaches us is that there are sometimes implicit testimony that is given, both in the production of documents -- and I would also point the Court to the *Chin* case that we referenced, where the requirements of a privilege log were suspended because the information that's being conveyed and the implicit testimony is such that it implicates the Fifth Amendment.

So ordinarily if we were just talking about the attorney-client privilege or a work product doctrine assertion, we wouldn't have this issue because the actual information that was conveyed in the privilege log would not be such that it would provide a link in the chain for potentially building a criminal case.

But this is the very point of why Waymo wants this information, so that they can get a link in the chain to start down the path -- to get the beginning point of a lead that can start them down the path towards understanding where those documents are. And that's what the Fifth Amendment prevents, and that's the point of *Hubbell*, and that's the implicit testimony that Mr. Levandowski has provided to his counsel in the context of this joint defense privilege.

And when the requirements for that privilege log, which really should be the minimal necessary, but when they encroach upon the Fifth Amendment, I mean, I think that that

Fifth Amendment protection trumps.

And here there, you know, is information that we can give, in any event, to test the validity of the joint defense privilege, and the name, for example, of the third-party vendors are not necessary to do that. To the extent that the Court feels that it is, we think that that information should be properly provided in camera and the Court could observe that.

But to give that information to Waymo is to require Mr. Levandowski indirectly through his lawyers to answer the very questions that I just raised, and that is testimony. It may be tacit testimony, it may be implicit testimony, but it's still testimony. And Waymo should not be allowed to use the power of this Court to pry that information out of Mr. Levandowski either directly or indirectly through his lawyers.

**THE COURT:** All right. Let me hear from the other side.

**MS. BAILY:** Good morning, Your Honor.

**THE COURT:** Remind me your name.

**MS. BAILY:** Melissa Baily.

**THE COURT:** Baily?

**MS. BAILY:** Baily.

**THE COURT:** Thank you. Go ahead.

**MS. BAILY:** So we just heard that Mr. Levandowski is

asserting his Fifth Amendment very broadly, and that's going to have severe and significant consequences on this case; but, frankly, it's not really relevant to why we're here today because what we're here to talk about today is not Waymo trying to pry certain information from Mr. Levandowski or from his lawyers; what we're here to talk about today is Your Honor's order that defendants, Uber and Otto, provide certain documents and certain information. Uber and Otto do not have Fifth Amendment rights. They're corporations.

Mr. Levandowski, through your order and what we're talking about today, has not been asked to testify about anything. And the Fifth Amendment privilege is a personal privilege. Mr. Levandowski can assert it all he wants when he's asked to testify, but he cannot ask others to assert it for him. That is contrary to Supreme Court precedent.

So there is no Fifth Amendment that we're here to discuss today with respect to Your Honor's order related to Uber and Otto.

Now, if Uber and Otto want to assert that there's a common interest privilege with respect to Mr. Levandowski stealing documents, then they can do that in a privilege log, but they need to do it in a lot of detail; and I believe Your Honor covered that to some degree yesterday. And there is no reason that they should not be forced to provide the name of a third-party author of a document over which they are seeking

the privilege.

**THE COURT:** Well, could I ask this? It's very unclear to me whether we're talking about one document or many documents.

**MS. BAILY:** It's unclear to me, Your Honor.

**THE COURT:** Just stay right there.

**MS. BAILY:** Okay.

**THE COURT:** Mr. Gonzalez, how many documents are at issue -- in play on the privilege log that --

**MR. RAMSEY:** Your Honor, I'm sorry. I would like to object. I mean, this goes --

**THE COURT:** What's the objection?

**MR. RAMSEY:** That this would violate the Fifth Amendment privilege.

**THE COURT:** Overruled.

**MR. RAMSEY:** Well, can I just -- for the record, Your Honor, could I just --

**THE COURT:** You've made your record.

**MR. RAMSEY:** Thank you.

**THE COURT:** Mr. Gonzalez, so how many documents are we talking about? You led me to believe it was just one, the due diligence report; but on reflection, I'm not sure you actually said that. How many documents are in play?

**MR. GONZALEZ:** So, Your Honor, it depends on what the question is. I mean, we've been talking about this due

diligence report for, it seems, many multiple days.

**THE COURT:** I'll make it very clear to you, and I don't want any evasion. I gave a direct order on March 13th or 16th to produce documents, and I said what they were, what you had to produce. Now, you know what you had to produce. You want to claim privilege at least as to one, but is it more than one?

**MR. GONZALEZ:** There is a report. There are, Your Honor, many, many e-mails that talk about the general issue of the report and related issues.

**THE COURT:** How many of those would you be putting on the privilege log if you were to claim privilege? That's what I want to know.

**MR. GONZALEZ:** So we're being overinclusive, Your Honor. Right now the log, we're just about finished with it, is about 300 pages.

**THE COURT:** That would be --

**MR. GONZALEZ:** It's thousands of e-mails.

**THE COURT:** -- under this privilege thing based -- that relate to this problem; is that what you're saying?

**MR. GONZALEZ:** Yes.

**THE COURT:** You've got 300 items that are hanging fire waiting on the order that I'm going to make on this motion?

**MR. GONZALEZ:** To be clear, I believe the log at this point is 300 pages, which it's hundreds -- basically,

Your Honor, it's hundreds of e-mails, possibly thousands. I know that we were reviewing at least 7,000 e-mails, Your Honor, and we've got a log --

**THE COURT:** All right. So there's more than just one due diligence report?

**MR. GONZALEZ:** If you're asking me broadly about the privileges that are at issue, the answer is yes.

**THE COURT:** All right. I appreciate the clarification. Thank you. Please have a seat.

**MR. GONZALEZ:** You're welcome.

**THE COURT:** All right. Go ahead.

**MS. BAILY:** Well, Your Honor, with respect to all of those documents, even if we were asking that Mr. Levandowski provide information about those documents, the Fifth Amendment doesn't even apply.

We already know that the documents exist. The public knows. The government knows. We already know that the documents relate to the 14,000 documents that Mr. Levandowski --

**THE COURT:** But he hasn't admitted himself, I don't -- maybe -- I don't know if he has; I don't think he has -- he hasn't admitted himself that he has possession of 14,000 documents or that he took the 14,000 documents that you allege.

Now, you made a pretty good record that he did, but that's your side of the story. If we actually heard his side of the

story, he might say something different.

So I guess counsel's point is that it would be admitting to trade secret theft in violation of Title 18 of the United States Code possibly if he admitted to it, or maybe state law violations, a very serious proposition; therefore, he wants to invoke the Fifth Amendment.

**MS. BAILY:** Your Honor, we're not asking for his testimony right now. We're asking for the production of documents or the production of a privilege log. And what I'm saying is, even if we were asking Mr. Levandowski for the documents, we know that there's a due diligence report that exists and we know where it is.

**THE COURT:** Well, where is it? I don't know where it is.

**MS. BAILY:** Well, we know Uber has it. They're going to put it on a log.

**THE COURT:** Well, that's a fair point.

**MS. BAILY:** And if we know that it exists and we know where it is, then there is no Fifth Amendment right with respect to production. So even if we were asking Mr. Levandowski for it, he would have to provide a log. We already know about the documents and we already know where they are. It's beside the point.

It's Uber. Uber doesn't have a Fifth Amendment right, and --

**THE COURT:** What do you say -- that's true. That's true, but what do you say to the joint defense agreement argument that that extends not the privilege, not the -- that the attorney-client privilege would cover the information in that report?

**MS. BAILY:** Right. So if what you're asking me, Your Honor, is setting aside the Fifth Amendment, because it has no role here, what about the common interest privilege, then I would say with respect to the common interest privilege, currently Uber's position is that there is no common interest with respect to the 14,000 documents.

If they're going to assert that before they even acquired Otto that there was some common interest with respect to the stolen documents, then we need enough information to evaluate exactly what the common legal interest was, how these documents furthered that common interest agreement, and whether the documents were privileged to begin with, whether they were disclosed to third parties.

We're talking a lot about keeping secret the identity of a third party who had access to what is now the privilege is being claimed over. Well, that would usually be a waiver of the attorney-client privilege. So the idea that Uber is going to be able to hide that from us so that we can't test these privileges, I just don't know of any authority for it, especially when the Fifth Amendment doesn't come into play at

all.

**THE COURT:** Is there -- I'm going to ask Mr. Ramsey to answer this question too.

Is there any decision in the history of the universe that says you don't have to provide a privilege log in circumstances like ours?

**MS. BAILY:** I am not aware of one. My understanding is that this would be an unprecedented decision that explicitly contradicts settled Supreme Court law.

**THE COURT:** All right. Mr. Ramsey, what's the answer to that one question, please.

**MR. RAMSEY:** Your Honor, I think that there are two that are analogous or are best cases.

**THE COURT:** That say privilege log, please. Now, don't give me general platitudes. I want to know is there anything that takes your principles that you're relying on to the point to say you don't even have to put it on a privilege log?

**MR. RAMSEY:** Yes, Your Honor.

**THE COURT:** Okay. That's great to hear. Tell me what they are.

**MR. RAMSEY:** *SEC versus Chin*, which is a District Court of Colorado case that we cited. It's 2012 U.S. District Lexis 182252.

**THE COURT:** Okay. What was the fact pattern in that

case?

**MR. RAMSEY:** It's similar -- the difference I would point out to the Court is it's not a joint defense case. It's one directly in which a privilege log was requested from the counsel themselves. So there was a request for -- I'm sorry -- privilege -- one second. I'm just trying to pull directly up.

But there was a request for a privilege log where the assertion of sort of various categories of documents would provide information about the -- information -- it says (reading):

"Compliance with the subpoena would require the respondents to provide information apparently not known to the government and which may be incriminating."

And then it went on to talk about that being in the context of a privilege log and specifically suspended that requirement.

It says (reading):

"Consequently, under the unique circumstances of this case and given the nature of the requests contained in the subpoenas, requiring Ronald and Misty Touchard to provide a detailed privilege log of the documents claimed to be subject to the protections of the Fifth Amendment is testimonial, could be incriminating, and falls within the protection of being self-incrimination."

**THE COURT:** Hold that thought. We're going to come

back to it. I'm going to ask Ms. Baily to comment on *SEC versus Chin*.

What's your -- you said you had another decision. What's that?

**MR. RAMSEY:** That's *In Re Syncor ERISA Litigation*. That's a Central District of California case. It's 229 F.R.D. 636, 649.

**THE COURT:** And what was the fact pattern there?

**MR. RAMSEY:** Your Honor, I'm sorry. I'm blanking right at this moment, but if you give me just a moment, I can get the --

**THE COURT:** All right. I'll come back to that.

Ms. Baily, what do you say about *SEC v. Chin*?

**MS. BAILY:** Well, I have the same thing to say about both cases. I have two things to say about them. The first is that in both of those cases it was the person who was asserting the personal right not to incriminate himself who was objecting to the production of the log, so --

**THE COURT:** No, no. Mr. Ramsey said it was the attorney.

**MS. BAILY:** My understanding is that whether it was -- my understanding is that it was the, for example, the defendant who was asserting his personal privilege not to provide information in a log.

**THE COURT:** Well, who was the subpoena directed to?

**MS. BAILY:** I believe it was the defendant. I could be wrong. I would like to look again.

**MR. RAMSEY:** I believe that -- I'm sorry. I didn't mean to interrupt.

I believe she's correct. I didn't mean to suggest that it wasn't --

**THE COURT:** Well, then, how can that help you? I mean, I see that that's a good point if the subpoena was directed directly at Mr. Levandowski, but that's not our fact pattern.

**MR. RAMSEY:** But here what this is doing is -- and I'm prying out information -- well, let me point to a couple cases, and that's *Fisher* makes clear that attorneys when it comes to the Fifth Amendment stand in the shoes of their client. So prosecutors have to --

**THE COURT:** No, they didn't really say that. What it said was the client has the Fifth Amendment privilege but the lawyer is bound by the attorney-client privilege. It does not say that the lawyer stands in the shoes of the client and asserts the Fifth Amendment.

**MR. RAMSEY:** I think what it says is with respect to information that's covered by the Fifth, just because it's in the hands of the lawyer does not create an independent source. So a prosecutor cannot circumvent a client's Fifth Amendment protection simply because the information is in the hands of

their lawyer. To, you know, take that to its logical conclusion in the criminal setting, it would --

**THE COURT:** *Fisher*, I read it, does it even mention a privilege log?

**MR. RAMSEY:** *Fisher* does not mention a privilege log.

**THE COURT:** No, it doesn't.

**MR. RAMSEY:** But --

**THE COURT:** It says the documents themselves, but how are we ever going to test the existence of the privilege without a privilege log?

**MR. RAMSEY:** Well, I think here the question is whether there's an existence of a valid common interest privilege, and that's established through the face of the common interest agreement, and that's the privilege that we're talking about.

Because once that's established, to the extent that Mr. Levandowski has the right to assert the Fifth Amendment privilege over the information, he gets to do that through his lawyers. His lawyers are not situated differently to establish an independent source. That source of asking that information from his lawyers is the equivalent of asking that information from him, and that's what we have here.

**THE COURT:** You know that if we were to adopt your view, then it looks like thousands of documents would be relegated to secrecy with no way for us to -- or at least no

way for Waymo to challenge the claim of privilege.

**MR. RAMSEY:** No. I actually --

**THE COURT:** Almost anything could be swept under the rug.

**MR. RAMSEY:** No, I don't think that's correct, Your Honor.

**THE COURT:** Why isn't that correct?

**MR. RAMSEY:** Because we are asserting his Fifth Amendment privilege, and this is the distinction between the Fifth Amendment privilege and the attorney-client privilege. We are asserting his Fifth Amendment privilege with respect to 42 documents. And so --

**THE COURT:** Forty-two? That's the first time I've heard that. Where did you say that?

**MR. RAMSEY:** I did not put it in our brief. We talked about the log that was being prepared; and in terms of the log entries that relate to the due diligence report, my understanding is that's 42 documents and we've reviewed those.

**THE COURT:** Listen, I have been pulling my hair out trying to figure out what's at stake in this motion.

**MR. RAMSEY:** Forty-two documents, Your Honor.

**THE COURT:** Forty-two documents.

**MR. RAMSEY:** Forty-two line entries.

**THE COURT:** How come Mr. Gonzalez told me there were thousands?

**MR. RAMSEY:** I think there was some confusion in the way the question was phrased. The question was: How many privileges will Uber assert? Now, Uber has its own attorney-client and work product privileges that it plans to assert with respect to documents, but that's separate and apart from the Fifth Amendment invocations.

**THE COURT:** How am I supposed to know what these 42 documents are?

**MR. RAMSEY:** Well, there is some basic information that can allow you to test the Fifth -- for example, that it's a due diligence report -- but we'd invite the Court to --

**THE COURT:** Who did the due diligence report?

**MR. RAMSEY:** Well, that, Your Honor, is what we're fighting about because disclosing that information provides a link in the chain, and it's not a question about whether the information itself is somehow inculpatory. The question is whether the information could provide a prosecutor a starting point, a link in the chain, a lead. And that's what we're talking about.

They want this information because if they know who provided that -- who prepared that report, who is the author, that would tend to reveal the location. It would start to establish the link in the chain for those documents, and that is exactly what we're --

**THE COURT:** What's so wrong about that?

**MR. RAMSEY:** *Hubbell* says that that's --

**THE COURT:** It would be the third party doing all the testifying. Mr. Levandowski wouldn't have to inculpate himself.

**MR. RAMSEY:** No, it would be --

**THE COURT:** It would be somebody else that would say, "Hey, he brought 14,000 documents over here. We reviewed them. We told him they were all trade secrets."

**MR. RAMSEY:** It would be --

**THE COURT:** Something like that, that's what they're trying to get it for, and that would be a very legitimate use of the process.

**MR. RAMSEY:** It would not be legitimate, Your Honor. They're trying to build their case. It would be a third party who's been employed in the context of the joint defense agreement, and that is -- and who received the information about those documents. The implicit testimony --

**THE COURT:** I want to give you a hypothetical because you are hiding from me what the real facts are, and you want me to be in the dark. This is not a criticism of Ms. Baily because she's trying to shed light on these circumstances, but you're asking me to rule on something that is amorphous and in the dark. So I want -- I'm going to give you a hypothetical that I thought of. I'm not saying it's true. I'm saying it could be true and I don't know, and Waymo has got a right to

find out if this is true or not, in my humble opinion.

So let's say somebody steals trade secrets from their employer, not necessarily Mr. Levandowski, they go out and they go to a competitor and they say, "Let's form a competing company."

And the competitor says, "By the way, can you take with you some of the documents? It would be good to give us a head start."

So let's just say for purposes of my hypothetical that both sides have a lot of guilty knowledge, and they say, "How can we deal with this?" No problem, joint defense agreement.

Then one side says, "Well, listen, maybe we can get an opinion from somebody that these are not really trade secrets. Maybe that will help us protect us if we ever get sued. So let's give them to a third party, get a due diligence report. We'll get them to tell us that it's not a trade secret."

So they turn it over to a law firm, third-party law firm, who gives them that opinion, or maybe they turn it over to an economist firm who tells them what it's worth so they can set the price for the transaction.

Now, that entire transaction, which is hypothetical and not necessarily anything close to what's going on in our case, though it is comprehended by what you're telling me, is within the ambit of what you're telling me, and there would be thoroughly guilty people on both sides, thoroughly guilty

people on both sides who want to cloak everything and even the assertion of privilege they want to get away with not having to list it on a privilege log. You want to bless that kind of transaction, don't you?

**MR. RAMSEY:** When there's a legitimate legal purpose, which there was here in performing the due diligence.

**THE COURT:** I just have your word for it. I don't know that it was legitimate. Where did you get that idea?

**MR. RAMSEY:** Well, there's a reasonable basis for that.

**THE COURT:** No, there's not. There's nothing in the record that shows me that it was reasonable.

**MR. RAMSEY:** I also think that the Fifth Amendment protection is supposed to be interpreted broadly, and waivers of the Fifth Amendment are disfavored. And so I think in this situation there is a reasonable basis to believe that that information was shared for a legitimate legal purpose.

**THE COURT:** No, it's not. There is no such basis to infer that.

**MR. RAMSEY:** It's what's on the face of the joint defense agreement, which Waymo in their brief specifically said that there was an anticipation of various types of litigation such as this that they were preparing a defense, if necessary, to. And that's a legitimate purpose. That's not a business purpose. That's a legal purpose. And when there is a legal

purpose, a joint defense is valid.

**THE COURT:** In 42 years in practice and this job, I have seen joint defense agreements used as a cloak for wrongdoing. I have also seen them used for legitimate purposes. I don't know which one applies here. I just can't take your word because they wrote it the right way and used the right magic recitals that they have a legitimate purpose here.

**MR. RAMSEY:** And I would ask the Court to view this in camera and --

**THE COURT:** Well, give it to me right now and I'll review it while I'm on the bench. Give me the 42 documents that you want to be withheld. I'll do it right now.

**MR. RAMSEY:** I do not have the 42 documents.

**THE COURT:** See, that's just a bluff.

**MR. RAMSEY:** No, that's not a bluff, Your Honor.

**THE COURT:** It's a bluff.

**MR. RAMSEY:** It's not a bluff.

**THE COURT:** I'm going to make a ruling very quickly and you're not prepared. I will read them right now. Give them to me.

**MR. RAMSEY:** I would ask Your Honor to move slowly here. This is a constitutional protection and, quite frankly, it's -- like I said, waivers are disfavored and it's the sort of protection that could create problems down the line. A *Kastigar* hearing ultimately is what would be needed to the

extent that this information is compelled.

It is a difficult row to hoe for, you know, various sides down the line, but I would ask the Court to move slowly. And I don't have the 42 documents with me. They were not in our possession, and so I, you know, couldn't have those; but I would ask --

**THE COURT:** So you're making this offer that I review it in camera but you don't even have it in your possession, so you're not in a position to deliver on it, are you?

**MR. RAMSEY:** I am in a position to deliver on it because --

**THE COURT:** No, no. It's a delay tactic.

**MR. RAMSEY:** No, Your Honor.

**THE COURT:** Mr. Ramsey, I will do it if you give them to me. With their permission, I would review them today.

**MR. RAMSEY:** May I have just a moment, Your Honor?

**THE COURT:** Yeah. I want to make one other thing clear before you confer.

**MR. RAMSEY:** I'm sorry, Your Honor?

**THE COURT:** I want to make it clear that if I review them, I may decide that they need to see them in order to assist me in determining whether or not there should be a privilege asserted. I'm not giving you any guarantee that I would never take the next step of saying I need more information.

So I am not going to buy into the idea that I would make a decision solely on what you on an *ex parte* basis gave me, but I am willing, I am willing to at least look at *ex parte* to see what you want me to look at and then make a decision whether to require you to disclose more so that they would have a fair opportunity to make their case.

So if you want to give them to me with that caveat, I will -- and today, they have to be today because you should have come with them in your hand today if you wanted me -- I knew that was a bluff, but go ahead. You confer.

(Pause in proceedings.)

**MR. GONZALEZ:** Your Honor?

**THE COURT:** Yes.

**MR. GONZALEZ:** So I thought we were here today to argue about whether or not we have to provide a privilege log. We have a privilege log, and we don't have any objection to the Court viewing --

**THE COURT:** You're not the one making the motion. Look, we are here -- that was one of the reasons we're here, but Mr. Ramsey trying to make some record that I refused to look at the things in camera threw that out there.

I know how this works. I didn't -- I've been around, and then he would go up on appeal on an emergency motion saying I refused even to do that, and now you're trying to divert me off that.

**MR. GONZALEZ:** No, Your Honor.

**THE COURT:** Too bad. Just have a seat.

Mr. Ramsey, what is your answer?

**MR. RAMSEY:** I would suggest, Your Honor, you look at the privilege log unredacted in camera and with our suggested redactions.

**THE COURT:** No, I'm not going to do that. That will -- that won't help me much. How would that possibly help me?

**MR. RAMSEY:** Well, it actually will show you the information that we think should be redacted because it establishes the implicit testimony, which is really what's at issue here. It's the information in the privilege log that is being disclosed.

And so to the extent that we can show you the information that we think should be redacted, because our motion is to suspend the requirements of the privilege log, that is our request, and that would allow you to see the information that we are -- the actual information that we're asking to be suspended and will allow you to evaluate whether there's implicit testimony that's included with that, and at the same time it would still preserve Uber's rights to make later claims about other privileges.

But this goes to the core of what we're asking, and it's the information that the Court needs to evaluate. This is the

specific --

**THE COURT:** Would that be accompanied by a declaration from someone like Mr. Levandowski who could show that it would be incriminating in some way, or would I just have to take your word for it again?

**MR. RAMSEY:** You don't have to take my word, Your Honor. The Supreme Court in *Hubbell* has said that the location of documents -- and this is what they're trying to get at, it's the location, it's the possession of documents. The Supreme Court in *Hubbell* and *Fisher* said that that implicit testimony is what could establish a link in the chain.

And so when they're trying to find out that information about location, they don't know the location, Your Honor, that is what they are trying to find out. That is what they just said to this Court, was that they didn't know where the documents were.

So that's what we're talking about, information that would provide a link in the chain, and that's what *Hoffman* says, the information itself does not have to be inculpatory.

**THE COURT:** I'm going to come back to your in camera proposal, and I want to get Ms. Baily's view on that too.

But let me get your view on that first before I go on. I have some more questions for you.

**MS. BAILY:** Your Honor, well, especially with respect to this sort of staged, *Oh, look at the privilege log; Oh, then*

*maybe look at the documents,* I mean, this is clearly a shell game that is created for delay.

We have to move quickly. Mr. Levandowski is still at Uber and still seemingly has our documents, and so the notion that we are going to take -- you know, even my friend's original motion said, "Oh, we're going to make serial motions about these Fifth Amendment issues." Well, you know, serial motions are not going to work here while Mr. Levandowski is still running Uber's self-driving car program and still has my most confidential material.

And I hate to come back to the basics here, but we today are not talking about Mr. Levandowski offering any testimony at all. We are talking about a privilege log about documents. We know where the documents are. They're at Uber. Uber is putting them on a log. If they want to establish a common interest privilege and an attorney-client privilege, then they have to do what is required to do that, and they have to identify third parties who have had access to the documents.

We're not asking Mr. Levandowski to do it. Uber has to do it. Mr. Levandowski can't say to everyone else in the world, "Don't offer evidence that's incriminating to me." It is his personal privilege. It's just the theory that we're all sort of assuming is correct here just doesn't hold water under Supreme Court precedent.

**THE COURT:** All right. You said that earlier, so I

have that point in mind.

Did the author of the due diligence report sign the joint defense agreement or sign some other agreement?

**MR. RAMSEY:** One moment, Your Honor.

**THE COURT:** I'd like to understand that.

(Pause in proceedings.)

**MR. RAMSEY:** Yes, Your Honor, there is a signed letter.

**THE COURT:** To the joint -- no, no, no. Answer my question. Did they sign on to the joint defense agreement?

(Pause in proceedings.)

**MR. RAMSEY:** Yes, Your Honor. There's a signed letter that indicates that the documents were being provided under the joint defense agreement for review under the joint defense agreement.

**THE COURT:** All right. Now, the copy of the joint defense agreement you gave me does not show any third party signing on to it. So what you gave me is actually concealing something from me, isn't it?

**MR. RAMSEY:** Not intentionally, Your Honor.

**THE COURT:** How many other people signed letters like that?

**MR. RAMSEY:** I believe that is -- I believe that's the only one, Your Honor.

**THE COURT:** You believe or you know? Anytime a lawyer

says they believe, there's a high risk it's not true. They just don't know.

**MR. RAMSEY:** Well, it's not --

**THE COURT:** They're guessing.

**MR. RAMSEY:** But, Your Honor, it's not a high risk, or at least I'm not trying to intentionally deceive the Court.

**THE COURT:** I know you're not, but as a lawyer, you've got to tell me whether you know or not.

**MR. RAMSEY:** I don't know for absolute.

**THE COURT:** So you don't know. All right.

Was this a law firm, this third party? Was it a law firm?

**MR. RAMSEY:** It's not a law firm, Your Honor.

(Pause in proceedings.)

**THE COURT:** Did this third party provide any of that information to somebody else?

**MR. RAMSEY:** Not outside of the joint defense privilege.

**THE COURT:** Is there a sworn declaration that says that somewhere, or do I just take your word for it?

**MR. RAMSEY:** We could submit -- there's not a declaration that we have, but we can submit a declaration that it was only disclosed for that limited purpose and that there is written protocol that says that it is only being --

**THE COURT:** You see how problematic this is?

**MR. RAMSEY:** -- released for that information.

**THE COURT:** Ordinarily if there's a claim of privilege, we look to see every single person who got the information because there could easily be a waiver. It happens all the time.

You want me to assume everything went right. It could have gone haywire. There could be any number of ways in which even if your theory works, it was waived; and very likely maybe your theory doesn't even work under the joint defense agreement.

But the whole purpose of a privilege log is to test the claim of privilege, and you want me to just take your word as an honorable person -- honorable lawyer who's appeared in front of me many times and for whom I have great respect, you want me to -- you want to ride on that and me to just take your word for it in an important case like this. I can't do that. I just can't do it. It's got to be a sworn record.

**MR. RAMSEY:** Your Honor, the redacted log that we'd like you to view *ex parte* in camera --

**THE COURT:** Have you given the redacted version to them?

**MR. RAMSEY:** No, Your Honor. That's what --

**THE COURT:** You won't even give them the redacted version? That's the version you want me to let them see; right? And yet you haven't even given it to them for comment.

**MR. RAMSEY:** That's a fair point. We can give the

redacted version. We were waiting to get some guidance from I think --

**THE COURT:** No, no, no, no. You're waiting to do -- anytime a lawyer says they want guidance from the judge, they're waiting to see what they've got to tell the judge in order to get to -- in other words, they want me to make a ruling and then they'll give me whatever it is that I want.

No. You make your record -- you make your record and it's either good enough or it's not good enough.

**MR. RAMSEY:** We can provide them a redacted copy, Your Honor.

**THE COURT:** Mr. Gonzalez, I want you to come up here for a minute.

Now I'm confused. You told me there were thousands of documents that you were going to claim privilege on, but now Mr. Ramsey says there's only 42. So are you trying to do some kind of riding on the coattails of this to conceal information from the other side? What's going on here?

**MR. GONZALEZ:** Not whatsoever, Your Honor. The 42 number that you heard is the report plus exhibits to the report. My bigger number includes e-mail communications back and forth during the due diligence process, and that's why it's a substantially larger number. There's no intent to hide anything. We're preparing a very lengthy log that will have a substantial amount of detail.

**MS. BAILY:** Your Honor, I'm not sure why we didn't get any nonredacted entries in the log.

**THE COURT:** You should have. Of course, you should have. If they were going to make this argument, you should have had it before the hearing.

(Pause in proceedings.)

**THE COURT:** Ms. Baily, I cut you off several times. You go ahead and say what else you would like to say.

**MS. BAILY:** Well, Your Honor, I do just -- going back to the two District Court cases, because I do just want to finish the record on that, and I know it does go back to something that you've told me you understand, but my understanding of those two cases is, A, that it was the personal privilege that was being asserted with respect to the person -- the person who is asserting the Fifth Amendment privilege, in order to avoid providing the log, was the equivalent of Mr. Levandowski in this situation. We don't have that here.

The other thing I would just say is in both of those cases, there was a question as to whether the existence and location of the documents would otherwise be known without the log. We don't have that here. We know where the documents are and we know that they exist. Uber has them. So those are the cases.

So just coming back to Your Honor's original question, it

would still be unprecedented for Uber to be able to assert Mr. Levandowski's Fifth Amendment privilege in order to avoid providing information on a privilege log.

With respect to the information on a privilege log, we need that information for exactly the reasons Your Honor already commented on, so I'll be brief, but there's no reason why we should not be able to depose this third party to understand whether there has been a waiver. And even to take a declaration's word for it I think would be unfair here.

And the last thing I'd like to say is, we really can't move slowly here. I mean, moving slowly is what has been happening. You know, sometimes I feel like -- again, like it's a shell game because, you know, yesterday -- you know, we heard about a due diligence report yesterday, we heard about a 400-page -- 200- to 400-page privilege log, today we heard that only 42 entries are at issue but then we didn't get the rest of the entries. And, you know, we're on a fast schedule that we need because Mr. Levandowski is still at Uber and we still have not received our documents back.

So, Your Honor, unless you have other questions.

**THE COURT:** I understand that. Okay. And I'm sympathetic to that point, but yesterday I heard Mr. Gonzalez say that you've known since October about the 14,000 documents.

**MS. BAILY:** Your Honor, so my friend should re-review the preliminary injunction motion where we set out explicitly

the timeline of when the investigation started, also when we found out that the defendants had our documents, and when we found out that the defendants' technology looks like our own. That is all set out explicitly in the preliminary injunction motion.

**THE COURT:** Okay. Mr. Gonzalez, I have a -- I'm still -- see, I don't want to get myself into a mess where I -- and here's the mess: That Mr. Ramsey is going to hand up to me now maybe two documents, one redacted, one unredacted, that only refers to 42 documents. And then if you give me another one that doesn't track what he's giving me, then it's going to be confusing what I'm ruling because you're the one that's supposed to be asserting the privilege. In other words, you're the one that's supposed to be giving me the privilege log, not Mr. Ramsey. No one is subpoenaing his client. So how am I going -- have you seen his document --

**MR. GONZALEZ:** Yes.

**THE COURT:** -- he's pointing to?

**MR. GONZALEZ:** I'm familiar with the log, Your Honor.

**THE COURT:** With his version of the 42?

**MR. GONZALEZ:** Your Honor --

**THE COURT:** How am I going to tie that into your thousands of pages then?

**MR. GONZALEZ:** Transparency, I prepared that log. We prepared that log, so I'm familiar with it. The log that I'm

talking about is a separate log so that there is no confusion. That log --

**THE COURT:** How can you have one that has thousands of entries and yet they say that they're only claiming privilege over 42?

**MR. GONZALEZ:** Your Honor, I can't -- I can't tell you why they're picking the 42, but what I can tell you is that the 42 are exhibits to the report, and that's probably where their focus is. My list is a very broad list.

**THE COURT:** All right. Here's what we're going to do, unless I hear an objection. Ms. Baily, I'm going to let you object before I actually do it.

I'm going to sit right here and I'm going to let Mr. Ramsey hand up to me two documents, the redacted version and the unredacted version that refer to the 42, and he's got to give you right now the unredacted version.

And you, Mr. Gonzalez, have got to give me the privilege log that you want to use so that I can see -- because you're the one at the end of the day that's got to file the privilege log, not Mr. Ramsey.

**MR. GONZALEZ:** Understood, Your Honor.

**THE COURT:** I'll sit right here. What do you --

**MS. BAILY:** You said that I was going to get the unredacted version.

**THE COURT:** You're going to get for now the unredacted

version.

**MS. BAILY:** So we're all going to look at --

**THE COURT:** I might at the end of the day rule that you get everything --

**MS. BAILY:** Okay.

**THE COURT:** -- but I don't want Mr. Ramsey to argue on appeal that I spurned his offer.

**MR. GONZALEZ:** Your Honor, did you mean redacted, that they'll get the redacted version?

**THE COURT:** Exactly. That's what I meant, redacted.

**MS. BAILY:** That's why I was asking.

**THE COURT:** I misspoke. I misspoke. I'm sorry. I meant you get the redacted version for now.

All right. So let's sit right here. We're going to do some homework.

Do you have any objection to that, Ms. Baily?

(Pause in proceedings.)

**THE COURT:** Mr. Gonzalez, do you have any objection?

**MR. GONZALEZ:** I don't have any objection to your seeing those logs, Your Honor. The only thing I want to be careful about, and this is very important, is we're not here today -- I haven't had a chance to even brief joint interest, so we're here today to talk about this log and whether there's a Fifth Amendment concern.

**THE COURT:** Listen, if you lose -- if this is lost,

I'm going to get out an order that very quickly you're going to produce a privilege log. If you had something to tag along to this, you should have done it promptly. Too bad.

**MR. GONZALEZ:** Your Honor, I'm fine with that. I'm fine with producing the log. I just want to make clear that they keep talking about moving quickly, and we will produce the log, Your Honor. That's not an issue. I'm only pointing out that there's been a lot of discussion here about joint interest privilege, which we haven't even had a chance to brief.

**THE COURT:** Yeah, you did. There was a motion. You could have put in a brief.

**MR. GONZALEZ:** But the motion, Your Honor, is whether or not we have to produce a log that discloses the name of the consultant. That's the issue before the Court, and I just want to make it clear that that's --

**THE COURT:** I think -- no, no, no. It was a much broader motion than that. That's not what -- that was not the only item on the table, so I'm not buying in to what you're saying.

If you don't want to turn over your records, you don't have to. I'm asking -- I just do not want to be spurning an opportunity to try to help Mr. Ramsey, who is going to argue on appeal that I refused to look at his version.

**MR. GONZALEZ:** Your Honor, we have no objection.

**THE COURT:** I'm going to look at it right now.

**MR. GONZALEZ:** We have no objection.

**THE COURT:** All right.

**MS. BAILY:** Your Honor, I'm just going to state two objections only for the record. One is we object to not seeing the unredacted log; and, two, I just have to state for the record the objection that this procedure assumes that somehow the Fifth Amendment could somehow apply to something that Uber is providing. And, as you know --

**THE COURT:** I understand.

**MS. BAILY:** You understand that.

**THE COURT:** I'm not ruling against that. I tend to agree with you, but since this is an amorphous motion, I'm trying my best to get my arms around it --

**MS. BAILY:** I understand.

**THE COURT:** -- and I want to see the materials.

All right.

**MR. RAMSEY:** Your Honor, what I have is I have an unredacted log with highlights of what we propose to be redacted. I do not --

**THE COURT:** So you don't have what you told me you had?

**MR. RAMSEY:** I didn't tell you I have a redacted version. What I have --

**THE COURT:** Do you have something you can give to Ms. Baily right now?

**MR. RAMSEY:** No, Your Honor.

**THE COURT:** All right. Then your offer is rejected.

**MR. RAMSEY:** But, Your Honor, momentarily I could sit through and line through one. We just have to black it out.

What I was prepared was to give the Court the log with the highlights of our proposed redactions, and so I have no objection to getting to her forthwith, immediately sitting and doing it right away, a redacted version of this log. But what I have for the Court at this moment is a copy of the log with highlights that show our proposed redactions.

**THE COURT:** All right. What we're going to do is -- do you have another copy of that thing?

**MR. RAMSEY:** We do have a clean copy.

**MR. GONZALEZ:** I have a clean one, Your Honor.

**THE COURT:** All right. Then you will stay right here after the hearing is over, Ms. Baily will stay, you will go through and you will do the redactions that conform exactly to what you give me, and then -- and do not change it in any way. It's got to be exact, and then -- except that it will be blacked out so that she can't see the things. Then you give me -- then you leave with my deputy clerk the one copy, and I will work with that one copy.

**MR. RAMSEY:** Yes, Your Honor.

**THE COURT:** All right.

**MR. RAMSEY:** Thank you.

**THE COURT:** So you have to stay a little later till you get your version.

**MS. BAILY:** That's fine, Your Honor.

Can we have the other massive log that was due on Friday that doesn't have any redactions?

**THE COURT:** Just one second. Have you turned over any log at all?

**MR. GONZALEZ:** No, we haven't, Your Honor. The massive log was not due on Friday. Your order says to produce it promptly, and the order -- the log that was ready on Friday is the one that's being objected to; and I told them yesterday we're working on the lengthier one, which requires a review of thousands of e-mails, and we're probably 80 percent done with that.

**THE COURT:** How does the longer -- I still do not understand how the longer privilege log that has thousands of entries ties into the 42 that Mr. Ramsey wants me to look at.

**MR. GONZALEZ:** I believe this is the answer, Your Honor: The only tie-in is that the objection that's been made is that they don't want the disclosure of the consultant to be made; and so the only thing that I would have to redact from my very long log is the name of that consultant if Your Honor concludes that we should not be disclosing that.

**THE COURT:** I believe you are grossly misinformed about the purpose of today's hearing. That's not what I

understood this was about. So I hope the Court of Appeals judges will read this record to see the obfuscation that the poor judge has been subjected to on this motion.

You tell me it's only about one -- the name of one provider due diligence, and Mr. Ramsey is arguing this in an extremely broad -- much broader context, all of which is impossible for us to -- the other side in fairness to be able to respond to because they don't even have the privilege log, which is the traditional way to assert a privilege.

Mr. Ramsey, do you want to -- I'm going to -- nevertheless, I'm going to let you do what I said I would do. I want you to know there is a substantial risk that I'm going to order all of it to be produced promptly, and you better be ready to make an emergency motion to the Court of Appeals because I'm not going to stay this very long, maybe 24 hours.

So they're going to be producing a privilege log probably -- I'm talking to Uber now -- soon; and so if you want -- if I rule against you, you better be ready to go to the Court of Appeals on an emergency motion.

**MR. RAMSEY:** Yes, Your Honor, we would be requesting a stay if you decide that.

**THE COURT:** I won't stay it long. I will stay it just long enough for you to present an emergency motion to the Court of Appeals --

**MR. RAMSEY:** Yes, Your Honor.

**THE COURT:** -- if I rule against you.

All right. Are we done for today?

**MR. RAMSEY:** Your Honor, there's only one other issue. You mentioned whether there had been any distribution of the report outside the joint defense. Your Honor, we could submit a brief declaration today that there was no authorization from Mr. Levandowski to distribute this information outside of the common interest privilege.

**THE COURT:** Listen, see, once again you're fishing for what it is. You have made a record. The record is what it is. If you want to try to beef up the record and file more, I would consider possibly allowing you to do that, although it would be unfair because now it's a rolling motion where you're making it up as you go along.

So I don't know whether I would allow that or not, but it's up to you. If you want to decide to go down that path and try to supplement your record, I will consider whether or not that should be allowed.

**MR. RAMSEY:** Thank you, Your Honor.

And I would just also point to paragraph 4 of the declaration that was submitted indicating that it was prepared -- a third party prepared a due diligence report that may have referenced documents reviewed pursuant to the common interest privilege.

So with that, Your Honor, I'm prepared to start redacting.

**THE COURT:** Ms. Baily, are we done now?

**MR. VERHOEVEN:** Your Honor, this is Mr. Verhoeven. I apologize for not being here yesterday.

**THE COURT:** That's okay.

**MR. VERHOEVEN:** But I did read the transcript, and Your Honor had said that with respect to their statement, the defendant's statement or Uber's statement, that they had a good story to tell and how does that --

**THE COURT:** I'm glad you reminded me.

Mr. Gonzalez, you did tell me that. You did tell me that he has a good story to tell, but now you're saying that he won't tell it. How did you get -- how do you square those two things?

**MR. GONZALEZ:** All right, Your Honor, it's publicly available. He went to college at Berkeley. He --

**THE COURT:** That's all you were talking about?

**MR. GONZALEZ:** No, Your Honor. I just started. I just started.

**THE COURT:** He went to Berkeley? That's a good story?

**MR. GONZALEZ:** No. The good story is this, and it is a good story: He went to Berkeley, studied there also for a master's. Created a motorcycle, Your Honor, that drove itself. It was the only motorcycle in a national competition of autonomous vehicles. And you know where that motorcycle is today, Your Honor? In the Smithsonian.

After that he set up two separate companies on autonomous vehicles, and he did all of that before he ever set foot on Google grounds, before he ever set foot there.

This is not someone, in my view, since you asked me to give you my opinion, this is not someone who has to steal anything. He knows this stuff.

**THE COURT:** Well, then why did he take the 14,000 documents?

**MR. GONZALEZ:** Your Honor, that, I don't have an answer to, but I do think he's got a very good story to tell.

**THE COURT:** That's the story that the jury is going to want to know about.

**MR. GONZALEZ:** Well, Your Honor, if I have my way, he'll testify but I can't compel him.

**MR. VERHOEVEN:** Your Honor, with respect to the order, I think it was the March 16th order that compelled production of documents on the 31st of March, we've been told by counsel for Uber that they don't have any ability to review Mr. Levandowski's files.

We know that they're a signatory -- counsel for Uber was a signatory for the joint defense agreement -- or the common interest agreement they're talking about. They now say they have hundreds of items related to that on their logs, but they say they don't have any control to produce any of that.

They produced a signed employment agreement for

Mr. Levandowski last Friday when they submitted a brand new demand for arbitration. Notably Mr. Levandowski wasn't even a signatory to it.

The notion they don't have control of these documents and that's the reason they haven't even reviewed them is not credible, Your Honor. And Your Honor's order said that they were to produce not just the 14,000 documents, but documents of subsequent use of the information in those documents.

Now, Your Honor, what they're doing interpreting your order -- and I want to make this perfectly clear -- is they're not looking for the information in those 14,000 documents and whether they've been used. All they're doing is they're asking us for file names and they're running searches for exact file names. They asked us for hashtags. They're running searches of just attached hashtags.

**THE COURT:** You weren't here for the hearing when I dealt with it the best I could yesterday. Your side is getting 15 more search terms and they're going to run those search terms. I'm not going to go back and re -- you make good points, but I'm not going to go back and let you reargue. You weren't here. Your other side did a great job arguing, but it's too late. No.

**MR. VERHOEVEN:** The only point I want to make is we've made those documents available for inspection. We've made our trade secret list available confidentially to the other side.

They need to review those in order to comply with Your Honor's order to determine whether or not the information is used by them, and they have not done that.

Thank you, Your Honor.

**THE COURT:** Look, you can -- you made your point, and I'm not rejecting that latter point, but I'm not going to go back and revisit what happened yesterday.

**MR. VERHOEVEN:** Thank you, Your Honor.

**THE COURT:** All right. Mr. Ramsey, do you have something to say?

**MR. RAMSEY:** Yes, Your Honor. Just with respect to a stay, we would ask that if you do decide to rule against us, that the order be that Uber be required to turn over the privilege log with all the information except what we have proposed be redacted. And if you decide that that additional proposed redaction should be turned over, we'd ask that just with respect to those redactions, that that order be stayed.

**THE COURT:** Just a minute. I thought you were going to turn over the redacted version to Ms. Baily --

**MR. RAMSEY:** We are.

**THE COURT:** -- in a few minutes.

**MR. RAMSEY:** We are, Your Honor.

**THE COURT:** So what are you --

**MR. RAMSEY:** My point is to the redactions themselves. So just where I could say with respect to the unredacted

version, we would ask for -- we ask the Court just to have that limited order, which could be hopefully stayed longer than the 24 hours that the Court indicated.

**THE COURT:** Why? Why can't you do a brief? Why can't you get your emergency motion ready now?

**MR. RAMSEY:** Well, we can try, but I'm concerned that 24 hours may not be enough.

**THE COURT:** Well, I'll consider what you say, but the other side makes a good point; and that is, this is a fast-moving industry and I've already delayed the hearing till May 3rd. And come May 3rd, I don't want someone to be saying that *There are unresolved issues. They haven't had a chance to look at materials. They're still producing documents.*

So this is not -- earlier you were saying, yes, go slow, go slow, Fifth Amendment. Okay. Fair point.

On the other side of the ledger, though, is they have made a record. Right now the record available to the Court under oath is pretty convincing that Mr. Levandowski downloaded 14,000 documents, wiped his computer clean, transferred those documents to a thumb drive, and took the thumb drive with him when he went to start a new company. That's the record undenied.

So it's possible that tomorrow whenever the Uber opposition comes in, we will see that that's completely false, but right now it's not and that record warrants some

expedition. So I have to balance that in there too.

**MR. RAMSEY:** And I understand that, Your Honor, and I would just note that we are moving and have been moving quickly. We made our --

**THE COURT:** Yes, you did.

**MR. RAMSEY:** -- appearance in this case last week on Thursday. I think the next day, Friday, we were issued an order to turn around a brief over the weekend and then by Tuesday at noon. Just so the Court knows, you know, both my law partner and I had vacations scheduled. We worked straight through our vacations to turn around that brief by noon on Tuesday.

We then had the response yesterday at 4:00 o'clock. My law partner canceled the end part of his vacation, came back. We are here today. We were here yesterday.

So we are trying everything we can, and I know the Court's familiar with the size of our firm. We are not the size of Morrison & Foerster or Quinn Emmanuel, but --

**THE COURT:** You're both excellent lawyers, so that makes up for a lot of things.

**MR. RAMSEY:** So we have been moving --

**THE COURT:** So just get cracking is all I have to say.

**MR. RAMSEY:** Well, I would just ask the Court's consideration. We do have some other significant cases that we're working on as well.

**THE COURT:** I'll keep that in mind. I will consider that, your point.

**MR. RAMSEY:** Thank you, Your Honor.

**THE COURT:** All right. So you need to stay behind long enough to do the redacted version and to give that to Ms. Baily. And then I'm going -- I've got an 11:00 o'clock hearing. I've got to be out here at 11:00 o'clock, but I will look at the version that you leave behind with the highlighting that you want to have redacted before I'll make a decision. All right?

**MR. RAMSEY:** Thank you, Your Honor.

**THE COURT:** All right. Thank you.

**MR. GONZALEZ:** Your Honor, just one very quick thing.

**THE COURT:** Yes.

**MR. GONZALEZ:** Yesterday you had mentioned John Cooper as a potential special master. I just wanted you to know that I've conferred with my clients, and even though his firm actually represents Google, we would be fine with that.

**THE COURT:** Well, what does the other side say?

**MR. VERHOEVEN:** Your Honor, we need a little bit more time to get back to you. I just got back to town at 11:30 last night.

**THE COURT:** All right. Would you do that? I am not -- I don't have the specific assignment yet for Mr. Cooper; however, somebody like him who's got some technical abilities

and a superb lawyer I believe will in due course be of great value in this case, and I don't want there to be a snafu when the time comes, *Oh, it will take us two more weeks*. So, please, by tomorrow could you let me know?

**MR. VERHOEVEN:** Absolutely, Your Honor.

**MR. GONZALEZ:** And, Your Honor, the last thing that you had asked, we have no objection -- our client has no objection to Mr. Cooper inspecting our device if the Court would deem that appropriate.

**THE COURT:** Well, fine.

**MR. VERHOEVEN:** Your Honor, on --

**THE COURT:** Wait.

But I let your in-house lawyer see their trade secrets over their objection. They get to see your product over your objection. It works both ways. I can see a legitimate need going both ways. I'm not ruling out Mr. Cooper for that role yet, but I'm saying it may work both ways.

**MR. GONZALEZ:** Understood. Thank you, Your Honor.

**MR. VERHOEVEN:** Your Honor, really quickly, on that subject, we're going back and forth on privileges. It looks like most of the relevant production is going to be claimed as privilege here.

Your Honor, one way to help us is to order an inspection of their product so under the protective order, our technical team and our technical expert could look at it next week, cut

through all of this tape, and see what they're doing so that we can adequately prepare our reply in time and on schedule, Your Honor.

If we use -- if we have to go through the process in order to get access to it to use a third-party special master, it's going to take time for that person to get up to speed on the technology.

**THE COURT:** Well, who is the exact person that you want to inspect their LiDAR system?

**MR. VERHOEVEN:** So Mr. Kintz -- has he been cleared?

**MR. JAFFE:** Yes.

**MR. VERHOEVEN:** -- has been cleared under the protective order procedure.

**THE COURT:** And so your proposal is just he and he alone would inspect the system?

**MR. VERHOEVEN:** He and Mr. Jordan, who has technical background, Your Honor.

**THE COURT:** Just those two?

**MR. JAFFE:** I think we would prefer some of our colleagues to come with us, but a small group.

**THE COURT:** No. No.

**MR. JAFFE:** If the Court says just me and Mr. Kintz, we will do that.

**THE COURT:** What's wrong with those two?

**MR. GONZALEZ:** So, Your Honor, as I said, if you want

to appoint somebody neutral, we have no objection to that.

**THE COURT:** No. The answer is no. I'm ordering what they want. By the end of next week, your expert and you, but nobody else, gets to go inspect their LiDAR system.

Mr. Gonzalez, it's fair.

**MR. VERHOEVEN:** Thank you, Your Honor.

**THE COURT:** 14,000 documents. This is the -- they've got a right to see if your client has stolen it and using it. This record warrants that. I'm going to order it.

**MR. VERHOEVEN:** Thank you, Your Honor.

**THE COURT:** All right. Thank you.

**MR. GONZALEZ:** Thank you, Your Honor.

(Proceedings adjourned at 10:47 a.m.)

---oOo---

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Thursday, April 6, 2017

Jo Ann Bryce, CSR No. 3321, RMR, CRR, FCRR
U.S. Court Reporter

# EXHIBIT 4

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

WAYMO LLC,

Plaintiff,

v.

UBER TECHNOLOGIES, INC., *et al.*,

Defendants.
_______________________________________/

No. C 17-00939 WHA

**ORDER DENYING MOTION TO MODIFY PRIVILEGE LOG REQUIREMENTS BASED ON FIFTH AMENDMENT**

## INTRODUCTION

In this action for trade secret misappropriation, patent infringement, and unfair competition, a non-party moves to prevent defendants from providing a conventional privilege log based on Fifth Amendment and attorney-client grounds. The motion is **DENIED**.

## STATEMENT

A cornerstone of the case by Waymo LLC is its evidence that non-party Anthony Levandowski downloaded over 14,000 files containing its trade secrets and proprietary information pertaining to self-driving cars to his company-issued laptop, transferred them to a portable storage device, wiped the laptop clean, then promptly left his position at Waymo with the downloads to start his own competing autonomous-vehicle ventures, defendants Ottomotto LLC and Otto Trucking LLC. Shortly thereafter, defendant Uber Technologies, Inc., acquired the new ventures for $680 million. Uber then quickly progressed in its own development of competing self-driving vehicles. This, Waymo contends, is how Uber accomplished in only nine months what it took Waymo seven years to do.

Waymo has moved for provisional relief against defendants. A hearing on that motion remains scheduled for May 3. On March 16, after a case management conference, an order approved a plan for expedited discovery (Dkt. No. 61). That order required, among other things, that defendants produce by March 31 "all files and documents downloaded by Anthony Levandowski . . . before leaving plaintiff's payroll and thereafter taken by [him]," and "the card reader, thumb drive, or other media used for the downloads, as well as all subsequent emails, memoranda, PowerPoints, text messages, or notes that have forwarded, used, or referred to any part of said downloaded material" (*id.* at ¶ 4).

On March 28, defendants requested a non-public conference to address a "confidential matter . . . to protect legitimate privacy concerns" (Dkt. No. 122 at 2). Defendants did not disclose the subject of the requested conference in advance to either Waymo or the Court. Nevertheless, the Court convened the conference provisionally under seal with the caveat that the transcript might be made public afterwards. Counsel for both sides appeared but new, separate counsel appeared for non-party Levandowski. (The transcript from the conference became public soon thereafter.)

During the conference, defense counsel indicated that, in the process of acquiring Levandowski's companies, Uber obtained a "due diligence" report prepared by a "third party" that may have referenced allegedly downloaded documents. To facilitate access to information held by Levandowski, both sides of the transaction and, this order assumes for the sake of argument, the third party entered into a joint defense agreement, in an effort to cloak the due diligence review by the third party under a claim of privilege. Evidently, some or all of the 14,000-plus files downloaded from Waymo were then disclosed to the third party or to Uber, although that is an interpretation of the circumstances and not a direct admission.

At the conference, counsel for defendants further indicated that they intended to put that report on a privilege log. Pursuant to a standing order, privilege logs must identify, with respect to each communication for which a claim of privilege is made (Judge Alsup's Supplemental Order to Order Setting Initial CMC in Civil Cases (effective Mar. 17, 2016), http://www.cand.uscourts.gov/whaorders):

United States District Court
For the Northern District of California

(a) all persons making or receiving the privileged or protected communication;

(b) the steps taken to ensure the confidentiality of the communication, including affirmation that no unauthorized persons have received the communication;

(c) the date of the communication; and

(d) the subject matter of the communication.

Additionally, privilege logs must be sufficiently detailed and informative to justify the claimed privilege(s), and indicate the locations where any purportedly privileged documents were found.

Counsel for Levandowski, however, took the position that disclosing even the identity of the third party who had prepared the due diligence report on a privilege log would compromise Levandowski's Fifth Amendment privilege against self-incrimination. Counsel for Levandowski therefore requested that defense counsel be prohibited from making any such disclosure. The undersigned judge declined to grant the requested relief during the conference and indicated that Levandowski's Fifth Amendment argument should be made via formal motion, if at all.

Consequently, Levandowski now makes the instant motion based on claims of Fifth Amendment privilege and attorney-client privilege (Dkt. No. 147). The motion record is thin but includes a joint defense, common interest and confidentiality agreement ("joint defense agreement"), dated in April 2016, between the two sides in Uber's acquisition of Levandowski's companies (Dkt. No. 147-1). The joint defense agreement referred to "potential investigations, litigation, and/or other proceedings relating to the proposed transactions." The "litigation" or "other proceedings" under contemplation went unidentified. The agreement stated that the parties had a "common interest in opposing" such proceedings. It recited that the parties had already shared with each other "confidential and proprietary documents containing financial, operating and planning data." The agreement continued with classification provisions to maintain secrecy. It made no mention, however, of the Fifth Amendment or of how to deal with privilege logs.

United States District Court
For the Northern District of California

Waymo opposes the motion. Defendants — despite defense counsel's insistence that he "would love to put Mr. Levandowski on the stand" and asides that Levandowski's silence has had an "adverse impact" on defendants (*e.g.*, Dkt. No. 131 at 16:3–16:11) — do not oppose Levandowski's motion. This order follows briefing and oral argument.

**ANALYSIS**

It took considerable effort to pin down the actual relief sought by this motion. The moving papers conveyed mixed messages. The notice of motion stated that the motion sought to prohibit Uber "from disclosing *any* information provided by Levandowski in the course of the [joint defense agreement], and specifically . . . information concerning the due diligence review conducted by a third party under that agreement, *including but not limited to* the identity of the third party who conducted any such due diligence review, whether Mr. Levandowski possessed any documents that were reviewed by the third party, and the identity of any of Mr. Levandowski's possessions that may have been reviewed" (Dkt. No. 147 (emphasis added)).

The memorandum of points and authorities, however, requested only "a modification of the Court's standing privilege log requirement" on the basis that it "would improperly compel Uber to disclose information protected by a common interest privilege and thereby undermine Mr. Levandowski's Fifth Amendment right against compelled production as recognized by the Supreme Court in *United States v. Hubbell*, 530 U.S. 27 (2000), and *Fisher v. United States*, 425 U.S. 391 (1976)" (*id.* at 1). Specifically (*id.* at 2):

> Mr. Levandowski asks that Uber's counsel . . . be relieved of any obligation to provide detail concerning (1) the identity of the third-party who conducted any such due diligence review, (2) whether Mr. Levandowski possessed any documents that were reviewed by the third party, or (3) the identity of any of Mr. Levandowski's possessions that may have been reviewed.
>
> This is necessary for two reasons. First, ordering public disclosure of these facts on the privilege log would impair Mr. Levandowski's attorney-client privilege because it would compel disclosures of confidences shared by Mr. Levandowski with his own counsel that were later communicated with other counsel as part of an enforceable joint defense and common interest privilege agreement. Second, requiring disclosure of these facts would separately violate Mr. Levandowski's Fifth Amendment right.

Thus, from the papers, the scope of this motion remained unclear because the usual information accompanying a claim of privilege (namely, the particulars traditionally disclosed on a privilege log) turned out to be what Levandowski seeks to conceal. We were, as a result, uninformed as to who prepared the due diligence report and why; what it referenced; the extent, if any, to which the author(s) of the due diligence report reviewed any or all of the downloads; to whom the report was disclosed; and for what purpose each recipient used it.

At the hearing, the judge raised these questions and counsel for Levandowski finally turned over for in camera review a proposed privilege log containing 42 specific line items that Levandowski would partially redact. All 42 items concern the due diligence report (which report was not supplied, even for in camera review). The proposed redactions would conceal the identity of the third party that prepared the report, as well as descriptions of items reviewed during its preparation. Even in its unredacted form some questions would remain (such as why the report was prepared, whether it referenced any of the downloaded files, and for what purpose each recipient used it). Counsel for Waymo then received a redacted version of the log and, as expected, objected to the redactions.

* * *

Turning to the merits, a very practical point deserves emphasis up front. The purpose of a privilege log in our federal system is to list the materials withheld under any claim of privilege and to specify certain time-honored particulars as to each item withheld. This is the first step in the process of adjudicating a claim of privilege. The second step is to determine whether the privilege actually applies and has not been waived. The system would become compromised and much abused if a party could simply omit privilege log disclosures when informed that the information disclosed might incriminate a wrongdoer.

The joint defense agreement in question provided that the parties would claim the privileges recognized by the agreement but surely contemplated that they would do so in the customary way — via a privilege log. Again, nothing in the agreement purported to muzzle the parties when it came to supplying a privilege log in order to claim a privilege (not to mention that any such provision might well be void as against public policy as an obstruction of justice).

Nothing in the agreement called out a privilege against self-incrimination or referred to the Fifth Amendment, much less purported to obligate a party to avoid incriminating the other party.

Nevertheless, Levandowski's motion insists that attorneys for Uber, a signatory to the joint defense agreement, became his personal lawyers, and that the Fifth Amendment somehow prohibits them from revealing any information, even on a privilege log, that would help a prosecutor connect the dots to him.

Much of Levandowski's memorandum stresses uncontroversial premises. *First*, the Fifth Amendment privilege against self-incrimination can be asserted in a civil proceeding when "the person invoking the privilege reasonably believes that his disclosures could be used in a criminal prosecution, or could lead to other evidence that could be used in that manner." *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1263 (9th Cir. 2000). *Second*, an individual may invoke the Fifth Amendment to avoid producing documents on the basis that the act of production "may have a compelled testimonial aspect" as to that individual. *United States v. Hubbell*, 530 U.S. 27, 36 (2000); *Fisher v. United States*, 425 U.S. 391, 410 (1976). *Third*, the attorney-client privilege protects "[c]onfidential disclosures by a client to an attorney made in order to obtain legal assistance," so as to "encourage clients to make full disclosure to their attorneys." *Fisher*, 425 U.S. at 403. *Fourth*, the joint-defense privilege or "common interest" privilege can extend the attorney-client privilege such that it "protects not only the confidentiality of communications passing from a party to his or her attorney but also 'from one party to the attorney for another party where a joint defense effort or strategy has been decided upon and undertaken by the parties and their respective counsel.'" *United States v. Gonzalez*, 669 F.3d 974, 978 (9th Cir. 2012) (quoting *United States v. Austin*, 416 F.3d 1016, 1021 (9th Cir. 2005), and *United States v. Henke*, 222 F.3d 633, 637 (9th Cir. 2000)).

It does not follow from the foregoing premises, however, that compelling *Uber* to complete a conventional privilege log would violate *Levandowski's* Fifth Amendment privilege. Contrary to Levandowski's position, neither *Hubbell* nor *Fisher* so held, and *Fisher* expressly rejected the theory.

In *Hubbell*, the Supreme Court held in relevant part that, for Fifth Amendment purposes, "the act of producing documents in response to a subpoena may have a compelled testimonial aspect," since "'the act of production' itself may implicitly communicate 'statements of fact,'" including admissions regarding the existence, possession or control, or authenticity of documents. 530 U.S. at 36. As stated, this is an uncontroversial premise here.

In *Fisher*, taxpayers under investigation by the Internal Revenue Service transferred documents to their attorneys retained for the investigation. The IRS sought to compel the attorneys to produce those documents, and the attorneys refused based on, among other things, their clients' Fifth Amendment privilege and the attorney-client privilege. *Fisher*, 425 U.S. at 393–95. *Significantly, the Supreme Court held that "compelled production of documents from an attorney does not implicate whatever Fifth Amendment privilege the taxpayer might have enjoyed from being compelled to produce them himself." Id.* at 402 (emphasis added). The documents in question could be subpoenaed from the attorneys "without compulsion on the *taxpayer*. The protection of the Fifth Amendment [was] therefore not available." *Id.* at 398–99 (emphasis added). In other words, "The taxpayer's privilege under this Amendment [was] *not violated* . . . because enforcement against a taxpayer's lawyer would not 'compel' the taxpayer to do anything and certainly would not compel him to be a 'witness' against himself." *Id.* at 397 (emphasis added). In fact, *Fisher* vindicated two district court decisions permitting the government to compel attorneys to produce their clients' documents, notwithstanding the latter's protests on Fifth Amendment grounds.[*]

Counsel for Levandowski quote *Fisher* for the proposition that, "papers, if unobtainable by summons from the client, are unobtainable by summons directed to the attorney by reason of the attorney-client privilege." *Id.* at 405. Thus, "when the client himself would be privileged

[*] This order recognizes that in *United States v. Sideman & Bancroft, LLP* (a decision neither side mentioned), our court of appeals stated that, under *Fisher*, "[an attorney] does not have to produce [documents] if doing so violates [a client's] Fifth Amendment rights." 704 F.3d 1197, 1201–02 (9th Cir. 2013). While this language superficially appears to support Levandowski's position here, the Supreme Court in *Fisher* expressly held that a client's "Fifth Amendment privilege is . . . *not violated by* enforcement of [document] summonses directed toward their attorneys." *Fisher*, 425 U.S. at 397. Our court of appeals has recognized as much. *Beckler v. Superior Court, Los Angeles Cty.*, 568 F.2d 661, 662 (9th Cir. 1978) (quoting the aforementioned holding as the "clear[] announce[ment]" of the Supreme Court). This order follows *Fisher*'s express holding.

from production of [a] document . . . the attorney having possession of the document is not bound to produce." *Id.* at 404. Even though *Fisher* clearly explained that the attorneys were immunized by reason of the *attorney-client* privilege, Levandowski misconstrues the foregoing snippets from *Fisher* as holding that "the lawyer stands in the shoes of his client when it comes to invoking the Fifth Amendment privilege" (*e.g.*, Dkt. No. 147 at 7–8).

This misinterpretation of *Fisher* erroneously conflates the Fifth Amendment and attorney-client privileges. To repeat, "it is not the [client's] Fifth Amendment privilege that would excuse the Attorney from production." *Fisher*, 425 U.S. at 396. Although *Fisher* referenced the Fifth Amendment privilege to determine the extent of the attorney-client privilege under certain circumstances, it did not lend "Constitutional dimensions" to the latter. *Beckler*, 568 F.2d at 662 & n.2. Rather, it was the policy concern underlying the *attorney-client* privilege that drove the holding in *Fisher*. Specifically, a client with documents privileged against production by the Fifth Amendment "will then be reluctant to transfer possession to the lawyer unless the documents are also privileged in the latter's hands." *Fisher*, 425 U.S. at 403–04. Thus, the *attorney-client* privilege immunizes a lawyer against compelled production if two requirements are met. *First*, the *client* must be privileged against production of the document in question, "either as a party at common law" or under the Fifth Amendment. *Second*, the client must have transferred the document in question to the attorney "for the purpose of obtaining legal advice." *Id.* at 404–05.

Importantly, despite acknowledging that an act of production has "communicative aspects" like tacit concession of a document's existence or location (a point counsel for Levandowski repeatedly emphasize here), *Fisher* never suggested that conventional privilege log requirements could be avoided on that basis. Our court of appeals, moreover, has acknowledged that claims of privilege against the production of particular documents — even under the Fifth Amendment — may require "targeted support" precisely like a privilege log or submission of the documents for in camera review. *United States v. Bright*, 596 F.3d 683, 691–92 (9th Cir. 2010). In short, Levandowski's suggestion that mere invocation of the Fifth Amendment can automatically supplant privilege log requirements is baseless.

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

Levandowski's motion cites three non-binding decisions for the proposition that "the requirement of a detailed privileged log must yield to the constitutional right to be free from forced self-incrimination" (Dkt. No. 147 at 2–3, 12). All three decisions, however, are distinguishable from our case because they relieved only *individuals* asserting their Fifth Amendment privilege from the requirement of a detailed privilege log under the specific circumstances of their respective cases. *See United States SEC v. Chin*, No. 12-cv-01336-PAB-BNB, 2012 U.S. Dist. LEXIS 182252, at *26 (D. Colo. Nov. 29, 2012) (Judge Boyd Boland); *In re Syncor ERISA Litig.*, 229 F.R.D. 636, 649 (C.D. Cal. 2005) (Judge Rosalyn Chapman); *In re Fustolo*, No. 13–12692–JNF, 2015 WL 9595421, at *5 (Bankr. D. Mass. Dec. 31, 2015) (Judge Joan Feeney). None support Levandowski's position that requiring others with whom he did business, even if under a joint defense agreement, to supply typical privilege log information would be tantamount to compelling Levandowski to self-incriminate. Under the facts of *our* case, as stated, no binding authority supports Levandowski's suggestion that his Fifth Amendment privilege necessarily supersedes typical privilege log requirements.

Levandowski's arguments seem to suggest that, even though *Fisher* did not consider privilege logs, its holding should apply here because the privilege log disclosures at issue are "testimonial" in the same sense that actually producing the due diligence report would be. As the party asserting the attorney-client privilege, Levandowski "has the burden of establishing the relationship and privileged nature of the communication." *United States v. Richey*, 632 F.3d 559, 566 (9th Cir. 2011). He has not carried that burden here.

*First*, the identity of the third party that prepared the report is a *fact* known to Uber, not a communication between Levandowski and his attorney, much less a communication made for the purpose of obtaining legal advice. As such, it cannot be concealed by any attorney-client privilege, including under *Fisher*. *See Fisher*, 425 U.S. at 403 (the attorney-client privilege "protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege"); *Upjohn Co. v. United States*, 449 U.S. 383, 395–96 (1981) ("The [attorney-client] privilege only protects disclosure of communications; it does not protect

disclosure of the underlying facts by those who communicated with the attorney."); *Richey*, 632 F.3d at 566 ("The attorney-client privilege protects confidential communications between attorneys and clients, which are made for the purpose of giving legal advice.").

*Second*, the motion record fails to show that Levandowski communicated to his attorney in confidence, and for the purpose of obtaining legal advice, either (1) whether the third party reviewed documents in Levandowski's possession, or (2) the identity of any other items in Levandowski's possession reviewed by the third party. *Syncor*, a decision cited by Levandowski, actually illustrates the error of his suggestion that the aforementioned information falls within the ambit of the attorney-client privilege. In *Syncor*, a defendant attempted to claim attorney-client and joint-defense privileges over documents prepared during due diligence "solely for the business purpose of a potential merger." Judge Rosalyn Chapman rejected the claim, concluding that such documents "cannot fall within the ambit of the attorney-client privilege, which protects only communications between a lawyer and client." *Syncor*, 229 F.R.D. at 644–45 (quotation omitted). So too here.

On appeal, Levandowski may argue that he transferred incriminating documents via his attorney to the third party, not for the preparation of any ordinary due diligence report, but specifically so that counsel for Uber could evaluate the extent to which Levandowski would arrive with attendant liabilities. Thus, Levandowski may contend, both the transfer and the report itself were "for the purpose of obtaining legal advice." Although that proposition was not advanced here in the district court, given our expedited schedule, this order anticipates the possibility and explains why it, too, would fail. As stated, its factual predicates are not proven up with a sworn record. For example, nothing under oath provides any specific information as to the purpose or subject of the due diligence report (other than, of course, the mere fact that it is described as a "due diligence report"). This alone should be dispositive. Moreover, under the umbrella of this argument, a litigant could abuse the attorney-client privilege to conceal wrongdoing (like the theft and sale of trade secrets) so long as they cleverly passed it on as part of "due diligence." No binding authority supports such an extraordinary result.

Case: 17-1904 Document: 2 Page: 180 Filed: 04/13/2017

*Third*, even if the specific information Levandowski seeks to redact could be construed as confidential attorney-client communications, it is not testimonial within the meaning of the Fifth Amendment. *See Fisher*, 425 U.S. at 410 (whether "tacit averments . . . are both 'testimonial' and 'incriminating' for purposes of applying the Fifth Amendment . . . depend[s] on the facts and circumstances of particular cases"). As stated, this Court reviewed the requested redactions in camera and concluded that none of the information at issue constitutes self-incriminating testimony, implicit or otherwise, from *Levandowski*. To the extent that the information is arguably testimonial, it is clear that *Uber*, not Levandowski, would be the one testifying on the privilege log in question.

*Fourth*, the policy considerations underlying *Fisher* counsel against application of the attorney-client privilege here. As stated, the record does not show that Levandowski communicated the privilege log information at issue in confidence to his attorney for the purpose of obtaining legal advice. Indeed, if Levandowski transferred any incriminating documents to the third party, it would seem he did so for the purpose of selling his ventures to Uber for $680 million. In contrast, *Fisher* involved individuals who transferred documents to their personal attorneys for legal advice in connection with IRS investigations. It did not involve a joint defense agreement. Not did it involve presenting documents to a non-lawyer. Nor did it involve presenting documents to a consultant for due diligence by the other side in an acquisition. *Fisher* is very far removed from the circumstances of our case, which simply do not involve the kind of client-attorney communications that *Fisher* intended to protect. Levandowski has thus failed to justify his requests to withhold privilege log information under *Fisher*. *See id.* at 403 ("[S]ince the [attorney-client] privilege has the effect of withholding relevant information from the fact-finder, it applies only where necessary to achieve its purpose. Accordingly it protects only those disclosures necessary to obtain informed legal advice which might not have been made absent the privilege.").

Levandowski's motion cites the California Rules of Professional Conduct and our Civil Local Rules for the general proposition that attorneys are ethically required to avoid disclosing a client's "confidences" or "secrets" — "unless an appropriate court order is obtained by the

requesting party" (Dkt. No. 147 at 8–9). The suggestion that the privilege log at issue here would violate defense counsel's ethical obligation to protect Levandowski's "confidences" or "secrets" is a non-starter because the expedited discovery order dated March 16 is an "appropriate court order" that, according to Levandowski's own argument, supersedes generic countervailing ethical obligations.

In summary, Levandowski has not carried his burden to show that any privilege justifies his requested relief. Any remaining argument based on the joint defense agreement also fails because the joint-defense privilege "presupposes the existence of an otherwise valid underlying privilege, such as the attorney-client privilege, which has not been shown to be present." *See Syncor*, 229 F.R.D. at 645 (citing *Henke*, 222 F.3d at 637).

At risk of repetition, the very purpose of a privilege log is to allow a fair way to test a claim of privilege. That traditional privilege log requirements should be verboten merely because they might connect the dots back to a non-party in a possible criminal investigation is a sweeping proposition under which all manner of mischief could be concealed.

We are still at the privilege log stage. There will be time enough to argue soon over whether the due diligence report itself must be produced, but for now that report must be put on a privilege log in the conventional way — without any of the redactions requested by counsel for Levandowski.

## CONCLUSION

For the foregoing reasons, Levandowski's motion is **DENIED**.

1. By **11:00 P.M. TODAY**, defendants shall serve a privilege log complete as to all items unaffected by this motion.

2. By **APRIL 13 AT 5:00 P.M.**, defendants shall serve a privilege log complete as to all items affected by this motion unless the court of appeals extends the deadline.

3. Since it appears that the due diligence report is the main item at issue, the following procedure will be used to move the process along. By **APRIL 14 AT NOON**, plaintiff shall move, if it wishes to do so at all, to compel production of the report. Defendants and Levandowski shall have until **APRIL 21 AT NOON** to oppose, shall submit a proper sworn record

United States District Court
For the Northern District of California

as to all necessary predicates, and shall submit the full report (with attachments) for in camera review. Plaintiff may reply by **APRIL 25 AT NOON**. The briefs should address the possibility that discovery into the predicates for any privilege may be allowed.

Should counsel file any petition for a writ in the court of appeals, please take into account that this civil action includes claims for patent infringement.

The proposed privilege log with requested redactions submitted for in camera review shall remain under seal for the court of appeals. This order addresses only the Fifth Amendment argument and is without prejudice to any argument that the privilege log is otherwise incomplete.

**IT IS SO ORDERED.**

Dated: April 10, 2017.

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE

# EXHIBIT 5

MILES EHRLICH (Bar No. 237954)
miles@ramsey-ehrlich.com
ISMAIL RAMSEY (Bar No. 189820)
izzy@ramsey-ehrlich.com
AMY CRAIG (Bar No. 269339)
amy@ramsey-ehrlich.com
RAMSEY & EHRLICH LLP
803 Hearst Avenue
Berkeley, CA 94710
(510) 548-3600 (Tel)
(510) 291-3060 (Fax)

Attorneys for Non-Party Anthony Levandowski

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| WAYMO LLC,<br><br>Plaintiff,<br><br>v.<br><br>UBER TECHNOLOGIES, INC., *et al.*,<br><br>Defendants. | Case No.: 3:17-cv-00939-WHA<br><br>**ANTHONY LEVANDOWSKI'S NOTICE OF APPEAL** |

Notice is hereby given that Anthony Levandowski, intervenor in the above-captioned case, appeals to the United States Court of Appeals for the Federal Circuit from the district court's order denying Mr. Levandowski's motion to modify the court's expedited discovery order entered in this action on April 10, 2017. (Dkt. No. 202).

Date: April 11, 2017

Respectfully submitted,

*/s/ Ismail Ramsey*

Miles Ehrlich
Ismail Ramsey
Amy Craig
Ramsey & Ehrlich LLP
803 Hearst Avenue
Berkeley, CA 94710
Tel: (510) 548-3600
Fax: (510) 291-3060

miles@ramsey-ehrlich.com
izzy@ramsey-ehrlich.com
amy@ramsey-ehrlich.com

***Counsel for Intervenor Anthony Levandowski***